FILED
2/24/2023 6:29 PM
Kelly Ashmore
District Clerk
Grayson County

CV-23-0255
**CAUSE NO. _____**



| | | |
|---|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE REGISTERED HOLDERS OF CSAIL 2018-CX11 COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2018-CX11, | § § § § § § § § § | IN THE DISTRICT COURT |
| *PLAINTIFF,* | § § | |
| v. | § § | |
| APEX SOUTH GATE LLC, | § § | GRAYSON COUNTY, TEXAS |
| *DEFENDANT.* | § § | \_\_\_\_ JUDICIAL DISTRICT |

Grayson County - 15th District Court

**PLAINTIFF'S VERIFIED ORIGINAL PETITION, APPLICATION FOR APPOINTMENT OF TEMPORARY RECEIVER, AND REQUEST FOR EMERGENCY CONSIDERATION**

Plaintiff Wells Fargo Bank, National Association, as Trustee, on behalf of the Registered

Holders of CSAIL 2018-CX11 Commercial Mortgage Trust, Commercial Mortgage Pass-Through

Certificates, Series 2018-CX11 ("**Lender**"), acting by and through Special Servicer, files this

Verified Original Petition, Application for Appointment of Temporary Receiver, and Request for

Emergency Consideration, and shows as follows:[1]

**I.**
**NATURE OF THE ACTION**

1.      Lender seeks the *__emergency__* appointment of a receiver to temporarily take

possession of and operate the following three apartment complexes:  (i) Terrace Apartments, 1920

West Shields Street, Sherman, Texas 75092; (ii) Southgate Apartments, 915 South Travis Street,

Sherman, Texas 75090; and (iii) Westwood Gardens Apartments, 221 Archer Circle, Sherman

---

[1]      Capitalized terms not immediately defined are defined below.

**PLAINTIFF'S VERIFIED ORIGINAL PETITION, APPLICATION FOR APPOINTMENT OF TEMPORARY RECEIVER, AND REQUEST FOR EMERGENCY CONSIDERATION – PAGE 1**

Texas 75092 (collectively, and as further described in the applicable Deed of Trust, the "**Property**"). The Property secures repayment to Lender of a multi-million dollar commercial loan, which was assumed by Defendant Apex South Gate LLC ("**Borrower**").

      2.     ***This is an emergency because Lender has just learned that Borrower's neglect and waste of the Property has caused the City of Sherman to seek permission to exercise its police power and immediately demolish all structural improvements associated with a substantial portion of the Property, which is Lender's only collateral. Lender is a REMIC Trust that has a fiduciary obligation to protect the collateral on behalf of its investors. Lender's REMIC status means that it is very unlikely to be permitted to rebuild demolished property. But Lender's REMIC status also means that it is well funded and duty bound to institute this emergency request for a receiver, which is the only remedy that balances the equities of all affected parties because it does all of the following: (i) immediately removes Borrower from control; (ii) allows Lender to secure the Property by making protective advances without becoming exposed to mortgagee-in-possession liability issues; (iii) allows the City to recoup costs that it has already spent on the Property; and (iv) allows the City and Lender to work together to efficiently maximize the value of the Property.***

      3.     The Court should immediately appoint a receiver for the Property because Borrower's repeated and continuous defaults subject the Property to imminent and irreparable harm. As an initial matter, Borrower is financially incapable of operating the Property and paying related obligations as they become due. Borrower has not made a single payment on the loan since October 2022. And, due to its failure to pay contractors, utility companies, and other vendors, Borrower has permitted liens, totaling over $280,000, to be filed against the Property.

4.    Additionally, Borrower has committed serious waste and serial acts of mismanagement at the Property.  For example, the following is a picture of the portion of the Property known as the Southgate Apartments:



5.    This picture is one of many that Lender has recently received.  The following are pictures of other local properties that Borrower's affiliates operate, which illustrate Borrower and its affiliates' pattern and practice of waste and mismanagement:

 

**PLAINTIFF'S VERIFIED ORIGINAL PETITION, APPLICATION FOR APPOINTMENT OF TEMPORARY RECEIVER, AND REQUEST FOR EMERGENCY CONSIDERATION – PAGE 3**

 

 

 

6. Although it is required to keep Lender appraised of all issues impacting the Property, Borrower actively concealed the dire state of the Property from Lender. Less than a month ago, Lender discovered the numerous liens pending against the Property on its own in connection with a title update. Because the title update revealed a *lis pendens* pertaining to the City of Sherman's emergency nuisance and abatement proceeding, Lender immediately scheduled a meeting with the City of Sherman to discuss a plan to utilize a receiver to immediately remove Borrower from the Property and permit Lender to make protective advances to secure the Property, which is its primary collateral. Lender met with the City of Sherman on February 20, 2023. And, at that meeting, the City of Sherman provided additional information regarding Borrower's waste and mismanagement of the Property:

- Without obtaining Lender's approval pursuant to the Loan Documents, Borrower caused all tenants to vacate the Southgate Apartments.

- Without obtaining Lender's approval pursuant to the Loan Documents, Borrower abandoned the Southgate Apartments without properly securing them.

- Borrower's abandonment of the Southgate Apartments, which are located adjacent to a school, caused over twenty calls to the police and other first responders regarding crime, vagrants, fire, and the like. To be sure, one of the four structural improvements associated with the Southgate Apartments has partially collapsed due to among other things, fire and lack of essential maintenance.

- The safety issues posed by Borrower's conduct, in turn, have caused the City of Sherman to spend valuable resources in connection with erecting a safety fence and instituting an emergency nuisance and abatement proceeding seeking permission to exercise its police power and immediately demolish all structural improvements associated with the Southgate Apartments.[2]

---

[2] The City of Denison has also provided information to Lender about properties that Borrower's affiliates own there. Liens totaling almost $1,000,000 have been filed against the properties that Lender is aware of. And those properties, apparently have all of the following issues:

- Multiple windows and door frames are not weather tight.

- Multiple areas of exterior surfaces have flaking or chipping paint.

- Roofs are in serious states of disrepair.

- There is accumulation of animal waste inside and outside of units.

- There are multiple holes in the walls, floors, and ceilings of units.

PLAINTIFF'S VERIFIED ORIGINAL PETITION, APPLICATION FOR APPOINTMENT OF TEMPORARY RECEIVER, AND REQUEST FOR EMERGENCY CONSIDERATION – PAGE 5

7.    The City of Sherman is understandably concerned about both the Property and Borrower.  The Lender shares the City's concerns, is unable to foreclose due to the potential liability associated with the Property due to Borrower's conduct, and must find a path forward that fulfils the duty it owes to its investors to attempt to maximize the value of its secured collateral, namely the Property.  The only viable path forward is immediate appointment of a receiver.

8.    On the one hand, appointment of a receiver will (i) immediately remove Borrower from control; (ii) allow Lender to secure the Property by making protective advances without becoming exposed to mortgagee-in-possession liability issues; (iii) allow the City to recoup costs that it has already spent on the Property; (iv) prevent the City and Lender from incurring the significant expense and time associated with future litigation; and (v) allow the City and Lender to work together to efficiently maximize the value of the Property.  On the other hand, failure to appoint an agreed receiver will cause all parties to incur significant expenses associated with

---

- There are many leaking fixtures and other water intrusion issues.
- There are unsecured entry doors.
- There is visible pest/vermin infestation.
- Smoke detectors are missing.
- Light switch covers are missing and live wiring is exposed.
- Numerous windows are broken.
- Mold growth has accumulated.
- There is deteriorated weather proofing on staircases, walkways, and railings.
- Fire extinguishers are not present.
- Sprinkler systems are not operable.
- The HVAC system is in a serious state of disrepair.
- Human waste is present in some of the units.
- There is a sewer leak in the mailbox area.
- There is exposed wiring between buildings two and three.
- Borrower has not caused the fire alarm to be inspected since January 2020.

Receivership applications regarding other properties owned by Borrower's affiliates will be filed in short order.

immediate litigation regarding both this receivership application and the City's emergency nuisance and abatement proceeding, which is currently scheduled for hearing on March 6, 2023.

9.     Finally, the Court should appoint a temporary receiver for the Property because Borrower expressly agreed in the Loan Documents that a receiver should be appointed. Consequently, the Court should appoint a temporary receiver to stabilize and protect the Property pending a future sale or other disposition of the Property.

## II.
## DISCOVERY LEVEL

10.     Lender intends to conduct discovery under Texas Rule of Civil Procedure 190.3 (Level 2).

## III.
## PARTIES AND SERVICE

11.     Lender is a trustee on behalf of a trust that has elected REMIC tax classification. For purposes of the action(s) described herein, Lender is acting by and through Special Servicer.[3] Lender may be served with any notice or pleadings in this action through its undersigned attorneys of record.

12.     Borrower, again Defendant Apex South Gate LLC, is a Delaware limited liability company that may be served with process through its registered agent, VCorp Services, LLC, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

---

[3]     "Special Servicer" means Argentic Services Company LP, a Delaware limited partnership, not individually but solely in its authorized capacity as special servicer pursuant to that certain Pooling and Servicing Agreement, dated April 1, 2018.

## IV.
## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this matter because it involves commercial improved real property located in Grayson County, Texas.  Venue of this action is proper in Grayson County, Texas, pursuant to Texas Civil Practice and Remedies Code Section 15.011 and Section 15.002(a)(1).  Borrower is subject to personal jurisdiction in Texas because it conducts business in Texas and because the claims in this lawsuit arise out of Borrower's contacts with Texas.

## V.
## BACKGROUND FACTS

### A.    THE SECURED INDEBTEDNESS

14.    On January 31, 2018, South Gate Apartments, LLC ("**Original Borrower**"), as borrower, and Natixis Real Estate Capital LLC ("**Original Lender**"), as lender, entered into that certain loan agreement ("**Loan Agreement**"), which contains the terms and provisions of the commercial real estate loan (the "**Loan**") made by Original Lender to Original Borrower.[4]  The Loan is evidenced by that certain Promissory Note (as amended and/or assigned, the "**Note**"), dated January 31, 2018, executed by Original Borrower, as maker, payable to the order of Original Lender, as payee, in the original principal amount of $5,762,598.[5]  The proceeds of the funds advanced pursuant to the Note were used in connection with the Property, which includes all of the real property, personal property, and general intangibles described in the Deed of Trust.

15.    Repayment of the Note is secured by, among other things, the liens, security interests, terms, and provisions contained within that certain Deed of Trust, Assignment of Leases

---

[4]       *See* **Exhibit 1**, a true and correct copy of the Loan Agreement, which is incorporated herein by this reference.

[5]       *See* **Exhibit 2**, a true and correct copy of the Note (and affixed allonges), which is incorporated herein by this reference.

and Rents, and Security Agreement (as amended and/or modified, the "**Deed of Trust**"), dated effective January 31, 2018, executed and delivered by Original Borrower, as trustor, to Theresa B. Lyons, as trustee, for the benefit of the Original Lender, as beneficiary, recorded as Instrument No. 2018-2399 in the Real Property Records in Grayson County, Texas.[6]

16.     The Loan Agreement, the Note, the Deed of Trust, and any and all other documents executed in connection therewith and/or relating in any way thereto are referred to hereinafter either individually, or collectively, as the "**Loan Documents**."

**B.**     **ASSIGNMENT TO LENDER OF THE LOAN AND THE LOAN DOCUMENTS**

17.     Pursuant to a series of endorsements, assignments, and/or transfers, Lender and Borrower are the current parties to the Loan Documents.[7]

**C.**     **BORROWER'S PAYMENT DEFAULTS**

18.     Section 8.1(a) of the Loan Agreement states that "[a]n Event of Default shall exist with respect to the Loan if . . . any portion of the Debt is not paid when due . . . ."  Because Borrower has not made a single payment on the Loan since October 2022, on or about January 25, 2023, Lender sent Borrower a letter, which (i) notified Borrower of its payment defaults; (ii) notified Borrower that the maturity date of the Note was accelerated; and (iii) demanded that the Borrower immediately pay all amounts due and owing under the Loan Documents.[8]  To date Borrower has not paid what it owes.

---

[6]     *See* **Exhibit 3**, a true and correct copy of the Deed of Trust, which is incorporated herein by this reference.

[7]     *See* **Exhibit 4**, which contains true and correct copies of the documents assigning the Loan Documents to Lender and Borrower.

[8]     *See* **Exhibit 5**, a true and correct copy of the January 25, 2023 Notice of Acceleration, which is incorporated herein by this reference.

19.     Because of Borrower's longstanding payment defaults on the multi-million dollar Loan, the Court should appoint a receiver forthwith.  Borrower's insolvency is yet another reason why the Court should appoint a receiver.

## D.     BORROWER'S INSOLVENCY DEFAULTS

20.     Section 8.1(f) states that an Event of Default occurs if Borrower is generally not paying its debts as they become due.  And, according to Texas Business and Commerce Code Section 24.003(b), "a debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent."  Payment obligations under the Loan Documents are debts like any other.  Borrower has failed, on multiple occasions, to timely make such payments.  Moreover, Borrower has permitted liens, totaling over $280,000, to be filed against the Property.[9]  In short, the Court should also appoint a receiver because Borrower is presumed insolvent under Texas law. But by far the most compelling reason to appoint a receiver is that Borrower has committed waste, mismanaged the Property and every step, and concealed the dire state of the Property from Lender.

## E.     BORROWER'S WASTE, MISMANAGEMENT, AND REPORTING DEFAULTS

21.     Section 8.1(i) states that an Event of Default occurs if Borrower either commits physical waste of the Property or permits "the actual or threatened alteration, improvement, demolition or removal of all or any of portion of the [Property's] Improvements without the prior written consent of Lender."  Borrower has committed physical waste of the Property by, among

---

[9]      Failure to pay mechanic's liens is also a default pursuant to Section 10.1(f) of the Loan Agreement.  The following chart lists the liens that Lender recently discovered:

| SS1 Portfolio | | | |
|---|---|---|---|
| Property | Claimant | Amount | Description |
| Westwood Garden | Refrigeration & Gas Boiler Services | 3,345.46 | air conditioner maintenance and repair |
| Terrace Apts | Refrigeration & Gas Boiler Services | 819.92 | air conditioner maintenance and repair |
| Southgate Apts | Refrigeration & Gas Boiler Services | 4,479.47 | air conditioner maintenance and repair |
| Westwood Garden | Riggs Contracting, LLC | 9,726.00 | labor and material for improvement |
| Terrace Apts | El Lider LLC | 17,451.21 | labor and material for improvement |
| Southgate Apts | Riggs Contracting, LLC | 6,942.00 | labor and material for improvement |
| All 3 | Reliant Energy | 239,839.15 | |
| | | 282,603.21 | |

other things, doing all of the following:

- Causing tenants to vacate a significant portion of the Property.
- Abandoning a significant portion of the Property.
- Failing to pay essential vendors associated with the Property.
- Failing to secure the Property.
- Failing to conduct essential maintenance of the Property.
- Permitting crime to occur at the Property.
- Causing a portion of the Property to collapse from fire damage.

Borrower's physical waste of the Property has, in turn, led the City of Sherman to institute an emergency nuisance and abatement proceeding seeking permission to exercise its police power and immediately demolish all structural improvements associated with the Southgate Apartments. These defaults, standing alone, necessitate the immediate appointment of a receiver.

22.   But Borrower compounded the emergency surrounding its waste by failing to timely report any of it to Lender, which constitutes yet another Event of Default under Section 8.1(f) of the Loan Agreement.[10]

23.   As soon as Lender discovered the myriad defaults committed by Borrower, it began pursuing the emergency appointment of a receiver, which is the only remedy that strikes the appropriate balance of equities between all affected parties.

**F.   CONTRACTUAL RIGHT TO APPOINTMENT OF RECEIVER**

24.   Via Section 10(a)(vii) of the Deed of Trust, Borrower expressly agreed that, upon the occurrence of an Event of Default, Lender may "apply for the appointment of a . . . receiver . . . without notice and without regard for the adequacy of the security for the Debt and without regard

---

[10]   In addition to its failure to abide by its reporting obligations, it does not appear that Borrower has actively pursued any insurance claim regarding the myriad damage to the Property. Although Lender is still investigating this issue, it may constitute yet another material Event of Default pursuant to, among other things, Section 10.1(j) of the Loan Agreement.

for the solvency of Borrower, any guarantor or indemnitor under the Loan or any other Person liable for the payment of the Debt." It is undisputed that Borrower's myriad defaults occurred and are continuing. Borrower's clear and unambiguous agreement to appointment of a receiver is enforceable.[11] And, even if consent to appointment of a receiver is not dispositive, it is still a factor that weighs heavily in favor of appointing a receiver.[12]

25.    Because Borrower's myriad defaults exist under the Loan Documents and are continuing, and because Borrower unambiguously agreed that Lender could seek and obtain the appointment of a receiver upon an Event of Default, Lender is contractually entitled to the appointment of a receiver for the Property.

## G.    BASIS FOR APPOINTMENT OF RECEIVER INDEPENDENT OF LOAN DOCUMENTS

26.    In addition to Lender's contractual right to the appointment of a receiver, the appointment is supported by concepts of equity and the tenets of Texas law.  Under Texas Civil Practice and Remedies Code ("**TCPRC**") Section 64.001(a)(2) and Subsection (b), a receiver may be appointed for property on the application of a creditor, such as Lender, if (i) the creditor has a probable interest in or right to the property; and (ii) the property is in danger of being lost, removed, or materially injured.  Under TCRP Section 64.001(a)(6), the Court may also appoint a receiver "in any other case in which a receiver may be appointed under the rules of equity."

---

[11]      *See Riverside Properties v. Teachers Ins. & Annuity Ass'n of America*, 590 S.W.2d 736, 738 (Tex. Civ. App.—Houston [14th Dist.] 1979, no writ) (holding that provisions in deed of trust and security agreements calling for appointment of a receiver pending foreclosure, while not binding on the court as a matter of law, were adequate to support a trial court's order appointing receiver); *Fannie Mae v. U.S. Property Solutions, LLC*, Cause No. 08-3588, 2009 WL 1172711, *1 (S.D. Tex. April 28, 2009) (noting that court appointed receiver "[b]ecause the Note explicitly provided for the appointment of a receiver in the event of default...."); *Franchise Loan Trust 1998-1 v. S&A Fee Properties SPE 2, LLC*, Cause No. 08-306, 2008 WL 4093620, *1 (E.D. Tex. Aug. 26, 2008).

[12]      *See Bank of America, National Association v. Quik-Way Foods of Dallas, Inc.*, Civil Action No. 3:10-CV-1932-L, 2011 WL 3156275, at *6 (N.D. Tex. July 25, 2011) (holding that parties' contractual agreement to receiver "bolsters" case for receiver's appointment); *see also New York Life Ins. Co. v. Watt West Inv. Corp.*, 755 F. Supp. 287, 292 (E.D. Cal. 1991) (holding that consent by the parties to appointment of a receiver in a deed of trust is a factor that commands "great weight," but is not dispositive).

27.     Here, the requirements of Texas Civil Practice and Remedies Code Section 64.001 receivership test are met because Borrower's insolvency, waste, mismanagement, and failure to keep Lender appraised of the status of its secured collateral show that the Property is not being cared for and is in imminent danger of being lost or damaged.

28.     Furthermore, no less drastic equitable remedies exist other than appointing a receiver because the damage to the Property cannot be remedied with money damages alone or by any equitable remedy other than a receivership. *See Russ-Ann Development, Inc. v. ECGC, Inc.*, 322 S.W.3d 921, 927 (Tex. App.—Tyler 2007, no pet.) ("In Texas, the potential loss of rights in real property is a probable, imminent, and irreparable injury that qualifies a party for a temporary injunction."). Thus, equity requires the appointment of a receiver.

29.     The potential deterioration of the Property (Lender's collateral), and the avoidance by Lender of mortgagee-in-possession liability issues, mandate that a suitable temporary receiver be appointed that is independent of Borrower to operate and manage the Property in a professional manner, to oversee and address repairs at the Property, and to seek to resolve any possible issues with vendors, tenants, and/or governmental entities. Once appointed, the receiver will gain access to address competent operation and maintenance of the Property.

30.     Borrower will not suffer harm if this Court appoints a receiver. First, Borrower has already agreed to the appointment of a receiver for the Property in the Loan Documents. Second, the appointment of a receiver for the Property will merely remove some of Borrower's responsibilities and authority, and allow Lender to address the deferred maintenance that exists at the Property without becoming exposed to mortgagee-in-possession liability issues. Ultimately, the harm suffered by Lender by not appointing a receiver outweighs the harm to Borrower from appointment of the receiver.

31.     Finally, Lender will likely succeed in the underlying actions for breach of contract and waste, as it is undisputed that Borrower's myriad defaults occurred and are continuing.

## VI.
## CAUSES OF ACTION AND REMEDIES

### A.     BREACH OF CONTRACT

32.     Lender incorporates by reference all of the paragraphs above and below to the extent they are consistent herewith.

33.     Borrower has breached its agreement with, and injured, Lender.  As referenced above, Borrower has failed to pay all amounts due and owing, is presumed insolvent, has permitted numerous lawsuits and liens to be filed, has committed serial acts of mismanagement, and has failed to keep Lender appraised of the dire status of the Property.  Accordingly, Lender is entitled to pursue all remedies available to the Lender under the Loan Documents, at law, and/or in equity, and must do so at this time to protect the value of Lender's collateral (the Property).

### B.     WASTE

34.     Lender incorporates by reference all of the paragraphs above and below to the extent they are consistent herewith.

35.     Borrower committed waste of the Property, which is Lender's secured collateral, by recklessly and/or intentionally failing to properly inspect, maintain, secure, and repair the Property, which caused the tremendous damage detailed herein.  Borrower's misconduct has disrupted both tenants and the City of Sherman, which has further injured the Property's reputation and ability to attract quality tenants, and which has also seriously jeopardized Lender's opportunity to maximize the Property's value.  This contributed to Borrower's financial distress and loan defaults, all of which has caused substantial damage to Lender.

C.    ATTORNEYS' FEES

36.    Lender incorporates by reference all of the paragraphs above and below to the extent they are consistent herewith.

37.    Because of Borrower's actions, Lender has found it necessary to engage the law firm of Holland & Knight LLP to prosecute this action and to protect its rights. Pursuant to the terms of the Loan Documents and TCPRC Section 38.001, *et seq.*, Lender is entitled to recover its reasonable and necessary attorneys' fees incurred in the prosecution of this action.

## VII.
## APPLICATION FOR APPOINTMENT OF TEMPORARY RECEIVER

38.    Lender incorporates by reference all of the paragraphs above and below to the extent they are consistent herewith.

39.    Pleading further, and without waiving the foregoing, pursuant to Section 64.001, *et seq.* of the TCPRC, Lender seeks the appointment of a temporary receiver to take possession and control of the Property.

40.    Under Section 10(a)(vii) of the Deed of Trust, Lender has the contractual right to the appointment of a receiver.

41.    Furthermore, notwithstanding the contractual agreement of Borrower to the appointment of a receiver, Lender is also entitled to the appointment of a receiver on statutory and equitable grounds.

42.    Lender is a secured creditor of Borrower, and the appointment of a temporary receiver facilitates subjecting the Property to Lender's secured claim, pending a sale or foreclosure of the Property.

43.    Lender specifically prays for the following relief:

        a.    **Appointment of Chris Neilson as Receiver.** The Court should appoint Chris Neilson of Trigild Texas, Inc., 4131 North Central Expressway, Suite

775, Dallas, Texas 75204, (214) 766-9272, chris.neilson@trigild.com, as receiver ("**Receiver**") for the Property. Neither Mr. Neilson nor Trigild is a party, attorney, or other person interested in this action. Mr. Neilson is a citizen of Texas and qualified Texas voter and is otherwise qualified to serve as receiver.[13] Mr. Neilson and his company are widely-respected and experienced property managers that have been appointed receiver by Texas courts for numerous commercial properties in Texas. Thus, Mr. Neilson is well equipped to preserve the value of all of the Property as Lender's collateral securing repayment of the Loan;

b.   **Receiver's Exclusive and Complete Control over the Property.** Receiver be allowed to take and have complete and exclusive control and possession of the Property, together with any and all bank accounts, credit card receipts, demand deposits, reimbursement rights, bank deposits, security deposits and all other forms of accounts, accounts receivable, payment rights, cash and cash equivalents, along with any and all information necessary to operate the Property, including but not limited to all security codes, combinations, passwords and other access codes and all other collateral securing the indebtedness owed to Lender;

c.   **Items to be Delivered to Receiver by Borrower.** Borrower and all persons acting under its direction be ordered to deliver possession to Receiver, without any right of offset or recoupment, of the Property and all other collateral securing the indebtedness owed to Lender, including but not limited to (to the extent in the possession or control of the Borrower or the Borrower's agents): (1) cash collateral (whether consisting of cash on hand, cash in any and all bank accounts or other accounts, all rights to security deposits, including, but not limited to, amounts that Borrower may have deposited with utility companies, all rights to unearned insurance premiums or claim proceeds, or pre-payments of any kind, and all other cash and cash equivalents); (2) all keys; (3) all loans and communications and correspondence files relating thereto; (4) security deposits, rent, prepaid rent, other sums relating to the use, enjoyment, possession, improvement or occupancy of all or any part of the Property and any accounts of any of the foregoing; (5) a current list of the occupants of the Property, including the complete tenant ledgers with respect to each occupant; (6) complete tenant files and tenant histories; (7) any and all accounts receivable and accounts payable reports; (8) any and all contracts in effect with respect to the Property and all communications and correspondence pertinent thereto, including, but not limited to, all service contracts and warranty information and contracts with vendors who provide or have provided services at the Property; (9) any and all files relating to contracts, bids or other materials relating to any contractor work at the Property; (10) any and all payroll records, employee files, applications and other materials relevant to those

---

[13]   *See* **Exhibit 6**, which is a brief description of Mr. Neilson's background and his resume and a description of his qualifications to serve as a receiver for commercial properties in the State of Texas.

persons employed at the Property; (11) any and all insurance policies covering the Property, and all communications and correspondence pertinent thereto; (12) any and all bank statements and records relating to any accounts associated with the Property; (13) any and all records relating to pending or current litigation; and (14) any and all other records pertaining to the operation and management of the Property requested by Receiver;

d.   **Borrower's Actions**.  Borrower and any persons acting under Borrower's direction be (1) directed to deliver the Property to Receiver; (2) enjoined from in any way disturbing the possession of the Property or other property that is the subject of the order appointing Receiver; (3) prohibited and restrained from disposing of, dissipating, mishandling or misappropriating any of the Property or other such property; (4) prohibited from taking any actions that would, directly or indirectly, have an adverse impact on the value of the Property; (5) prohibited and restrained from canceling, reducing or modifying any and all insurance coverage in existence with respect to the Property; and (6) prohibited and restrained from collecting any rents or other sums, all until further order of the Court;

e.   **Receiver's Right to Prevent Waste of, and to Preserve, the Property**.  Effective immediately, Receiver be ordered to take any and all actions Receiver deems reasonable and appropriate to prevent waste to the Property and to preserve, secure, manage, maintain and safeguard the Property and all other forms of property to which Receiver is entitled to take possession and control under the order appointing Receiver;

f.   **Receiver Vested with the Information Related to the Property**.  Receiver be vested with the books and records of Borrower with respect to operation of the Property and other property subject hereto, including any and all information related to:  (1) rent rolls and leases affecting the Property, including, but not limited to, leases for current and former tenants and a detailed accounting of all security deposits for current and former tenants; (2) amounts paid by lessees and other obligors of Borrower; (3) liens, encumbrances and other interests against or affecting the Property; (4) property taxes owed and previously paid; (5) all types of insurance affecting the Property, including but not limited to, any and all information regarding any pending or settled insurance claims; (6) plans, specifications, surveys and drawings of the Property, including, but not limited to, building and individual floor plans, elevator and/or escalator plans and mechanical system plans; (7) any and all maintenance logs and repair records for all systems in place at the Property; (8) access codes to any of the Property; (9) all operating, income, financial and monthly statements related in any way to the Property, including but not limited to, any and all general ledgers, balance sheets, check registers, budgets and monthly billings; (10) all current account numbers for all utility companies; (11) any and all current marketing materials and information, including, but not limited to, any prospect reports; and (12) all other aspects of the Property;

g.  **Receiver's Right to Manage, Maintain, and Operate the Property**. Receiver be authorized to manage, maintain, operate, lease and market the Property and to employ such managers, agents, employees, brokers, accountants and attorneys as may in his commercially reasonable judgment be advisable or necessary in the management, conduct, control or custody of the affairs of Borrower and its assets, be authorized to make payments and disbursements in the ordinary course of business and to make such payments and disbursements as may be needed and proper for the preservation of the Property and other property of Borrower; and be authorized to pay net income from the Property to Lender, in reduction of the indebtedness owed to Lender by Borrower. Receiver may, with Lender's approval, replace existing property management if the Receiver determines, in the exercise of his professional discretion, that doing so is in the best interest of the Property. In the event that Receiver decides, with Lender's consent, to replace existing property management, Receiver is authorized to terminate the agreement with existing property management, without regard to any notice period, and to engage a professional property management company of his choosing, including Trigild or an affiliate thereof. Receiver will be compensated monthly at a rate of $300 per hour plus reimbursement of all out-of-pocket expenses. Receiver is entitled to a minimum of $3,000 per month.

h.  **Receiver Authorized to Sell the Property**. Receiver be authorized, (1) with prior written approval of the Court and Lender, to sell all or a portion of the Property and other collateral and, in connection with such sale, to facilitate an assumption of the Loan, and execute on Borrower's behalf any necessary documents in connection with any sale or any sale and assumption, and this Court waives any requirement that a sale by the Receiver (after obtaining such prior written approval of the Court and Lender) be further confirmed by this Court, and (2) to reasonably cooperate with requests made by Lender that relate to a sale by Lender to a third party of the Loan (and the Loan Documents). Nothing stated herein shall be deemed to prejudice or prevent Lender from conducting a non-judicial foreclosure sale of the Property by a substitute trustee or accepting a deed-in-lieu of foreclosure from Borrower for the Property without prior approval from this Court;

i.  **Receiver's Right to Collect Amounts Due**. Receiver be authorized to receive and collect any and all sums due or owing to Borrower in any manner related to the Property (with the exception of any insurance premium refund, which shall be refunded to Borrower, expressly subject to the sentence at the end of this paragraph beginning with the word "Notwithstanding"), whether the same are now due or shall hereafter become due and owing, to deposit such sums into an account established and maintained by Receiver, and to expend such sums on the operation and management of the Property in the ordinary course of its business. Notwithstanding the foregoing, Borrower's right to refunded insurance

premiums is expressly subject to Lender's rights under the Loan Documents and nothing in this paragraph is intended to, nor shall be construed to, waive any of Lender's rights with respect to insurance premiums;

j.     **Legal Actions Related to the Property**.  Receiver be authorized to institute, prosecute, defend, compromise and/or intervene in or become a party to such actions or proceedings in state or federal courts necessary for the protection, maintenance and preservation of the assets of Borrower and to carry out the terms of the Court's order appointing Receiver, including but not limited to, the collection of rents and other amounts now or hereafter becoming due, the removal of tenants or other persons from the Property and/or the defense against any action brought against Receiver acting in such capacity;

k.     **Insurance**.  Receiver and/or Receiver's management company is authorized to maintain appropriate property insurance for the Property, including public general liability insurance, worker's compensation insurance, fire and extended coverage insurance, employer's liability insurance, employment practices insurance, liquor liability insurance, non-owned auto umbrella insurance, burglary and theft insurance, and other types of insurance normally obtained in connection with the operation and management of the Property; and is authorized to continue any current policies in place and to purchase further insurance as Receiver deems appropriate; Receiver and Receiver's management company shall be named insureds on all general liability policies; notwithstanding anything contrary in this subprovision, Receiver may cancel any existing insurance policy for the Property, and any refund of premiums shall be paid to the Receiver;

l.     **Payment of Property Taxes; Preparation and Filing of Tax Returns for the Property**.  Receiver be authorized to (1) pay all current and past due real estate taxes, personal property taxes and any other taxes and assessments against the Property; and (2) prepare and file tax returns with respect to the Property, and other property subject hereto, as may be required by law, provided, however, Receiver is not responsible for the preparation of tax returns for Borrower or any of its affiliates;

m.     **Property Protection Advances from Lender**.  Receiver and Lender be authorized to enter into transactions by which Lender may fund to Receiver, in Lender's sole and absolute discretion, property protection advances (on a nonrecourse basis as to Receiver) to enable Receiver to perform his duties hereunder, which may be advanced pursuant to the applicable pooling and servicing agreement and the Loan Documents, and will be secured by the liens, security interests, terms and provisions contained within the Loan Documents;

n.     **Leases; Payment of Utilities; Maintenance of the Property; Compliance with Laws**.  Receiver be authorized to:  (1) negotiate and enter into new

leases, occupancy agreements and contracts in the ordinary course of the business of the Property; (2) modify existing leases, occupancy agreements and contracts in the ordinary course of the business of the Property; (3) pay all utilities, expenses and other obligations secured by the Property or which may give rise to liens on the Property, and all other outstanding obligations to suppliers and service providers in the ordinary course of business, including obligations incurred prior to the commencement of the receivership, so long as Receiver has determined that it is prudent to do so in order to maintain business relationships that are beneficial to the conduct of the receivership; (4) make repairs necessary to the maintenance of the Property in order to preserve the Property in the ordinary course of business; and (5) comply with all requirements and regulations applicable to the Property. Prior to effectuating any proposed lease or proposed lease modification, the Receiver shall provide the Court and the Borrower with written notice regarding the terms of such lease or lease modification and, within ten (10) business days after receipt of such notice, any party may object to the terms of the proposed lease or lease modification. In the absence of such objection or further order from the Court, the Receiver shall, in its sole discretion, be free to effectuate such proposed lease or lease modification;

o.  **Application of Income from the Property**.  Receiver be permitted to apply income from the Property, subject to the lien and security interest rights of Lender, as follows:  (1) Receiver's approved fees and expenses; (2) the current operating expenses of the receivership in the ordinary course of business; (3) the obligations owed to Lender under the Loan Documents; and (4) such other obligations incurred;

p.  **Receiver's Cash on Hand**.  Receiver be permitted to maintain sufficient cash on hand to enable Receiver to meet those expenses, the payment of which is authorized herein, in an amount to be agreed to between Receiver and Lender;

q.  **Payment of Property Expenses**.  Receiver be permitted to pay all expenses incurred with regard to the Property in the normal and ordinary course of business of the Property by Receiver on or after the date Receiver is appointed.  Neither Receiver nor Lender shall be liable for any expenses incurred with regard to the Property prior to Receiver taking possession of the Property, nor shall Receiver or Lender be required to use any rents or additional funds advanced by Lender or other revenues collected after Receiver takes possession of the Property in payment of such expenses.  Notwithstanding the foregoing, Receiver may, in Receiver's sole and absolute discretion, pay those expenses that were incurred in the normal and ordinary course of business of the Property and that were incurred prior to Receiver taking possession of the Property, if, and only if, the payment of any such pre-existing expenses is necessary and critical to the ongoing operation of the Property (e.g., utilities).  It shall be incumbent upon

Receiver, in Receiver's sole and absolute discretion, to make a determination as to which expenses, if any, incurred prior to the Receiver's taking possession of the Property, were incurred in the normal and ordinary course of business and the payment of which is necessary and critical to the ongoing operation of the Property. Receiver's determination of such is binding on the parties hereto and will not be overturned by this Court. Otherwise, no pre-existing expenses shall be paid by Receiver without written approval by Lender or further order of this Court;

r. **Receiver's Liability**. Except in the event of gross negligence, willful misconduct, or actions in violation of orders of the Court, Receiver have no personal liability for any obligations incurred in the course of the receivership, any and all such liabilities being limited to the assets (including the cash and cash equivalents) received and generated by Receiver in the course of the receivership, subject to the existing lien of Lender;

s. **Receiver's Authority**. The authority granted to Receiver be self-executing; and

t. **General Authority**. The Receiver be permitted to take any and all actions necessary to preserve the income to and value of the Property; and to perform any other acts in regard to the Property as authorized by this Court.

## VIII.
## BONDS

44.     Lender and the Receiver are willing to post bonds in connection with appointment

of a Receiver, as directed by the Court.

## IX.
## CONDITIONS PRECEDENT

45.     Lender has satisfied all conditions precedent for bringing this action.

## X.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Lender respectfully requests that:

a.      Borrower be cited to appear and answer herein;

b.      Chris Neilson be appointed receiver pursuant to Chapter 64 of the TCPRC and be vested with all necessary authority to act on behalf of Borrower and any agent acting on its behalf (including any property manager), access and

administer all funds and accounts at all banks and other financial institutions owned or controlled by Borrower or any agent acting on its behalf, and

c.     On final trial hereof, Lender have judgment against Borrower for its actual damages as provided in the Loan Documents and interest to the extent allowed by applicable law, together with its reasonable and necessary attorneys' fees and all costs of court, and such other and further relief, both general and special, at law or in equity, to which Lender may be justly entitled.

46.     That the Court grant any other such, general, or different relief to which Lender may be entitled.

Respectfully submitted,

By:     *Chris Chauvin*

Christopher L. Chauvin
Texas Bar No. 24045644
chris.chauvin@hklaw.com
Alexander T. Dimock
Texas Bar No. 24094628
alex.dimock@hklaw.com

**HOLLAND & KNIGHT LLP**
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
(214) 969-1751 (facsimile)

**ATTORNEYS FOR PLAINTIFF**

## VERIFICATION BY DECLARATION

Pursuant to Texas Civil Practice and Remedies Code section 132.001, Bruce Rickert provides the following declaration:

I, Bruce Rickert, am over the age of eighteen, and I am legally competent to make this declaration, which is true and correct and based on my personal knowledge. I am an authorized signatory for Special Servicer, which is the Special Servicer of the Loan for Lender pursuant to that certain Pooling and Servicing Agreement dated April 1, 2018. It is in that capacity that I make this declaration.

I am one of the custodians of the books, records, and files of the Lender and Special Servicer that pertain to the Loan concerning the Property. I have personally worked on the books, records, and files, and as to the facts set forth in the foregoing Plaintiff's Verified Original Petition, Application for Appointment of Temporary Receiver, and Request for Emergency Consideration, and, except as to those facts directly attributed to Exhibits attached hereto or otherwise accredited, such facts set forth above are true and correct within my personal knowledge and/or knowledge derived from the business records of Lender and Special Servicer.

Exhibits one through five are true and correct copies of business records maintained in the ordinary course of business of Lender and Special Servicer.

My name is Bruce Rickert, my date of birth is March 2nd, 1970, and my business address is 500 North Central Expressway, Suite 261, Dallas, Texas 75074.

I declare under penalty of perjury that the foregoing is true and correct.

Bruce Rickert,
not in his individual or personal capacity, but solely in his capacity as an authorized signatory for Special Servicer pursuant to that certain Pooling and Servicing Agreement dated April 1, 2018

---

**LOAN AGREEMENT**

Dated as of January 31, 2018

Between

SOUTH GATE APARTMENTS, LLC,
as Borrower

and

NATIXIS REAL ESTATE CAPITAL LLC,
as Lender

---

**EXHIBIT 1**

# TABLE OF CONTENTS

Page

1.  DEFINITIONS; PRINCIPLES OF CONSTRUCTION ...................................................... 1

    1.1  Terms and Definitions .................................................................. 1
         1.1.1  Key Terms and Definitions ................................................. 1
         1.1.2  Additional Terms and Definitions ......................................... 2
    1.2  Index of Other Definitions ............................................................ 10
    1.3  Principles of Construction ............................................................ 10

2.  GENERAL LOAN TERMS ................................................................................ 10

    2.1  The Loan .................................................................................. 10
    2.2  Interest; Monthly Payments ............................................................ 10
         2.2.1  Generally .................................................................. 10
         2.2.2  Default Rate .............................................................. 11
         2.2.3  Taxes ..................................................................... 11
         2.2.4  Requirements of Law ....................................................... 11
    2.3  Loan Repayment and Defeasance .......................................................... 12
         2.3.1  Repayment ................................................................. 12
         2.3.2  Mandatory Prepayments ..................................................... 12
         2.3.3  Voluntary Defeasance of the Note .......................................... 12
         2.3.4  Permitted Prepayment ...................................................... 14
    2.4  Release of Property ..................................................................... 15
         2.4.1  Release on Defeasance ..................................................... 15
         2.4.2  Release on Payment in Full ................................................ 15
    2.5  Payments and Computations ............................................................. 15
         2.5.1  Making of Payments ........................................................ 15
         2.5.2  Computations .............................................................. 15
         2.5.3  Late Payment Charge ....................................................... 15
    2.6  Partial Release ......................................................................... 15

3.  CASH MANAGEMENT AND RESERVES ...................................................................... 17

    3.1  Cash Management Arrangements .......................................................... 17
    3.2  Required Repairs ....................................................................... 17
         3.2.1  Completion of Required Repairs ............................................ 17
         3.2.2  Required Repairs Reserves ................................................. 17
    3.3  Taxes and Insurance .................................................................... 18
    3.4  Capital Expense Reserves .............................................................. 18
    3.5  Intentionally Deleted .................................................................. 19
    3.6  Operating Expense Subaccount .......................................................... 19
    3.7  Casualty/Condemnation Subaccount ...................................................... 19
    3.8  Security Deposits ...................................................................... 19
    3.9  Grant of Security Interest; Application of Funds ...................................... 19
    3.10 Property Cash Flow Allocation ......................................................... 20
    3.11 Cash Collateral Reserve ............................................................... 20

| | | |
|---|---|---|
| 4. | **REPRESENTATIONS AND WARRANTIES** | 21 |
| | 4.1 Organization; Special Purpose | 21 |
| | 4.2 Proceedings; Enforceability | 21 |
| | 4.3 No Conflicts | 21 |
| | 4.4 Litigation | 21 |
| | 4.5 Agreements | 21 |
| | 4.6 Title | 22 |
| | 4.7 No Bankruptcy Filing | 22 |
| | 4.8 Full and Accurate Disclosure | 22 |
| | 4.9 No Plan Assets | 23 |
| | 4.10 Compliance | 23 |
| | 4.11 Contracts | 23 |
| | 4.12 Federal Reserve Regulations; Investment Company Act | 23 |
| | 4.13 Utilities and Public Access | 23 |
| | 4.14 Physical Condition | 24 |
| | 4.15 Leases | 24 |
| | 4.16 Fraudulent Transfer | 24 |
| | 4.17 Ownership of Borrower | 24 |
| | 4.18 Management Agreement | 25 |
| | 4.19 Hazardous Substances | 25 |
| | 4.20 Principal Place of Business | 25 |
| | 4.21 Other Debt | 25 |
| | 4.22 Embargoed Person | 25 |
| | 4.23 Anti-Money Laundering | 25 |
| | 4.24 Low Income Tenants | 26 |
| 5. | **COVENANTS** | 26 |
| | 5.1 Existence | 26 |
| | 5.2 Taxes | 26 |
| | 5.3 Repairs; Maintenance and Compliance; Alterations | 27 |
| |     5.3.1 Repairs; Maintenance and Compliance | 27 |
| |     5.3.2 Alterations | 27 |
| | 5.4 Performance of Other Agreements | 27 |
| | 5.5 Cooperate in Legal Proceedings | 27 |
| | 5.6 Further Assurances | 27 |
| | 5.7 Environmental Matters | 28 |
| |     5.7.1 Hazardous Substances | 28 |
| |     5.7.2 Environmental Monitoring | 28 |
| | 5.8 Title to the Property; Liens | 29 |
| | 5.9 Leases | 29 |
| |     5.9.1 Generally | 29 |
| |     5.9.2 Material Leases | 30 |
| |     5.9.3 Minor Leases | 30 |
| |     5.9.4 Additional Covenants with respect to Leases | 31 |
| | 5.10 Estoppel Statement | 31 |
| | 5.11 Property Management | 31 |
| |     5.11.1 Management Agreement | 31 |
| |     5.11.2 Termination of Manager | 32 |
| | 5.12 Special Purpose Entity | 32 |

~84825-6832-1881~

**EXHIBIT 1**

| | | |
|---|---|---|
| 5.13 | Intentionally Deleted | 32 |
| 5.14 | Change In Business or Operation of Property | 32 |
| 5.15 | Certain Prohibited Actions | 32 |
| 5.16 | Prohibited Transfers | 32 |
| 5.17 | Expenses | 34 |
| 5.18 | Indemnity | 35 |
| 5.19 | Embargoed Person | 36 |
| 5.20 | Anti-Money Laundering | 37 |
| 5.21 | ERISA | 37 |
| 5.22 | Low Income Tenants | 37 |

**6.   NOTICES AND REPORTING** .................................................................... 37

| | | |
|---|---|---|
| 6.1 | Notices | 37 |
| 6.2 | Borrower Notices and Deliveries | 37 |
| 6.3 | Financial Reporting | 38 |
| | 6.3.1   Bookkeeping | 38 |
| | 6.3.2   Annual Reports | 38 |
| | 6.3.3   Monthly/Quarterly Reports | 39 |
| | 6.3.4   Other Reports | 39 |
| | 6.3.5   Annual Budget | 39 |
| | 6.3.6   Breach | 39 |

**7.   INSURANCE; CASUALTY; AND CONDEMNATION** ................................ 40

| | | |
|---|---|---|
| 7.1 | Insurance | 40 |
| | 7.1.1   Coverage | 40 |
| | 7.1.2   Policies | 41 |
| 7.2 | Casualty | 42 |
| | 7.2.1   Notice; Restoration | 42 |
| | 7.2.2   Settlement of Proceeds | 42 |
| 7.3 | Condemnation | 43 |
| | 7.3.1   Notice; Restoration | 43 |
| | 7.3.2   Collection of Award | 43 |
| 7.4 | Application of Proceeds or Award | 43 |
| | 7.4.1   Application to Restoration | 43 |
| | 7.4.2   Application to Debt | 44 |
| | 7.4.3   Procedure for Application to Restoration | 44 |
| | 7.4.4   Prepayment upon Partial Condemnation | 44 |

**8.   DEFAULTS** ........................................................................................... 45

| | | |
|---|---|---|
| 8.1 | Events of Default | 45 |
| 8.2 | Remedies | 46 |
| | 8.2.1   Acceleration | 46 |
| | 8.2.2   Remedies Cumulative | 46 |
| | 8.2.3   Severance | 47 |
| | 8.2.4   Delay | 47 |
| | 8.2.5   Lender's Right to Perform | 47 |

~4825-6832-1881~

**EXHIBIT 1**

9. SECONDARY MARKET PROVISIONS ............................................................47

    9.1    Transfer of Loan ...............................................................................47
    9.2    Use of Information ............................................................................48
    9.3    Borrower Indemnity ..........................................................................48
    9.4    Restructuring of Loan .......................................................................50

10. MISCELLANEOUS ...................................................................................51

    10.1    Exculpation .....................................................................................51
    10.2    Brokers and Financial Advisors ........................................................53
    10.3    Retention of Servicer .......................................................................53
    10.4    Survival...........................................................................................53
    10.5    Lender's Discretion..........................................................................53
    10.6    Governing Law ................................................................................54
    10.7    Modification, Waiver in Writing .......................................................54
    10.8    Trial by Jury....................................................................................54
    10.9    Headings/Exhibits ...........................................................................55
    10.10    Severability.....................................................................................55
    10.11    Preferences.................................................................................55
    10.12    Waiver of Notice............................................................................55
    10.13    Remedies of Borrower .....................................................................55
    10.14    Prior Agreements ............................................................................55
    10.15    Offsets, Counterclaims and Defenses ................................................55
    10.16    Publicity .........................................................................................56
    10.17    No Usury.........................................................................................56
    10.18    Conflict; Construction of Documents .................................................56
    10.19    No Third Party Beneficiaries ............................................................57
    10.20    Yield Maintenance Premium .............................................................57
    10.21    Assignment .....................................................................................57
    10.22    Counterparts ...................................................................................57

Schedule 1 –    Index of Other Definitions
Schedule 2 –    Required Repairs
Schedule 3 –    Organization of Borrower
Schedule 4 –    Definition of Special Purpose Entity
Schedule 5 –    Service Contracts
Schedule 6 –    Allocated Loan Amounts
Schedule 7 –    Low Income Units

**LOAN AGREEMENT**

This LOAN AGREEMENT (as the same may be modified, supplemented, amended or otherwise changed, this "*Agreement*"), is made as of January 31, 2018, by and between SOUTH GATE APARTMENTS, LLC, a Texas limited liability company (together with its permitted successors and assigns, "*Borrower*"), and NATIXIS REAL ESTATE CAPITAL LLC, a Delaware limited liability company, (together with its successors and assigns, "*Lender*").

1.  **DEFINITIONS; PRINCIPLES OF CONSTRUCTION**

      1.1    <u>Terms and Definitions</u>.  The following terms have the meanings set forth below:

            1.1.1    <u>Key Terms and Definitions</u>.

            *Amortization Schedule*:  360 months.

            *Borrower Representative*:  Initially, none.

            *Deposit Bank*:  Wells Fargo Bank, N. A., or such other bank or depository selected by Lender in its discretion.

            *Guarantor*:  Mendi Salijeski and Fikrije Shemo.

            *Interest Rate*:  a rate of interest equal to 5.77000% per annum.

            *Key Principals*:  Mendi Salijeski and Fikrije Shemo.

            *Manager*:  S.S. Partners Management, LLC, a Texas limited liability company, or any successor, assignee or replacement manager appointed by Borrower in accordance with <u>Section 5.11</u> hereof.

            *Monthly Debt Service Payment Amount*:  Interest only for the first twenty-four (24) Payment Dates and, commencing on the March 5, 2020 Payment Date, $33,702.21 on each Payment Date thereafter.

            *Principal*:  maximum original principal amount of $5,762,598.00.

            *Property*:  the parcels of real property and Improvements thereon owned by Borrower and encumbered by the Security Instrument; together with all rights pertaining to such real property and Improvements, and all other collateral for the Loan as more particularly described in the Granting Clauses of the Security Instrument.  The Property is comprised of (i) Terrace Apartments located at 1920 W. Shields Street, Sherman, Texas (the "*Terrace Property*"); (ii) Southgate Apartments located at 915 S. Travis Street, Sherman, Texas (the "*Southgate Property*"); and (iii) Westwood Gardens Apartments located at 221 Archer Circle, Sherman, Texas (the "*Westwood Property*").

            *Start–up Date*:  the earlier of: (a) the fourth anniversary of the date hereof; and (b) the date that is the two (2) years from the "start–up day" (within the meaning of Section 860G(a)(9) of the Code) of the REMIC Trust holding the Note, or if more than one Note exists evidencing the Debt the REMIC Trust holding the final portion of the Note to be securitized.

            *Stated Maturity Date*:  February 5, 2028.

**EXHIBIT 1**

### 1.1.2  Additional Terms and Definitions.

*Affiliate*: as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person or of an Affiliate of such Person.

*Allocated Loan Amount*: for each Release Parcel, the allocated loan amount set forth on **Schedule 6** hereto.

*Allocated Net Proceeds*: means the gross proceeds received from the sale or refinance of a Release Parcel less customary and reasonable transaction costs as approved by Lender in its sole and absolute discretion.

*Approved Capital Expenses*: Capital Expenses incurred by Borrower, provided that during a Cash Management Period, such Capital Expenses shall either be (i) included in the approved Capital Budget for the current calendar month or (ii) approved by Lender.

*Approved Leasing Expenses*: actual out-of-pocket expenses incurred by Borrower and payable to third parties that are not Affiliates of Borrower or Guarantor in leasing space at the Property pursuant to Leases entered into in accordance with the Loan Documents, including brokerage commissions and Tenant improvements, which expenses (i) are (A) specifically approved by Lender in connection with approving the applicable Lease, (B) incurred in the ordinary course of business and on market terms and conditions in connection with Leases which do not require Lender's approval under the Loan Documents, or (C) otherwise approved by Lender, which approval shall not be unreasonably withheld or delayed, and (ii) are substantiated by executed Lease documents and brokerage agreements.

*Approved Operating Expenses*: during a Cash Management Period, operating expenses incurred by Borrower which (i) are included in the approved Operating Budget for the current calendar month, (ii) are for real estate taxes, insurance premiums, electric, gas, oil, water, sewer or other utility service to the Property or (iii) have been approved by Lender. In addition to the foregoing, and notwithstanding anything to the contrary contained herein or in the Management Agreement, during any Cash Management Period, any fees, commissions or other amounts payable to Manager pursuant to the Management Agreement shall be capped at three percent (3%) of gross rents.

*Business Day*: any day other than a Saturday or a Sunday or any day on which commercial banks in New York, New York are authorized or required to close.

*Capital Expenses*: expenses that are capital in nature or required under GAAP to be capitalized.

*Cash Management Period*: shall commence upon Lender giving notice to Borrower and Clearing Bank of the occurrence of any of the following: (i) a Default or an Event of Default or (ii) the failure by Borrower, after the end of a calendar quarter, to maintain the Debt Service Coverage Ratio of at least 1.20:1; and shall end upon Lender giving notice to Borrower and the Clearing Bank that the Cash Management Period has ended, which notice Lender shall only be required to give if (1) the Loan and all other obligations under the Loan Documents have been repaid in full or (2) there has been a Full Defeasance of the Loan or (3) in the case of a Cash Management Period triggered by an event described in subclause (ii) above only, for six (6) consecutive months since the commencement of the existing Cash Management Period (A) no Default or Event of Default has occurred, (B) no event that would trigger

2

**EXHIBIT 1**

another Cash Management Period has occurred, and (C) the Debt Service Coverage Ratio is at least equal to 1.25:1.

*Clearing Account*:  the account established by Borrower for the benefit of Lender at the Clearing Bank for the direct deposit by Tenants of all Rents.

*Clearing Account Agreement*:  that certain agreement by and among Lender, Borrower, Manager and Clearing Bank setting forth Borrower's, Clearing Bank's and Manager's obligations relating to the establishment of the Clearing Account, the direct deposit by Tenants of all Rents to the Clearing Account.

*Clearing Bank*:  the bank selected by Borrower and approved by Lender in its sole discretion at which the Clearing Account is established.

*Code*:  the Internal Revenue Code of 1986, as amended and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

*Control*:  with respect to any Person, either (i) ownership, directly or indirectly, of forty-nine percent (49%) or more of all equity interests in such Person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise.

*Debt*:  the unpaid Principal, all interest accrued and unpaid thereon, any Yield Maintenance Premium and all other sums due to Lender in respect of the Loan or under any Loan Document.

*Debt Service*:  with respect to any particular period, the scheduled Principal and interest payments due under the Note in such period.

*Debt Service Coverage Ratio*:  as of any date, the ratio calculated by Lender of (i) the Net Operating Income for the twelve (12) month period ending with the most recently completed calendar month to (ii) the Debt Service with respect to such period.

*Default*:  the occurrence of any event under any Loan Document which, with the giving of notice or passage of time, or both, would be an Event of Default.

*Default Rate*:  a rate per annum equal to the lesser of (i) the maximum rate permitted by applicable law, or (ii) five percent (5%) above the Interest Rate, compounded monthly.

*Defeasance Percentage*:  the percentage derived by dividing, (i) in the case of an initial Partial Defeasance, the original principal amount of the Defeased Note by the original principal amount of the Note or (ii) in the case of a subsequent Defeasance, the amount of the subsequent Defeased Note by the original principal amount of its corresponding Undefeased Note.

*Deposit Account*:  the Eligible Account at the Deposit Bank established and controlled by Lender to receive Rents from the Clearing Bank.

*Deposit Account Agreement*:  that certain agreement by and among Lender, Borrower and Deposit Bank establishing the Deposit Account and setting forth the parties' obligations relating to the funds transferred from the Clearing Account pursuant to the provisions of this Agreement.

**EXHIBIT 1**

~#4825-6832-1881~

*Eligible Account*: shall mean either (i) an account maintained with the Deposit Bank or another depository institution or trust company; provided the short term unsecured debt obligations or commercial paper of such other depository institution or trust company are rated at least A-1 (or equivalent) by each Rating Agency in the case of accounts in which funds are held for thirty (30) days or less (or, in the case of accounts in which funds are held for more than thirty (30) days and the long term unsecured debt obligations of which are rated at least A (or equivalent) by each Rating Agency) or (ii) a segregated trust account maintained with the trust department of a federal or state chartered depository institution or trust company acting in its fiduciary capacity which institution or trust company is subject to regulations similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least $50,000,000 and is subject to federal and state authority.

*ERISA*: the Employment Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

*ERISA Affiliate*: all members of a controlled group of corporations and all trades and business (whether or not incorporated) under common Control and all other entities which, together with Borrower, are treated as a single employer under any or all of Section 414(b), (c), (m) or (o) of the Code.

*Escrows*: amounts paid by Borrower into Subaccounts established for the purpose of paying Taxes, the premiums for Policies, ground rents, franchise and license fees.

*GAAP*: generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

*Governmental Authority*: any court, board, agency, commission, office or authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) now or hereafter in existence.

*Individual Property*: each of the (i) Terrace Property, (ii) Southgate Property, and (iii) Westwood Property.

*Interest Period*: (i) the period from the date hereof through the next day of a calendar month that is the fourth (4th) day of such calendar month, and (ii) each period thereafter from the fifth (5th) day of each calendar month through the fourth (4th) day of the next calendar month; except that the Interest Period, if any, that would otherwise commence before and end after the Maturity Date shall end on the Maturity Date.  Notwithstanding the foregoing, in the event Lender shall have elected to change the date on which scheduled payments under the Loan are due, as described in the definition of "Payment Date", from and after the effective date of such election, each Interest Period shall commence on the day of each month in which occurs such changed Payment Date and end on the day immediately preceding the following Payment Date, as so changed.

*Leases*: all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Property or the Improvements, including any guarantees, extensions, renewals, modifications or amendments thereof and all additional remainders, reversions and other rights and estates appurtenant thereunder.

*Legal Requirements*: statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower, any Loan Document or all or part of the Property or the construction, ownership, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating

4

~#4825-6832-1881~

**EXHIBIT 1**

thereto, and all covenants, agreements, restrictions and encumbrances contained in any instrument, either of record or known to Borrower, at any time in force affecting all or part of the Property.

*Lien*: any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting all or any part of the Property or any interest therein, or any direct or indirect interest in Borrower or Borrower Representative, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

*Loan Documents*: this Agreement and all other documents, agreements and instruments now or hereafter evidencing, securing or delivered to Lender in connection with the Loan, including the following, each of which is dated as of the date hereof: (i) Promissory Note made by Borrower to Lender in the principal amount equal to the Loan (as the same may be amended, modified, restated, severed, split, consolidated, renewed, replaced, or supplemented from time to time, the "*Note*"), (ii) the Deed of Trust, Assignment of Leases and Rents and Security Agreement made by Borrower in favor of Lender which covers the Property (the "*Security Instrument*"), (iii) the Assignment of Leases and Rents from Borrower to Lender, (iv) the Assignment of Agreements, Licenses, Permits and Contracts from Borrower to Lender, (v) the Clearing Account Agreement, (vi) the Deposit Account Agreement and (vii) the Guaranty of Recourse Obligations (the "*Recourse Guaranty*") made by Guarantor; as each of the foregoing may be (and each of the foregoing defined terms shall refer to such documents as they may be) amended, restated, replaced, supplemented or otherwise modified from time to time.

*Loan-to-Value* (**LTV**): a fraction expressed as a percentage, the numerator of which is the principal balance of the Note, and the denominator of which is the appraised value of the Property as determined by Lender based upon a current "as-is" MAI appraisal for the Property obtained by and acceptable to Lender at Borrower's sole cost and expense.

*Low Income Restrictions*: means those covenants, conditions and/or restrictions contained in that certain Land Use Restriction Agreement dated as of August 11, 1995 by and between Resolution Trust Corporation and the Texas Department of Housing and Community Affairs (the "*TX Housing Agency*") recorded at Volume 2428, Page 289 of the Real Property Records of Grayson County, Texas (the "*Land Use Restoration Agreement*") and any similar covenants, conditions and/or restrictions applicable to any Individual Property and imposed by the State of Texas or any political subdivision or any agency thereof.

*Management Agreement*: the management agreement between Borrower and Manager, pursuant to which Manager is to manage the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with Section 5.11.

*Material Alteration*: any (i) individual alteration affecting (A) structural elements of the Property, (B) a roof of the Property or (C) any building system of the Property, or (ii) non-structural alteration the cost of which exceeds $250,000; provided, however, that in no event shall any of the following constitute a Material Alteration (a) any Required Repairs, (b) any tenant improvement work performed pursuant to any Lease existing on the date hereof or entered into hereafter in accordance with the provisions of this Agreement, or (c) alterations performed as part of a Restoration.

*Material Lease*: any Lease which is not for the residential use of the lessee thereunder.

**EXHIBIT 1**

*Maturity Date*: the date on which the final payment of principal of the Note (or the Defeased Note, if applicable) becomes due and payable as therein provided, whether at the Stated Maturity Date, by declaration of acceleration, or otherwise.

*Minor Lease*: any Lease that is not a Material Lease.

*Natixis*: means Natixis Real Estate Capital LLC, a Delaware limited liability company, its successors and assigns.

*Net Operating Income*: for any period, the actual net operating income of the Property after deducting therefrom deposits to (but not withdrawals from) any reserves required under this Agreement.

*NRSRO*: shall mean any credit rating agency that has elected to be treated as a nationally-recognized statistical rating agency for purposes of the Exchange Act irrespective of whether or not such credit rating agency has been engaged by Lender or another Indemnified Party to rate any of the Securities issued in connection with a Secondary Market Transaction involving the Loan or any portion thereof.

*Officer's Certificate*: a certificate delivered to Lender by Borrower which is signed by a senior executive officer of Borrower Representative.

*Open Prepayment Date*: the Payment Date which is closest to the sixtieth (60th) day prior to the Stated Maturity Date for the Loan.

*Partial Release Amount*: means with respect to any Release Parcel to be released in connection with a Partial Release pursuant to Section 2.6, the greater of (i) one hundred twenty-five percent (125%) of the Allocated Loan Amount for such Release Parcel and (ii) ninety percent (90%) of the Allocated Net Proceeds for such Release Parcel.

*Payment Date*: the fifth (5th) day of each calendar month or, if such day is not a Business Day, the immediately preceding Business Day; provided, however, that Lender may elect once during the Term, in its sole discretion, to change the date on which scheduled payments are due under the Loan upon written notice thereof to Borrower setting forth such changed date, in which event, upon the effective date of such notice, the Payment Date shall be the date set forth therein.

*Permitted Encumbrances*: (i) the Liens created by the Loan Documents, (ii) all Liens and other matters disclosed in the title insurance policy insuring the Lien of the Security Instrument, (iii) Liens, if any, for Taxes or other charges not yet due and payable and not delinquent, (iv) any workers', mechanics' or other similar Liens on the Property provided that any such Lien is bonded or discharged within thirty (30) days after Borrower first receives notice of such Lien and (v) such other title and survey exceptions as Lender approves in writing in Lender's discretion.

*Permitted Indebtedness*: the Debt and unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property which do not exceed, at any time, a maximum amount of one percent (1%) of the original amount of the Principal and are paid within thirty (30) days of the date incurred.

*Permitted Investments*: any one or more of the following obligations or securities payable on demand or having a scheduled maturity on or before the Business Day preceding the date upon which such funds are required to be drawn, and having at all times the required ratings, if any,

6

**EXHIBIT 1**

provided for in this definition: any Money Market Fund (the "Fund") so long as the Fund is rated "AAA M" or "AAA M-G" by each Rating Agency (or, if not rated by any Rating Agency other than S&P, otherwise acceptable to such Rating Agency or Agencies, as applicable, as confirmed in writing that such investment would not, in and of itself, result in a downgrade, qualification or withdrawal of the then current ratings assigned to any Securities).

*Permitted Transfers*: (i) a Lease entered into in accordance with the Loan Documents, (ii) a Special Transfer in accordance with the requirements set forth in Section 5.16, (iii) a Permitted Encumbrance, (iv) provided that no Default or Event of Default shall then exist, a Transfer of an interest in Borrower other than the interests in Borrower held by Borrower Representative, or a Transfer of an interest in Borrower Representative to any Person, provided that (A) such Transfer shall not (x) cause the transferee (together with its Affiliates) to acquire Control of Borrower or Borrower Representative or (y) result in Key Principal(s) no longer possessing, directly or indirectly, the power to direct or cause the direction of the management and policies of Borrower or Borrower Representative through the ownership of voting securities, by contract or otherwise, (B) after giving effect to such Transfer, Key Principal(s) shall continue to own at least 51% of all equity interests (direct or indirect) in Borrower, (C) Borrower shall give Lender notice of such Transfer together with copies of all instruments effecting such Transfer not less than ten (10) days prior to the date of such Transfer, and (D) the legal and financial structure of Borrower and its members and the single purpose nature and bankruptcy remoteness of Borrower and its members after such Transfer, shall satisfy Lender's then current applicable underwriting criteria and requirements, or (v) a Transfer for estate planning purposes of any Key Principal's direct or indirect interests in Borrower to the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal, or to a trust for the benefit of such Key Principal or for the benefit of the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal so long as Key Principal continues to possess, directly or indirectly, the power to direct or cause the direction of the management and policies of Borrower through the ownership of voting securities, by contract or otherwise.

*Person*: any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

*Phase I Environmental Site Assessment*: means collectively, (i) that certain Phase I Environmental Site Assessment Report (Project No. 17-198157.3) prepared by Partner Engineering and Science, Inc. ("Partner"), dated December 29, 2017, (i) that certain Phase I Environmental Site Assessment Report (Project No. 17-198157.6) prepared by Partner, dated December 29, 2017, and (iii) that certain Phase I Environmental Site Assessment Report (Project No. 17-198157.7) prepared by Partner dated December 29, 2017.

*Plan*: (i) an employee benefit or other plan established or maintained by Borrower or any ERISA Affiliate or to which Borrower or any ERISA Affiliate makes or is obligated to make contributions and (ii) which is covered by Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code.

*Property Condition Report*: means collectively, (i) that certain Property Condition Assessment (Project No. 17-198157.3) prepared by Partner, dated December 29, 2017, (ii) that certain Property Condition Assessment (Project No. 17-198157.6) prepared by Partner, dated December 29, 2017, and (iii) that certain Property Condition Assessment (Project No. 17-198157.7) prepared by Partner, dated December 29, 2017.

~#4825-6832-1881~

**EXHIBIT 1**

*Rating Agency*: each of Standard & Poor's Ratings Services, a division of The McGraw–Hill Companies, Inc. ("*S&P*"), Moody's Investors Service, Inc. ("*Moody's*"), and Fitch, Inc. or any other nationally–recognized statistical rating organization to the extent any of the foregoing have been engaged by Lender or its designee in connection with or in anticipation of any Secondary Market Transaction.

*Rating Comfort Letter*: a letter issued by each of the applicable Rating Agencies which confirms that the taking of the action referenced to therein will not result in any qualification, withdrawal or downgrading of any existing ratings of Securities created in a Secondary Market Transaction.

*Release Parcel*: any Individual Property.

*Regulation AB*: shall mean Regulation AB under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

*REMIC Trust*: a "real estate mortgage investment conduit" within the meaning of Section 860D of the Code that holds the Note, or any portion thereof.

*Rents*: all rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower, Manager or any of their agents or employees from any and all sources arising from or attributable to the Property and the Improvements, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or rendering of services by Borrower, Manager or any of their agents or employees and proceeds, if any, from business interruption or other loss of income insurance.

*Section 8*: Chapter 8 of the United States Housing Act of 1937 (42 U.S.C.), as amended, and any regulations promulgated thereunder.

*Section 8 Certificate Holders*: recipients of federal certificates or vouchers for rent subsidies pursuant to the Housing Choice Voucher Program or any similar program under Section 8.

*Servicer*: a servicer selected by Lender to service the Loan.

*State*: the state in which the Property is located.

*Taxes*: all real estate and personal property taxes, assessments, water rates or sewer rents, maintenance charges, impositions, vault charges and license fees, now or hereafter levied or assessed or imposed against all or part of the Property.

*Tenant*: any existing tenant, replacement tenant or proposed tenant under any existing Lease or any proposed Lease.

*Term*: the entire term of this Agreement, which shall expire upon repayment in full of the Debt and full performance of each and every obligation to be performed by Borrower pursuant to the Loan Documents.

~#4825-6832-1881~

EXHIBIT 1

*Toxic Mold*: any toxic mold or fungus at the Property which is of a type (i) that might pose a significant risk to human health or the environment or (ii) that would negatively impact the value of the Property.

*Transfer*: any sale, conveyance, transfer, lease or assignment, Lien, or the entry into any agreement to sell, convey, transfer, lease or assign, whether by law or otherwise, including forfeiture of, on, in or affecting (i) all or part of the Property (including any legal or beneficial direct or indirect interest therein), (ii) any direct or indirect interest in Borrower (including any profit interest), (iii) any direct or indirect interest in Borrower Representative or (iv) the direct or indirect right or power to direct or cause the direction of the management and policies of Borrower or Borrower Representative, through the ownership of voting securities, by contract or otherwise.

*UCC*: the Uniform Commercial Code as in effect in the State or the state in which any of the Cash Management Accounts are located, as the case may be.

*U.S. Obligations*: direct non–callable obligations backed by the full faith and credit of the United States of America.

*Welfare Plan*: an employee welfare benefit plan, as defined in Section 3(1) of ERISA.

*Yield Maintenance Premium*: means a prepayment fee equal to the greater of (i) three percent (3%) of the amount of Principal being prepaid and (ii) the product obtained by multiplying:

(A)   the amount of Principal being prepaid,

*by*

(B)   the excess (if any) of the Monthly Note Rate over the Assumed Reinvestment Rate;

*by*

(C)   the Present Value Factor.

The following definitions shall apply:

**Monthly Note Rate:** one–twelfth (1/12) of the Interest Rate, expressed as a decimal calculated to five digits.

**Assumed Reinvestment Rate:** one–twelfth (1/12) of the yield rate equal to the lesser of (i) the yield on the U.S. Treasury issue (primary issue) with a maturity date closest to the Open Prepayment Date, or (ii) the yield on the U.S. Treasury issue (primary issue) with a term equal to the remaining average life of the Debt (assuming prepayment in full on the Open Prepayment Date), with each such yield being based on the bid price for such issue as published in the Wall Street Journal on the date that is fourteen (14) days prior to the date of such prepayment (or, if such bid price is not published on that date, the next preceding date on which such bid price is so published) and converted to a monthly compounded nominal yield.

**Present Value Factor:** the factor that discounts to present value the costs resulting to Lender from the difference in interest rates during the months remaining between the date of prepayment and the Open Prepayment Date, using the Assumed Reinvestment Rate as the discount rate, with monthly compounding, expressed numerically as follows:

~#4825-6832-1881~

**EXHIBIT 1**

$$1 - \dfrac{\left(\dfrac{1}{1 + ARR}\right)^{n}}{ARR}$$

n = number of months remaining between the date of prepayment and the Open Prepayment Date

ARR = Assumed Reinvestment Rate

> *Zoning Report*: means, collectively, (i) that certain Zoning Report, dated December 8, 2017, prepared by Zoning-Info, Inc., (Site No. 53113), (ii) that certain Zoning Report, dated December 8, 2017, prepared by Zoning-Info, Inc., (Site No. 53116), and (iii) ) that certain Zoning Report, dated December 8, 2017, prepared by Zoning-Info, Inc., (Site No. 53112).

    **1.2**   **Index of Other Definitions**. An index of other terms which are defined in this Agreement or in other Loan Documents is set forth on **Schedule 1**.

    **1.3**   **Principles of Construction**. Unless otherwise specified, (i) all references to sections and schedules are to those in this Agreement, (ii) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision, (iii) all definitions are equally applicable to the singular and plural forms of the terms defined, (iv) the word "including" means "including but not limited to," and (v) accounting terms not specifically defined herein shall be construed in accordance with GAAP, or such other accounting method used by Borrower applied consistently and approved by Lender.

**2.**    **GENERAL LOAN TERMS**

    **2.1**   **The Loan**. Lender is making a loan (the "*Loan*") to Borrower on the date hereof, in the original principal amount (the "*Principal*") of $5,762,598.00, which shall mature on the Stated Maturity Date. Borrower acknowledges receipt of the Loan, the proceeds of which are being and shall be used to (i) acquire or refinance the Property, (ii) fund certain of the Subaccounts, and (iii) pay transaction costs. Any excess proceeds may be used for any lawful purpose. No amount repaid in respect of the Loan may be reborrowed.

    **2.2**   **Interest; Monthly Payments**.

        **2.2.1**   **Generally**. From and after the date hereof, interest on the unpaid Principal shall accrue at the Interest Rate and be payable as hereinafter provided. On the date hereof, Borrower shall pay interest on the unpaid Principal from the date hereof through and including February 4, 2018. On March 5, 2018 (the "*First Payment Date*") and each Payment Date thereafter through and including the Payment Date immediately preceding the Stated Maturity Date, Borrower shall pay an amount equal to the Monthly Debt Service Payment Amount; which payment is based on the Interest Rate and the Amortization Schedule. The Monthly Debt Service Payment Amount due on any Payment Date shall first be applied to the payment of interest accrued from the scheduled Payment Date preceding the Payment Date on which such Monthly Debt Service Payment Amount is paid through the day of the month immediately preceding the Payment Date on which such Monthly Debt Service Payment Amount is paid, notwithstanding that the actual Payment Date may not have been the scheduled Payment Date because the scheduled Payment Date is not a Business Day. The remainder of such Monthly Debt Service Payment Amount shall be applied to the reduction of the unpaid Principal. All accrued and unpaid interest shall be

-#4825-6832-1881-

**EXHIBIT 1**

due and payable on the Maturity Date. If the Loan is repaid on any date other than on a Payment Date (whether prior to or after the Stated Maturity Date), Borrower shall also pay interest that would have accrued on such repaid Principal to but not including the next Payment Date.

**2.2.2  Default Rate.** After the occurrence and during the continuance of an Event of Default, the entire unpaid Debt shall bear interest at the Default Rate, and shall be payable upon demand from time to time, to the extent permitted by applicable law.

**2.2.3  Taxes.** Any and all payments by Borrower hereunder and under the other Loan Documents shall be made free and clear of and without deduction for any and all present or future taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto, excluding taxes imposed on Lender's income, and franchise taxes imposed on Lender by law or regulation of any Governmental Authority (all such non–excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities being hereinafter referred to in this Section 2.2.3 as "*Applicable Taxes*"). If Borrower shall be required by law to deduct any Applicable Taxes from or in respect of any sum payable hereunder to Lender, the following shall apply: (i) the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.2.3), Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions and (iii) Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable law. Payments pursuant to this Section 2.2.3 shall be made within ten (10) days after the date Lender makes written demand therefor.

**2.2.4  Requirements of Law.**

(a)  If any Legal Requirement or any change in the interpretation or application thereof or compliance by Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(i)  shall subject Lender to any tax of any kind whatsoever with respect to this Agreement, the Note or the Loan (excluding net income taxes) or change the basis of taxation of payments to Lender in respect thereof;

(ii)  shall impose, modify or hold applicable any reserve, special deposit, compulsory advance or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances or other extensions of credit by, or any other acquisition of funds by, any office of Lender;

(iii)  shall impose on Lender any other condition;

and the result of any of the foregoing is to increase the cost to Lender, by an amount which Lender deems to be material, of making or maintaining the Loan or to reduce any amount receivable hereunder in respect thereof, then, in any such case, Borrower shall, from time to time, upon receipt of prior written notice of not less than ten (10) Business Days of such fact and a reasonably detailed description of the circumstances, promptly pay Lender such additional amount or amounts as will compensate Lender for such increased cost or reduced amount receivable (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally) and are not prohibited by such Legal Requirement to be charged back.

(b)  If Lender shall have determined that the adoption of or any change in any Legal Requirement regarding capital adequacy or in the interpretation or application thereof or compliance by Lender or any corporation controlling Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date

**EXHIBIT 1**

hereof shall have the effect of reducing the rate of return on Lender's or such corporation's capital as a consequence of its obligations hereunder by an amount deemed by Lender to be material (taking into consideration Lender's or such corporation's policies with respect to capital adequacy), then from time to time, Borrower shall promptly, upon notice from Lender, pay to Lender such additional amount or amounts as will compensate Lender for such reduction (provided such additional amounts are then being charged by Lender to its borrowers under similar loans generally).

(c)    If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.4, it shall promptly notify Borrower of the event by reason of which it has become so entitled. A certificate as to any additional amounts payable pursuant to this subsection submitted by Lender to Borrower shall be conclusive in the absence of manifest error or the provision of immediate proof by Borrower to the contrary.

**2.3    Loan Repayment and Defeasance.**

**2.3.1    Repayment.** Borrower shall repay the entire outstanding principal balance of the Note in full on the Maturity Date, together with interest thereon to (but excluding) the date of repayment and any other amounts due and owing under the Loan Documents. Borrower shall have no right to prepay or defease all or any portion of the Principal, except in accordance with Sections 2.3.2, 2.3.3 and 2.3.4 below. Except during the continuance of an Event of Default, all proceeds of any repayment, including permitted prepayments, of the Loan shall be applied by Lender as follows in the following order of priority: *First*, accrued and unpaid interest at the Interest Rate; *Second*, to Principal; and *Third*, to any other amounts then due and owing under the Loan Documents, including the Yield Maintenance Premium (if such repayment or prepayment occurs prior to the Stated Maturity Date). Notwithstanding the foregoing, if (i) no Event of Default then exists, the Yield Maintenance Premium shall not be due in connection with a prepayment of the Loan on or after the Open Prepayment Date and (ii) there exists an Event of Default, then, irrespective of when prepayment is made, Lender shall be entitled to receive, in addition to the unpaid Principal and accrued interest and other sums due under the Loan Documents, an amount equal to the Yield Maintenance Premium. During the continuance of an Event of Default, all proceeds of repayment, including any payment or recovery on the Property (whether through foreclosure, deed–in–lieu of foreclosure, or otherwise) shall, unless otherwise provided in the Loan Documents, be applied in such order and in such manner as Lender shall elect in Lender's discretion.

**2.3.2    Mandatory Prepayments.** The Loan is subject to mandatory prepayment in certain instances of Insured Casualty or Condemnation (each a "*Casualty/Condemnation Prepayment*"), in the manner and to the extent set forth in Section 7.4.2. Each Casualty/Condemnation Prepayment, after deducting Lender's costs and expenses (including reasonable attorneys' fees and expenses) in connection with the settlement or collection of the Proceeds or Award, shall be applied in the same manner as repayments under Section 2.3.1, and if such Casualty/Condemnation Payment is made on any date other than a Payment Date, then such Casualty/Condemnation Payment shall include interest that would have accrued on the Principal prepaid to but not including the next Payment Date. Provided that no Event of Default is continuing, any such mandatory prepayment under this Section 2.3.2 shall be without the payment of the Yield Maintenance Premium.

**2.3.3    Voluntary Defeasance of the Note.**

(a)    Subject to the terms and conditions set forth in this Section 2.3.3, Borrower may defease the entire amount of the Principal (a "*Full Defeasance*") or a portion of the Principal (a "*Partial Defeasance*") (any such Full Defeasance or Partial Defeasance, a "*Defeasance*"); provided, that no Defeasance may occur (i) prior to the Start–up Date, (ii) if an Event of Default shall have occurred (unless such Event of Default will be cured by the Defeasance) and (iii) on any date other than a Payment Date.

12

Each Defeasance shall be subject, in each case, to the satisfaction of all of the following conditions precedent:

(i)        Borrower will give Lender not less than thirty (30) days prior written notice (the "*Defeasance Notice*") specifying a Payment Date (the "*Defeasance Date*") on which a Defeasance Deposit (hereinafter defined) is to be made.

(ii)       Payment to Lender of all accrued and unpaid interest on the unpaid Principal of the Note to and including the Defeasance Date and the scheduled amortization payment due on such Defeasance Date.

(iii)      Payment to Lender of all other sums, not including scheduled interest or Principal payments, then due and payable under the Note and the other Loan Documents.

(iv)      Payment to Lender of an amount equal to the sum of (x) an amount sufficient to purchase U.S. Obligations which provide payments that will meet the Scheduled Defeasance Payments, (y) costs and expenses incurred or to be incurred in the purchase of the U.S. Obligations and (z) any revenue, documentary stamp or intangible taxes or any other tax or charge due in connection with the Defeasance (the "*Defeasance Deposit*").

(v)       Payment to Lender of all costs and expenses incurred by Lender in connection with such Defeasance, including reasonable attorneys' fees.

(vi)      In the case of a Partial Defeasance, the execution and delivery by Borrower of all necessary documents to amend and restate the Note and issue two substitute notes, one having a principal balance equal to the defeased portion of the original Note (the "*Defeased Note*") and the other having a principal balance equal to the undefeased portion of the original Note (the "*Undefeased Note*"). The Defeased Note and Undefeased Note shall have terms identical to the terms of the Note, except for the principal balance and a pro rata allocation of the Monthly Debt Service Payment Amount. (After a Partial Defeasance, all references hereunder and in the other Loan Documents to the term "Note" shall mean and be deemed to refer to the Undefeased Note, unless expressly provided to the contrary.) A Defeased Note cannot be the subject of any further Defeasance.

(vii)     Delivery to Lender of: (A) a security agreement, in form and substance satisfactory to Lender, creating a first priority lien on the Defeasance Deposit and the U.S. Obligations purchased on behalf of Borrower with the Defeasance Deposit in accordance with this provision of this Section 2.3.3 (the "*Security Agreement*"); (B) an Officer's Certificate of Borrower certifying that the requirements set forth in Section 2.3.3(a) have been satisfied; (C) an opinion of counsel for Borrower in form and substance satisfactory to Lender stating, among other things, that Lender has a perfected first priority security interest in the Defeasance Deposit and the U.S. Obligations purchased by Lender on behalf of Borrower, that the Security Agreement is the legal, valid and binding obligation of Borrower enforceable against Borrower in accordance with its terms and that the Defeasance will not adversely affect the status of any REMIC Trust formed in connection with a Secondary Market Transaction; (D) a certificate of an accounting firm acceptable to Lender which certifies that the U.S. Obligations are sufficient to make the Scheduled Defeasance Payments; (E) a Rating Comfort Letter from each applicable Rating Agency with respect to such Defeasance; and (F) such other certificates, documents or instruments as Lender may reasonably request.

In connection with the conditions set forth in this Section 2.3.3(a), Borrower hereby appoints Lender as its agent and attorney-in-fact for the purpose of using the Defeasance Deposit to purchase U.S. Obligations which provide payments (A) on or prior to, but as close as possible to, all successive Payment

~#4825-6832-1881~

**EXHIBIT 1**

Dates after the date of calculation through the Stated Maturity Date (and in connection therewith Borrower shall not be permitted to provide early notice of prepayment pursuant to <u>Section 2.3.4</u> hereof; provided, however, Successor Borrower (as defined below) shall be permitted to provide such notice of prepayment) and (B) in amounts sufficient to pay, (x) in the case of a Full Defeasance, the Monthly Debt Service Payment Amount required under the Note (or Undefeased Note, as the case may be) together with the unpaid Principal of the Note (or Undefeased Note, as the case may be) payable on the Stated Maturity Date and (y) in the case of a Partial Defeasance, the Monthly Debt Service Payment Amount multiplied by the Defeasance Percentage together with the unpaid Principal of the Defeased Note payable on the Stated Maturity Date (such payments, the "*Scheduled Defeasance Payments*"). Borrower, pursuant to the Security Agreement or other appropriate document, shall authorize and direct that the payments received from the U.S. Obligations may be made directly to Lender and applied to satisfy the obligations of Borrower under the Note or the Defeased Note, as applicable. Any amounts received in respect of the U.S. Obligations in excess of the amounts necessary to make monthly payments hereunder shall be retained by Lender until payment in full of the Debt. Semi-annual payments in respect of the U.S. Obligations shall be applied to the payments under the Note or the Defeased Note, as applicable, as the same become due thereunder.

(b)    Borrower shall deliver a copy of the Defeasance Notice to Natixis Real Estate Capital LLC, 1251 Avenue of the Americas, New York, New York 10020; Attention: Real Estate Administration, at the same time and in the same manner, as given to Lender. In connection with a Defeasance of the Loan under this <u>Section 2.3.3</u>, Natixis, at its option, shall establish or designate a successor entity (the "*Successor Borrower*"), which Successor Borrower shall be a Special Purpose Entity acceptable to Lender and shall not own any other assets or have any other liabilities or operate any other property, except in connection with other defeased loans held in the same securitized pool with the Loan. The right to establish or designate the Successor Borrower, as well as the right of the Successor Borrower to provide notice of prepayment pursuant to <u>Section 2.3.4</u> hereof, shall be retained by Natixis (but may be assigned to an Affiliate) notwithstanding the sale, assignment or transfer of this Agreement unless such obligation is expressly assigned by Natixis and assumed by the transferee. Borrower shall, in the case of a Full Defeasance, transfer and assign all obligations, rights and duties under and to the Security Agreement and to the Note or, in the case of a Partial Defeasance, transfer and assign all obligations, rights and duties under and to the Security Agreement and to the Defeased Note, as applicable, together with the pledged U.S. Obligations to the Successor Borrower. The Successor Borrower shall assume all obligations under the Loan Documents and the Security Agreement, and Borrower shall be relieved of its obligations thereunder. Borrower shall pay a $1,000 fee to any such Successor Borrower as consideration for assuming such obligations. Notwithstanding anything herein to the contrary, no other assumption fee shall be payable upon a transfer of the Note or the Defeased Note, as applicable, in accordance with this <u>Section 2.3.3</u>, but Borrower shall pay all costs and expenses incurred by Lender, including Lender's reasonable attorneys' fees and expenses and ongoing fees and expenses incurred in connection with this <u>Section 2.3.3</u>.

**2.3.4    Permitted Prepayment.** On the Open Prepayment Date or on any Payment Date thereafter prior to the Stated Maturity Date, Borrower shall have the right to pay the entire Debt upon ten (10) Business Days notice to Lender, without payment of the Yield Maintenance Premium and without effecting a Defeasance, provided that no Event of Default then exists. If any such payment of the Debt pursuant to the preceding sentence is made on any date other than the Open Prepayment Date or any Payment Date thereafter prior to the Stated Maturity Date, such payment shall be accompanied by a payment in an amount equal to interest on the unpaid Principal through the end of the Interest Period during which such payment is made.

~4825-6832-1881~

**EXHIBIT 1**

**2.4    Release of Property.**  Except as set forth in this Section 2.4, no repayment, prepayment or Defeasance shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Security Instrument.

**2.4.1    Release on Defeasance.**  If Borrower has elected a Full Defeasance, and the requirements of Section 2.3.3 have been satisfied, the Property shall be released from the Lien of the Security Instrument, and the U.S. Obligations pledged pursuant to the Security Agreement shall be the sole source of collateral securing the Debt.  In connection with such release, Borrower shall submit to Lender, not less than twenty (20) days prior to the Defeasance Date, a form of release for execution by Lender appropriate in the State and satisfactory to Lender, and all other documentation Lender requires to be delivered by Borrower, together with an Officer's Certificate certifying that such documentation (i) is in compliance with all Legal Requirements and (ii) will effect such release in accordance with the terms of this Agreement.

**2.4.2    Release on Payment in Full.**  Lender shall, upon the written request and at the expense of Borrower, upon payment in full of the Debt in accordance herewith, release or, if requested by Borrower, assign to Borrower's designee (without any representation or warranty by and without any recourse against Lender whatsoever) the Lien of the Loan Documents if not theretofore released.

**2.5    Payments and Computations.**

**2.5.1    Making of Payments.**  Each payment by Borrower shall be made in funds settled through the New York Clearing House Interbank Payments System or other funds immediately available to Lender by 11:00 a.m., New York City time, on the date such payment is due, to Lender by deposit to such account as Lender may designate by written notice to Borrower.  Whenever any such payment shall be stated to be due on a day that is not a Business Day, such payment shall be made on the immediately preceding Business Day.  All such payments shall be made irrespective of, and without any deduction, set-off or counterclaim whatsoever and are payable without relief from valuation and appraisement laws and with all costs and charges incurred in the collection or enforcement thereof, including attorneys' fees and court costs.

**2.5.2    Computations.**  Interest payable under the Loan Documents shall be computed on the basis of the actual number of days elapsed over a 360-day year.

**2.5.3    Late Payment Charge.**  If any Principal, interest or other sum due under any Loan Document is not paid by Borrower on the date on which it is due, subject to any applicable grace or cure period, if any, Borrower shall pay to Lender upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the maximum amount permitted by applicable law (the "*Late Payment Charge*"), in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Such amount shall be secured by the Loan Documents.

**2.6    Partial Release.**  Notwithstanding anything contained in this Agreement or any other Loan Document to the contrary, from and after the Start-Up Date Borrower shall be entitled to obtain the release (each, a "*Partial Release*") of a Release Parcel from the lien of the Security Instrument and the other applicable Loan Documents provided that the following conditions are first or concurrently satisfied in a manner wholly satisfactory to Lender:

(a)    Borrower delivers evidence wholly satisfactory to Lender that the purchaser of the Release Parcel is a third party entity not affiliated with Borrower.

**EXHIBIT 1**

(b)    Lender determines that after the Partial Release, the Debt Service Coverage Ratio is not less than the greater of (i) the Debt Service Coverage Ratio immediately preceding such Partial Release and (ii) the Debt Service Coverage Ratio as of the date hereof;

(c)    Lender determines that after the Partial Release, the Loan-to-Value is not greater than the lesser of (i) the Loan-to-Value immediately preceding such Partial Release and (ii) the Loan-to-Value as of the date hereof.

(d)    Borrower delivers to Lender the Partial Release Amount which Partial Release Amount shall be applied against the outstanding Principal in accordance with the terms of this Loan Agreement, including, without limitation, with the terms for a Partial Defeasance pursuant to Section 2.3.3 of this Agreement;

(e)    Borrower shall have reimbursed Lender for all reasonable out-of-pocket costs and expenses Lender incurs with respect to or arising from the consummation of the Partial Release (including, without limitation, reasonable attorneys' fees and expenses);

(f)    At the time Borrower requests a Partial Release and at the time such Partial Release is consummated, there exists no continuing Event of Default;

(g)    Borrower shall have provided Lender with a written notice setting forth Borrower's request for the Partial Release, which notice shall: (i) be delivered to Lender at least thirty (30) days but no more than ninety (90) days prior to the proposed date of such Partial Release, and (ii) include, without limitation, (x) all draft documents purporting to convey the Release Parcel or otherwise relating to the consummation of the Partial Release, including a release of the Release Parcel from the lien of the Mortgage and the other applicable Loan Documents, and (y) all information which Lender deems reasonably necessary to process the request for such Partial Release, including the proposed date when the Partial Release is to occur and the name of the prospective third party transferee;

(h)    Borrower shall have obtained any and all third-party, governmental or other consents or approvals necessary as a condition to the consummation of such Partial Release and the consummation of such Partial Release shall not be in violation of any agreement or instrument by which Borrower or the Property is bound and Borrower shall have provided written evidence to Lender that such conditions have been satisfied;

(i)    Borrower shall have delivered to Lender at the time of the consummation of a Partial Release (i) an endorsement to the existing loan title insurance policy or policies ("*Title Policy*") amending the legal description of the real property insured under the Title Policy and insuring that the Partial Release does not affect the validity or priority of the lien of the Mortgage with respect to the remainder of the Property which shall continue to be encumbered by the Mortgage (the "*Remaining Property*");

(j)    Lender determines that after the Partial Release, the percentage of units at the Remaining Property subject to Low Income Restrictions and/or leased to Section 8 Certificate Holders is not greater than the percentage of such units as of the date hereof as reflected on Schedule 7; and

(k)    any additional documentation reasonably requested by Lender in conjunction with the consummation of the Partial Release.

Notwithstanding the foregoing provisions in this Section 2.6, if the Loan or any portion thereof is included in a REMIC Trust and, immediately following the release of a Release Parcel, the Loan-to-Value

16

**EXHIBIT 1**

ratio of the Remaining Property is greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust, based solely on real property and excluding any personal property and going concern value, if any), then the principal balance of the Loan must be paid down in accordance with the provisions of the Loan Documents by a "qualified amount" as that term is defined in Revenue Procedure 2010-30, or any successor IRS announcements or regulations.

## 3.  CASH MANAGEMENT AND RESERVES

**3.1  Cash Management Arrangements.**  All Rents received by Borrower or Manager shall be deposited into the Clearing Account within two (2) Business Days of receipt.  During a Cash Management Period, Funds deposited into the Clearing Account shall be swept by the Clearing Bank on a daily basis into the Deposit Account and applied and disbursed in accordance with this Agreement. Funds in the Deposit Account shall be invested at Lender's discretion only in Permitted Investments. Lender will also establish subaccounts of the Deposit Account which shall at all times be Eligible Accounts (and may be ledger or book entry accounts and not actual accounts) (such subaccounts are referred to herein as "*Subaccounts*").  The Deposit Account and any Subaccount will be under the sole control and dominion of Lender, and Borrower shall have no right of withdrawal therefrom.  Borrower shall pay for all expenses of opening and maintaining all of the above accounts.  At all times other than during the continuance of a Cash Management Period, (i) funds on deposit in the Clearing Account may be released to Borrower as permitted in the Clearing Account Agreement and (ii) Lender may, in its discretion, elect to maintain the deposits and reserves required under this Agreement in an Eligible Account at a bank or other depository selected by Lender other than the Deposit Bank in which case, all references to the Deposit Account and any Subaccounts hereunder shall be deemed to include such Eligible Account and the subaccounts of any such Eligible Account and all funds in such Eligible Account shall be invested at Lender's discretion only in Permitted Investments.

**3.2  Required Repairs.**

**3.2.1  Completion of Required Repairs.**  Borrower shall perform and complete each item of the repairs and environmental remedial work at the Property described on **Schedule 2** (the "*Required Repairs*") within twelve (12) months of the date hereof or such shorter period of time for such item set forth on **Schedule 2**.

**3.2.2  Required Repairs Reserves.**  On the date hereof, Borrower shall deposit with Lender the aggregate amount set forth on **Schedule 2** as being required to complete the Required Repairs and Lender shall cause such amount to be transferred to a Subaccount (the "*Required Repairs Subaccount*").  Provided no Default or Event of Default has occurred and is continuing, Lender shall disburse funds held in the Required Repairs Subaccount to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000, accompanied by the following items (which items shall be in form and substance satisfactory to Lender): (i) an Officer's Certificate (A) certifying that the Required Repairs or any portion thereof which are the subject of the requested disbursement have been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) identifying each Person that supplied materials or labor in connection with such Required Repairs or any portion thereof and (C) stating that each such Person has been or, upon receipt of the requested disbursement, will be paid in full with respect to the portion of the Required Repairs which is the subject of the requested disbursement; (ii) copies of appropriate Lien waivers or other evidence of payment satisfactory to Lender; (iii) at Lender's option, a title search for the Property indicating that it is free from all Liens not previously approved by Lender; (iv) a copy of each License required to be obtained with respect to the portion of the Required Repairs which is the subject of the requested disbursement; and (v) such other

17

**EXHIBIT 1**

evidence as Lender shall reasonably request that the Required Repairs which are the subject of the requested disbursement have been completed and paid for.

    **3.3**    **Taxes and Insurance.** Borrower shall pay to Lender on each Payment Date (i) one-twelfth of the Taxes that Lender estimates will be payable during the next twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates and (ii) one-twelfth of the Insurance Premiums that Lender estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies. Such amounts will be transferred by Lender to a Subaccount (the "*Tax and Insurance Subaccount*"). Provided that no Default or Event of Default has occurred and is continuing, Lender will (a) apply funds in the Tax and Insurance Subaccount to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Sections 5.2 and 7.1, provided that Borrower has promptly supplied Lender with notices of all Taxes and Insurance Premiums due, or (b) reimburse Borrower for such amounts upon presentation of evidence of payment and an Officer's Certificate in form and substance satisfactory to Lender; subject, however, to Borrower's right to contest Taxes in accordance with Section 5.2. In making any payment relating to Taxes and Insurance Premiums, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof. If Lender determines in its reasonable judgment that the funds in the Tax and Insurance Subaccount will be insufficient to pay (or in excess of) the Taxes or Insurance Premiums next coming due, Lender may increase (or decrease) the monthly contribution required to be made by Borrower to the Tax and Insurance Subaccount.

    **3.4**    **Capital Expense Reserves.** Borrower shall pay to Lender on each Payment Date an amount initially equal to $2,833.25. Lender will transfer such amount into a Subaccount (the "*Capital Reserve Subaccount*"). Additionally, upon thirty (30) days' prior notice to Borrower, Lender may reassess the amount of the monthly payment required under this Section 3.4 from time to time in its reasonable discretion (based upon its then current underwriting standards). Provided that no Default or Event of Default has occurred and is continuing, Lender shall disburse funds held in the Capital Reserve Subaccount to Borrower, within fifteen (15) days after the delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $5,000, provided that (i) such disbursement is for an Approved Capital Expense; (ii) Lender shall have (if it desires) verified (by an inspection conducted at Borrower's expense) performance of the work associated with such Approved Capital Expense; and (iii) the request for disbursement is accompanied by (A) an Officer's Certificate certifying (v) that such funds will be used to pay or reimburse Borrower for Approved Capital Expenses and a description thereof, (w) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (x) that the same has not been the subject of a previous disbursement, (y) that all previous disbursements have been used to pay the previously identified Approved Capital Expenses and (z) that any construction work associated with such Approved Capital Expenses has been completed in a good and workmanlike manner and in accordance with all applicable Legal Requirements, (B) reasonably detailed documentation satisfactory to Lender as to the amount, necessity and purpose therefor, (C) copies of appropriate Lien waivers or other evidence of payment satisfactory to Lender in connection with any construction work associated with such Approved Capital Expenses and (D) at Lender's option, a title search for the Property indicating that it is free from all Liens not previously approved by Lender. Any such disbursement of more than $10,000 to pay (rather than reimburse) Approved Capital Expenses may, at Lender's option, be made by joint check payable to Borrower and the payee on such Approved Capital Expenses.

18

**EXHIBIT 1**

**3.5** **Intentionally Deleted.**

**3.6** **Operating Expense Subaccount.** During a Cash Management Period, Rents shall be transferred into a Subaccount (the "*Operating Expense Subaccount*") as provided in Section 3.10. Provided no Default or Event of Default has occurred and is continuing, Lender shall disburse funds held in the Operating Expense Subaccount to Borrower, within fifteen (15) days after delivery by Borrower to Lender of a request therefor (but not more often than once per month), in increments of at least $1,000, provided (i) such disbursement is for an Approved Operating Expense; and (ii) such disbursement is accompanied by (A) an Officer's Certificate certifying (w) that such funds will be used to pay Approved Operating Expenses and a description thereof, (x) that all outstanding trade payables (other than those to be paid from the requested disbursement or those constituting Permitted Indebtedness) have been paid in full, (y) that the same has not been the subject of a previous disbursement, and (z) that all previous disbursements have been or will be used to pay the previously identified Approved Operating Expenses, and (B) reasonably detailed documentation satisfactory to Lender as to the amount, necessity and purpose therefor.

**3.7** **Casualty/Condemnation Subaccount.** Borrower shall pay, or cause to be paid, to Lender all Proceeds or Awards due to any Casualty or Condemnation to be transferred to a Subaccount (the "*Casualty/Condemnation Subaccount*") in accordance with the provisions of Section 7. All amounts in the Casualty/Condemnation Subaccount shall be disbursed in accordance with the provisions of Section 7.

**3.8** **Security Deposits.** Borrower shall keep all security deposits under Leases at a separately designated account under Borrower's control at the Clearing Bank so that the security deposits shall not be commingled with any other funds of Borrower (such account, the "*Security Deposit Account*"). During a Cash Management Period, Borrower shall, upon Lender's request, if permitted by applicable Legal Requirements, turn over to Lender the security deposits (and any interest theretofore earned thereon) under Leases, to be held by Lender in a Subaccount (the "*Security Deposit Subaccount*") subject to the terms of the Leases. Security deposits held in the Security Deposit Subaccount will be released by Lender upon notice from Borrower together with such evidence as Lender may reasonably request that such security deposit is required to be returned to a Tenant pursuant to the terms of a Lease or may be applied as Rent pursuant to the rights of Borrower under the applicable Lease. Any letter of credit or other instrument that Borrower receives in lieu of a cash security deposit under any Lease entered into after the date hereof shall (i) be maintained in full force and effect in the full amount unless replaced by a cash deposit as hereinabove described and (ii) if permitted pursuant to any Legal Requirements, name Lender as payee or mortgagee thereunder (or at Lender's option, be fully assignable to Lender).

**3.9** **Grant of Security Interest; Application of Funds.** As security for payment of the Debt and the performance by Borrower of all other terms, conditions and provisions of the Loan Documents, Borrower hereby pledges and assigns to Lender, and grants to Lender a security interest in, all of Borrower's right, title and interest in and to all Rents and in and to all payments to or monies held in the Clearing Account, the Deposit Account and all Subaccounts created pursuant to this Agreement (collectively, the "*Cash Management Accounts*"). Borrower hereby grants to Lender a continuing security interest in, and agrees to hold in trust for the benefit of Lender, all Rents in its possession prior to the (i) payment of such Rents to Lender or (ii) deposit of such Rents into the Deposit Account. Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any Cash Management Account, or permit any Lien to attach thereto, or any levy to be made thereon, or any UCC financing statements, except those naming Lender as the secured party, to be filed with respect thereto. This Agreement is, among other things, intended by the parties to be a security agreement for purposes of the UCC. Upon the occurrence and during the continuance of an Event of Default, Lender may apply any sums in any Cash Management Account in any order and in any manner

19

**EXHIBIT 1**

as Lender shall elect in Lender's discretion without seeking the appointment of a receiver and without adversely affecting the rights of Lender to foreclose the Lien of the Security Instrument or exercise its other rights under the Loan Documents. Cash Management Accounts shall not constitute trust funds and may be commingled with other monies held by Lender. Borrower shall be entitled to receive on a semi-annual basis interest on any balance in the Deposit Account and any Subaccounts other than Subaccounts established for the collection of Escrows (including any Eligible Account maintained at a bank or other depository other than the Deposit Bank selected by Lender in accordance with Section 3.1) at a rate equal to the U.S. and Regional Composite National Bank Average Retail Savings Money Market CD Yield, from time to time. Upon repayment in full of the Debt, all remaining funds in the Subaccounts, if any, shall be promptly disbursed to Borrower.

**3.10    Property Cash Flow Allocation.**

(a)    During a Cash Management Period, any Rents deposited into the Deposit Account up to and including the Business Day prior to a Payment Date shall be applied on such Payment Date as follows in the following order of priority:

(i)    First, to make payments into the Tax and Insurance Subaccount as required under Section 3.3;

(ii)    Second, to pay the monthly portion of the fees charged by the Deposit Bank in accordance with the Deposit Account Agreement;

(iii)    Third, to Lender to pay the Monthly Debt Service Payment Amount due on such Payment Date (plus, if applicable, interest at the Default Rate and all other amounts, other than those described under other clauses of this Section 3.10(a), then due to Lender under the Loan Documents), which payments shall be made into a Subaccount (the "***Monthly Debt Service Subaccount***") to be established for such purpose under the Deposit Account Agreement;

(iv)    Fourth, to make payments into the Capital Reserve Subaccount as required under Section 3.4;

(v)    Fifth, to make payments for Approved Operating Expenses as required under Section 3.6;

(vi)    Sixth, after the consummation of a Secondary Market Transaction, to pay the pro rata portion of the expenses described in Section 9; and

(vii)    Lastly, any excess amounts shall be held in the Cash Collateral Reserve Subaccount as required under Section 3.11.

(b)    The failure of Borrower to make all of the payments required under clauses (i) through (vi) of Section 3.10(a) in full on each Payment Date shall constitute an Event of Default under this Agreement.

(c)    Notwithstanding anything to the contrary contained in this Section 3.10, after the occurrence of a Default or an Event of Default, Lender may apply all Rents deposited into the Deposit Account and other proceeds of repayment in such order and in such manner as Lender shall elect.

**3.11    Cash Collateral Reserve.**  Following the commencement, and at all times during the continuance, of a Cash Management Period, all amounts remaining in the Deposit Account after making

**EXHIBIT 1**

the payments described in Section 3.10(a)(i) through (vi), if any, shall be deposited into a Subaccount (the "*Cash Collateral Reserve Subaccount*"). All funds deposited into the Cash Collateral Reserve Subaccount shall be held by Lender as additional security for the Debt and Borrower shall have no right to receive any disbursements therefrom. Notwithstanding the foregoing, upon the termination of any Cash Management Period, no further deposits shall be made into the Cash Collateral Reserve Subaccount and, provided that no Event of Default has occurred and is continuing, all amounts then on deposit in the Cash Collateral Reserve Subaccount shall be paid to Borrower.

## 4.   **REPRESENTATIONS AND WARRANTIES**

Borrower represents and warrants to Lender as of the date hereof that:

   **4.1   Organization; Special Purpose.** Each of Borrower and Borrower Representative has been duly organized and is validly existing and in good standing under the laws of the state of its formation, with requisite power and authority, and all rights, licenses, permits and authorizations, governmental or otherwise, necessary to own its properties and to transact the business in which it is now engaged. Each of Borrower and Borrower Representative is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, business and operations. Each of Borrower and Borrower Representative is a Special Purpose Entity.

   **4.2   Proceedings; Enforceability.** Borrower has taken all necessary action to authorize the execution, delivery and performance of the Loan Documents. The Loan Documents have been duly executed and delivered by Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and general principles of equity. The Loan Documents are not subject to, and Borrower has not asserted, any right of rescission, set-off, counterclaim or defense, including the defense of usury. No exercise of any of the terms of the Loan Documents, or any right thereunder, will render any Loan Document unenforceable.

   **4.3   No Conflicts.** The execution, delivery and performance of the Loan Documents by Borrower and the transactions contemplated hereby will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien (other than pursuant to the Loan Documents) upon any of the property of Borrower pursuant to the terms of, any agreement or instrument to which Borrower is a party or by which its property is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or any of its properties. Borrower's rights under the Licenses and the Management Agreement will not be adversely affected by the execution and delivery of the Loan Documents, Borrower's performance thereunder, the recordation of the Security Instrument, or the exercise of any remedies by Lender. Any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower of the Loan Documents has been obtained and is in full force and effect.

   **4.4   Litigation.** There are no actions, suits or other proceedings at law or in equity by or before any Governmental Authority now pending or threatened against or affecting Borrower, Borrower Representative, the Manager or the Property, which, if adversely determined, might materially adversely affect the condition (financial or otherwise) or business of Borrower, Borrower Representative, Manager or the condition or ownership of the Property.

   **4.5   Agreements.** Borrower is not a party to any agreement or instrument or subject to any restriction which might adversely affect Borrower or the Property, or Borrower's business, properties, operations or condition, financial or otherwise. Borrower is not in default in any material respect in the

**EXHIBIT 1**

performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance or any other agreement or instrument to which it is a party or by which it or the Property is bound.

**4.6    Title.** Borrower has good, marketable and indefeasible title in fee to the real property and good title to the balance of the Property, free and clear of all Liens except the Permitted Encumbrances. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes (if any) required to be paid by any Person under applicable Legal Requirements in connection with the transfer of the Property to Borrower have been paid. The Security Instrument when properly recorded in the appropriate records, together with any UCC Financing Statements required to be filed in connection therewith, will create (i) a valid, perfected first priority lien on Borrower's interest in the Property and (ii) valid and perfected first priority security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances. All mortgage, recording, stamp, intangible or other similar (if any) taxes required to be paid by any Person under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents have been paid. The Permitted Encumbrances do not materially adversely affect the value, operation or use of the Property, or Borrower's ability to repay the Loan. No Condemnation or other proceeding has been commenced or, to Borrower's best knowledge, is contemplated with respect to all or part of the Property or for the relocation of roadways providing access to the Property. There are no claims for payment for work, labor or materials affecting the Property which are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents. There are no outstanding options to purchase or rights of first refusal affecting all or any portion of the Property. The surveys for the Property delivered to Lender (the "*Surveys*") does not fail to reflect any material matter affecting the Property or the title thereto. Except as disclosed on the Surveys, all of the Improvements included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property, and no improvement on an adjoining property encroaches upon the Property, and no easement or other encumbrance upon the Property encroaches upon any of the Improvements, except those insured against by the title insurance policy insuring the Lien of the Security Instrument. Each parcel comprising the Property is a separate tax lot and is not a portion of any other tax lot that is not a part of the Property. There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, or any contemplated improvements to the Property that may result in such special or other assessments.

**4.7    No Bankruptcy Filing.** Borrower is not contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency law or the liquidation of all or a major portion of its property (a "*Bankruptcy Proceeding*"), and Borrower has no knowledge of any Person contemplating the filing of any such petition against it. In addition, neither Borrower nor Borrower Representative nor any principal nor Affiliate of either has been a party to, or the subject of a Bankruptcy Proceeding for the past ten years.

**4.8    Full and Accurate Disclosure.** No statement of fact made by Borrower in any Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein not misleading. There is no material fact presently known to Borrower that has not been disclosed to Lender which adversely affects, or, as far as Borrower can foresee, might adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower. All financial data, including the statements of cash flow and income and operating expense, that have been delivered to Lender in respect of Borrower and the Property (i) are true, complete and correct in all material respects, (ii) accurately represent the financial condition of Borrower and the Property as of the date of such reports, and (iii) to the extent prepared by an independent certified public accounting firm, have been prepared in accordance with GAAP consistently applied throughout the

~4825-6832-1881~

**EXHIBIT 1**

periods covered, except as disclosed therein. Borrower has no contingent liabilities, liabilities for taxes, unusual forward or long–term commitments, unrealized or anticipated losses from any unfavorable commitments or any liabilities or obligations not expressly permitted by this Agreement. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of Borrower or the Property from that set forth in said financial statements.

**4.9** <u>No Plan Assets.</u> Borrower is not an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, and none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3–101.

**4.10** <u>Compliance.</u> Borrower and the Property and the use thereof comply in all material respects with all applicable Legal Requirements (including with respect to parking and applicable zoning and land use laws, regulations and ordinances). Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority, the violation of which might materially adversely affect the condition (financial or otherwise) or business of Borrower. The Property is used exclusively for multifamily and other appurtenant and related uses. Except as disclosed in the Zoning Report, in the event that all or any part of the Improvements are destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits. No legal proceedings are pending or, to the best of Borrower's knowledge, threatened with respect to the zoning of the Property. Neither the zoning nor any other right to construct, use or operate the Property is in any way dependent upon or related to any property other than the Property. All certifications, permits, licenses and approvals, including certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property (collectively, the "*Licenses*"), have been obtained and are in full force and effect. The use being made of the Property is in conformity with the certificate of occupancy issued for the Property and all other restrictions, covenants and conditions affecting the Property.

**4.11** <u>Contracts.</u> Except as set forth on <u>Schedule 5</u>, there are no service, maintenance or repair contracts affecting the Property that are not terminable on one month's notice or less without cause and without penalty or premium. All service, maintenance or repair contracts affecting the Property have been entered into at arms–length in the ordinary course of Borrower's business and provide for the payment of fees in amounts and upon terms comparable to existing market rates.

**4.12** <u>Federal Reserve Regulations; Investment Company Act.</u> No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose that would be inconsistent with such Regulation U or any other regulation of such Board of Governors, or for any purpose prohibited by Legal Requirements or any Loan Document. Borrower is not (i) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (ii) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 2005, as amended; or (iii) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

**4.13** <u>Utilities and Public Access.</u> The Property has rights of access to public ways and is served by water, sewer, sanitary sewer and storm drain facilities adequate to service it for its intended uses. All public utilities necessary or convenient to the full use and enjoyment of the Property are located in the public right–of–way abutting the Property, and all such utilities are connected so as to serve the Property without passing over other property absent a valid easement. All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all

~#4825-6832-1881~

**EXHIBIT 1**

Governmental Authorities.

    **4.14**    **Physical Condition.**  Except as disclosed in the Property Condition Report, the Property, including all Improvements, parking facilities, systems, Equipment and landscaping, are in good condition, order and repair in all material respects; there exists no structural or other material defect or damages to the Property, whether latent or otherwise.  Borrower has not received notice from any insurance company or bonding company of any defect or inadequacy in the Property, or any part thereof, which would adversely affect its insurability or cause the imposition of extraordinary premiums or charges thereon or any termination of any policy of insurance or bond.  No portion of the Property is located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards.

    **4.15**    **Leases.**  Borrower has delivered to Lender a true, correct and complete rent roll for the Property (the "*Rent Roll*"), which includes all Leases affecting the Property.  Except as set forth on the Rent Roll: (i) each Lease is in full force and effect; (ii) the Tenants under the Leases have accepted possession of and are in occupancy of all of their respective demised premises, have commenced the payment of rent under the Leases, and there are no offsets, claims or defenses to the enforcement thereof; (iii) all rents due and payable under the Leases have been paid and no portion thereof has been paid for any period more than thirty (30) days in advance; (iv) the rent payable under each Lease is the amount of fixed rent set forth in the Rent Roll, and there is no claim or basis for a claim by the Tenant thereunder for an adjustment to the rent; (v) no Tenant has made any claim against the landlord under any Lease which remains outstanding, there are no defaults on the part of the landlord under any Lease, and no event has occurred which, with the giving of notice or passage of time, or both, would constitute such a default; (vi) to Borrower's best knowledge, there is no present material default by the Tenant under any Lease; (vii) all security deposits under Leases are as set forth on the Rent Roll and are held consistent with Section 3.8; (viii) Borrower is the sole owner of the entire lessor's interest in each Lease; (ix) each Lease is the valid, binding and enforceable obligation of Borrower and the applicable Tenant thereunder; (x) no Person has any possessory interest in, or right to occupy, the Property except under the terms of a Lease; and (xi) each Lease is subordinate to the Loan Documents, either pursuant to its terms or pursuant to a subordination and attornment agreement.  None of the Leases contains any option to purchase or right of first refusal to purchase the Property or any part thereof.  Neither the Leases nor the Rents have been assigned or pledged except to Lender, and no other Person has any interest therein except the Tenants thereunder.

    **4.16**    **Fraudulent Transfer.**  Borrower has not entered into the Loan or any Loan Document with the actual intent to hinder, delay, or defraud any creditor, and Borrower has received reasonably equivalent value in exchange for its obligations under the Loan Documents.  Giving effect to the transactions contemplated by the Loan Documents, the fair saleable value of Borrower's assets exceeds and will, immediately following the execution and delivery of the Loan Documents, exceed Borrower's total liabilities, including subordinated, unliquidated, disputed or contingent liabilities, including the maximum amount of its contingent liabilities or its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the execution and delivery of the Loan Documents will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts as they mature (taking into account the timing and amounts to be payable on or in respect of obligations of Borrower).

    **4.17**    **Ownership of Borrower.**  The organizational chart attached hereto as **Schedule 3** is complete and accurate and illustrates all Persons who have a direct or indirect ownership interest in Borrower.

**EXHIBIT 1**

**4.18** **Management Agreement.** The Management Agreement is in full force and effect. There is no default, breach or violation existing thereunder, and no event has occurred (other than payments due but not yet delinquent) that, with the passage of time or the giving of notice, or both, would constitute a default, breach or violation thereunder, by either party thereto. The management fees and the terms and provisions of the Management Agreement, are subordinate to the Loan Documents.

**4.19** **Hazardous Substances.** (i) To Borrower's knowledge, and except as disclosed in the Phase I Environmental Site Assessment, the Property is not in violation of any Legal Requirement pertaining to or imposing liability or standards of conduct concerning environmental regulation, contamination or clean–up, including the Comprehensive Environmental Response, Compensation and Liability Act, the Resource Conservation and Recovery Act, the Emergency Planning and Community Right–to–Know Act of 1986, the Hazardous Substances Transportation Act, the Solid Waste Disposal Act, the Clean Water Act, the Clean Air Act, the Toxic Substance Control Act, the Safe Drinking Water Act, the Occupational Safety and Health Act, any Legal Requirements relating to Toxic Mold, any state super–lien and environmental clean–up statutes, any local law requiring related permits and licenses, any common law relating to Toxic Mold or other Hazardous Substances, and all amendments to and regulations in respect of the foregoing laws (collectively, "*Environmental Laws*"); (ii) the Property is not subject to any private or governmental Lien or judicial or administrative notice or action or inquiry, investigation or claim relating to hazardous, toxic or dangerous substances, wastes, contaminants, and pollutants, including, without limitation, petroleum, petroleum products, crude oil and fractions thereof, Toxic Mold, or any other substances or materials which are included under or regulated by, or for which liability may arise pursuant to, Environmental Laws (collectively, "*Hazardous Substances*"); (iii) to the best of Borrower's knowledge, after due inquiry, no Hazardous Substances are or have been (including the period prior to Borrower's acquisition of the Property), discharged, generated, treated, disposed of or stored on, incorporated in, or removed or transported from the Property other than in compliance with all Environmental Laws; (iv) to the best of Borrower's knowledge, after due inquiry, no Hazardous Substances are present in, on or under any nearby real property which could migrate to or otherwise affect the Property; (v) no underground storage tanks exist on the Property and the Property has never been used as a landfill; and (vi) there have been no environmental investigations, studies, audits, reviews or other analyses conducted by or on behalf of Borrower which have not been provided to Lender.

**4.20** **Principal Place of Business.** The principal place of business of Borrower is its primary address for notices as set forth in Section 6.1, and Borrower has no other place of business.

**4.21** **Other Debt.** There is no indebtedness with respect to the Property or any indebtedness secured over excess cash flow or any residual interest therein, whether secured or unsecured, other than Permitted Encumbrances and Permitted Indebtedness.

**4.22** **Embargoed Person.** None of the funds or assets of Borrower, Borrower Representative or any Guarantor, as applicable, constitute property of, or are beneficially owned directly or, to Borrower's best knowledge, indirectly, by any Embargoed Person (as hereinafter defined) and no Embargoed Person has any direct interest, and to Borrower's best knowledge, as of the date hereof, based upon reasonable inquiry by Borrower, indirect interest, of any nature whatsoever in Borrower, Borrower Representative or Guarantor, as applicable, with the result that the investment in Borrower, Borrower Representative or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

**4.23** **Anti–Money Laundering.** None of the funds of Borrower, Borrower Representative or any Guarantor, as applicable, that are used to consummate this transaction are derived from or are the proceeds of any unlawful activity, with the result that the investment in Borrower, Borrower

25

Representative or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law or may cause any of the Property to be subject to forfeiture or seizure. Borrower has ascertained the identity of all persons and entities who have provided funds to capitalize Borrower and has conducted verification procedures which are sufficient to establish the identity and source of such funds.

**4.24 Low Income Tenants.** Other than the Terrace Property, no Individual Property is subject to Low Income Restrictions. No Individual Property is required to reserve any units pursuant to any program under Section 8 or required to rent to Section 8 Certificate Holders. Schedule 7 is complete and accurate with respect to the number of units at each Individual Property that are leased to Section 8 Certificate Holders and/or are subject to Low Income Restrictions.

All of the representations and warranties in this Article 4 and elsewhere in the Loan Documents (i) shall survive for so long as any portion of the Debt remains owing to Lender and (ii) shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf, provided, however, that the representations, warranties and covenants set forth in Section 4.19 shall survive in perpetuity.

## 5. COVENANTS

Until the end of the Term, Borrower hereby covenants and agrees with Lender that:

**5.1 Existence.** Each of Borrower and Borrower Representative shall (i) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, and franchises, (ii) continue to engage in the business presently conducted by it, (iii) obtain and maintain all Licenses, and (iv) qualify to do business and remain in good standing under the laws of each jurisdiction, in each case as and to the extent required for the ownership, maintenance, management and operation of the Property.

**5.2 Taxes.** Borrower shall pay all Taxes as the same become due and payable, and deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Taxes have been so paid no later than thirty (30) days before they would be delinquent if not paid (provided, however, that Borrower need not pay such Taxes nor furnish such receipts for payment of Taxes paid by Lender pursuant to Section 3.3). Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien against the Property, and shall promptly pay for all utility services provided to the Property. After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application of any Taxes, provided that (i) no Default or Event of Default has occurred and is continuing, (ii) such proceeding shall suspend the collection of the Taxes, (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder, (iv) no part of or interest in the Property will be in danger of being sold, forfeited, terminated, canceled or lost, (v) Borrower shall have furnished such security as may be required in the proceeding, or as may be requested by Lender, to insure the payment of any such Taxes, together with all interest and penalties thereon, which shall not be less than one hundred twenty–five percent (125%) of the Taxes being contested, and (vi) Borrower shall promptly upon final determination thereof pay the amount of such Taxes, together with all costs, interest and penalties. Lender may pay over any such security or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established.

26

**EXHIBIT 1**

### 5.3 Repairs; Maintenance and Compliance; Alterations.

**5.3.1 Repairs; Maintenance and Compliance.** Borrower shall at all times maintain, preserve and protect all franchises and trade names, and Borrower shall cause the Property to be maintained in a good and safe condition and repair and shall not remove, demolish or alter the Improvements or Equipment (except for alterations performed in accordance with Section 5.3.2 and normal replacement of Equipment with Equipment of equivalent value and functionality). Borrower shall promptly comply with all Legal Requirements and immediately cure properly any violation of a Legal Requirement. Borrower shall notify Lender in writing within one Business Day after Borrower first receives notice of any such non-compliance. Borrower shall promptly repair, replace or rebuild any part of the Property that becomes damaged, worn or dilapidated and shall complete and pay for any Improvements at any time in the process of construction or repair.

**5.3.2 Alterations.** Borrower may, without Lender's consent, perform alterations to the Improvements and Equipment which (i) do not constitute a Material Alteration, (ii) do not adversely affect Borrower's financial condition or the value or Net Operating Income of the Property and (iii) are in the ordinary course of Borrower's business. Borrower shall not perform any Material Alteration without Lender's prior written consent, which consent shall not be unreasonably withheld or delayed; provided, however, that Lender may, in its sole and absolute discretion, withhold consent to any alteration the cost of which is reasonably estimated to exceed $1,000,000 or which is likely to result in a decrease of Net Operating Income by two and one–half percent (2.5%) or more for a period of thirty (30) days or longer. Lender may, as a condition to giving its consent to a Material Alteration, require that Borrower deliver to Lender security for payment of the cost of such Material Alteration in an amount equal to one hundred twenty–five percent (125%) of the cost of the Material Alteration as estimated by Lender. Upon substantial completion of the Material Alteration, Borrower shall provide evidence satisfactory to Lender that (i) the Material Alteration was constructed in a good and workmanlike manner and in accordance with applicable Legal Requirements and substantially in accordance with plans and specifications approved by Lender (which approval shall not be unreasonably withheld or delayed), (ii) all contractors, subcontractors, materialmen and professionals who provided work, materials or services in connection with the Material Alteration have been paid in full and have delivered unconditional releases of lien and (iii) all material Licenses necessary for the use, operation and occupancy of the Material Alteration (other than those which depend on the performance of Tenant improvement work) have been issued. Borrower shall reimburse Lender upon demand for all out–of–pocket costs and expenses (including the reasonable fees of any architect, engineer or other professional engaged by Lender) incurred by Lender in reviewing plans and specifications or in making any determinations necessary to implement the provisions of this Section 5.3.2.

**5.4 Performance of Other Agreements.** Borrower shall observe and perform each and every term to be observed or performed by it pursuant to the terms of any agreement or instrument affecting or pertaining to the Property, including the Loan Documents.

**5.5 Cooperate in Legal Proceedings.** Borrower shall cooperate fully with Lender with respect to, and permit Lender, at its option, to participate in, any proceedings before any Governmental Authority which may in any way affect the rights of Lender under any Loan Document.

**5.6 Further Assurances.** Borrower shall, at Borrower's sole cost and expense, (i) execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve or protect the collateral at any time securing or intended to secure the Debt or for the better and more effective carrying out of the intents and purposes of the Loan Documents, as Lender may reasonably require from time to time; and (ii) upon Lender's request therefor given from time to time after the occurrence of any Default or Event of Default pay for

27

(a) reports of UCC, federal tax lien, state tax lien, judgment and pending litigation searches with respect to Borrower and Borrower Representative and (b) searches of title to the Property, each such search to be conducted by search firms reasonably designated by Lender in each of the locations reasonably designated by Lender.

### 5.7   Environmental Matters:

**5.7.1   Hazardous Substances.**  So long as Borrower owns or is in possession of the Property, Borrower shall (i) keep the Property free from Hazardous Substances and in compliance with all Environmental Laws, (ii) promptly notify Lender if Borrower shall become aware that (A) any Hazardous Substance is on or near the Property, (B) the Property is in direct or indirect violation of any Environmental Laws or (C) any condition on or near the Property might pose a threat to the health, safety or welfare of humans and (iii) remove such Hazardous Substances or cure such violations or remove such threats, as applicable, as required by law (or as shall be required by Lender in the case of removal which is not required by law, but in response to the opinion of a licensed hydrogeologist, licensed environmental engineer or other qualified environmental consulting firm engaged by Lender ("*Lender's Consultant*")), promptly after Borrower becomes aware of same, at Borrower's sole expense. Any removal, remediation or cure of any violation relating to Toxic Mold shall include, without limitation, all acts required to clean and disinfect any portions of the Property affected by Toxic Mold and to eliminate the source(s) of Toxic Mold in or on the Property, including providing any necessary moisture control systems at the Property. Nothing herein shall prevent Borrower from recovering such expenses from any other party that may be liable for such removal, remediation or cure.

**5.7.2   Environmental Monitoring.**

(a)      Borrower shall give prompt written notice to Lender of (i) any proceeding or inquiry by any party (including any Governmental Authority) with respect to the presence of any Hazardous Substance on, under, from or about the Property, (ii) all claims made or threatened by any third party (including any Governmental Authority) against Borrower or the Property or any party occupying the Property relating to any loss or injury resulting from any Hazardous Substance, and (iii) Borrower's discovery of any occurrence or condition on any real property adjoining or in the vicinity of the Property that could cause the Property to be subject to any investigation or cleanup pursuant to any Environmental Law. Borrower shall permit Lender to join and participate in, as a party if it so elects, any legal or administrative proceedings or other actions initiated with respect to the Property in connection with any Environmental Law or Hazardous Substance, and Borrower shall pay all reasonable attorneys' fees and disbursements incurred by Lender in connection therewith.

(b)      Upon Lender's request, at any time and from time to time, Borrower shall provide an inspection or audit of the Property prepared by a licensed hydrogeologist, licensed environmental engineer or qualified environmental consulting firm approved by Lender assessing the presence or absence of Hazardous Substances on, in or near the Property, and if Lender in its good faith judgment determines that reasonable cause exists for the performance of such environmental inspection or audit, then the cost and expense of such audit or inspection shall be paid by Borrower. Such inspections and audit may include soil borings and ground water monitoring. If Borrower fails to provide any such inspection or audit within thirty (30) days after such request, Lender may order same, and Borrower hereby grants to Lender and its employees and agents access to the Property and a license to undertake such inspection or audit.

(c)      If any environmental site assessment report prepared in connection with such inspection or audit recommends that an operations and maintenance plan be implemented for any Hazardous Substance, whether such Hazardous Substance existed prior to the ownership of the Property

28

**EXHIBIT 1**

by Borrower, or presently exists or is reasonably suspected of existing, Borrower shall cause such operations and maintenance plan to be prepared and implemented at its expense upon request of Lender. If any investigation, site monitoring, containment, cleanup, removal, restoration or other work of any kind is reasonably necessary under an applicable Environmental Law (*"Remedial Work"*), Borrower shall commence all such Remedial Work within thirty (30) days after written demand by Lender and thereafter diligently prosecute to completion all such Remedial Work within such period of time as may be required under applicable law. All Remedial Work shall be performed by licensed contractors approved in advance by Lender and under the supervision of a consulting engineer approved by Lender. All costs of such Remedial Work shall be paid by Borrower, including Lender's reasonable attorneys' fees and disbursements incurred in connection with the monitoring or review of such Remedial Work. If Borrower does not timely commence and diligently prosecute to completion the Remedial Work, Lender may (but shall not be obligated to) cause such Remedial Work to be performed at Borrower's expense. Notwithstanding the foregoing, Borrower shall not be required to commence such Remedial Work within the above specified time period: (x) if prevented from doing so by any Governmental Authority, (y) if commencing such Remedial Work within such time period would result in Borrower or such Remedial Work violating any Environmental Law, or (z) if Borrower, at its expense and after prior written notice to Lender, is contesting by appropriate legal, administrative or other proceedings, conducted in good faith and with due diligence, the need to perform Remedial Work. Borrower shall have the right to contest the need to perform such Remedial Work, provided that, (1) Borrower is permitted by the applicable Environmental Laws to delay performance of the Remedial Work pending such proceedings, (2) neither the Property nor any part thereof or interest therein will be sold, forfeited or lost if Borrower fails to promptly perform the Remedial Work being contested, and if Borrower fails to prevail in such contest, Borrower would thereafter have the opportunity to perform such Remedial Work, (3) Lender would not, by virtue of such permitted contest, be exposed to any risk of any civil liability for which Borrower has not furnished additional security as provided in clause (4) below, or to any risk of criminal liability, and neither the Property nor any interest therein would be subject to the imposition of any Lien for which Borrower has not furnished additional security as provided in clause (4) below, as a result of the failure to perform such Remedial Work and (4) Borrower shall have furnished to Lender additional security in respect of the Remedial Work being contested and the loss or damage that may result from Borrower's failure to prevail in such contest in such amount as may be reasonably requested by Lender but in no event less than one hundred twenty-five percent (125%) of the cost of such Remedial Work as estimated by Lender or Lender's Consultant and any loss or damage that may result from Borrower's failure to prevail in such contest.

        (d)      Borrower shall not install or permit to be installed on the Property any underground storage tank.

        **5.8**    **Title to the Property; Liens.**  Borrower will warrant and defend the title to the Property, and the validity and priority of all Liens granted or otherwise given to Lender under the Loan Documents, subject only to Permitted Encumbrances, against the claims of all Persons. Without Lender's prior written consent, Borrower shall not create, incur, assume, permit or suffer to exist any Lien on all or any portion of the Property or any Lien on any direct or indirect legal or beneficial ownership interest in Borrower or Borrower Representative, except Liens in favor of Lender and Permitted Encumbrances, unless such Lien is bonded or discharged within thirty (30) days after Borrower first receives notice of such Lien.

        **5.9**    **Leases.**

        **5.9.1**    **Generally.**  Upon request, Borrower shall furnish Lender with executed copies of all Leases then in effect. All renewals of Leases and all proposed leases shall provide for rental rates and terms comparable to then existing local market rates and shall be arm's length transactions with bona fide,

29

**EXHIBIT 1**

independent third–party Tenants.

5.9.2    **Material Leases.**   Borrower shall not enter into a proposed Material Lease or a proposed renewal, extension or modification of an existing Material Lease without the prior written consent of Lender, which consent shall not, so long as no Event of Default is continuing, be unreasonably withheld or delayed. Prior to seeking Lender's consent to any Material Lease, Borrower shall deliver to Lender a copy of such proposed Material Lease (a "***Proposed Material Lease***") blacklined to show changes from the standard form of Lease approved by Lender and then being used by Borrower. Lender shall approve or disapprove each Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease for which Lender's approval is required under this Agreement within ten (10) Business Days of the submission by Borrower to Lender of a written request for such approval, accompanied by a final copy of the Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease. If requested by Borrower, Lender will grant conditional approvals of a Proposed Material Lease or a proposed renewal, extension or modification of an existing Material Lease at any stage of the leasing process, from initial "term sheet" through negotiated lease drafts, provided that Lender shall retain the right to disapprove any such Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease if subsequent to any preliminary approval material changes are made to the terms previously approved by Lender, or additional material terms are added that had not previously been considered and approved by Lender in connection with such Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease. Provided that no Event of Default is continuing, if Borrower provides Lender with a written request for approval (which written request shall specifically refer to this Section 5.9.2 and shall explicitly state that failure by Lender to approve or disapprove within ten (10) Business Days will constitute a deemed approval) and Lender fails to reject the request in writing delivered to Borrower within ten (10) Business Days after receipt by Lender of the request, the Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease shall be deemed approved by Lender, and Borrower shall be entitled to enter into such Proposed Material Lease or proposed renewal, extension or modification of an existing Material Lease.

5.9.3    **Minor Leases.**   Notwithstanding the provisions of Section 5.9.2 above, provided that no Event of Default is continuing, renewals, amendments and modifications of existing Leases and proposed leases shall not be subject to the prior approval of Lender provided (i) the proposed lease would be a Minor Lease or the existing Lease, as amended or modified, or the renewal Lease is a Minor Lease, (ii) the Lease shall be written substantially in accordance with the standard form of Lease which shall have been approved by Lender, subject to any commercially reasonable changes made in the course of negotiation with the applicable Tenant, (iii) the Lease as amended or modified or the renewal Lease or series of leases or proposed lease or series of leases: (a) shall provide for net effective rental rates comparable to then existing local market rates, (b) shall have an initial term (together with all renewal options) of not less than one (1) year or greater than two (2) years, (c) shall provide for automatic self-operative subordination to the Security Instrument and, at Lender's option, (x) attornment to Lender and (y) if the Property is located in a jurisdiction in which the applicable law provides for the termination of leases that are subordinate to the Lien of the Security Instrument, the unilateral right by Lender to subordinate the Lien of the Security Instrument to the Lease, and (d) shall not contain any option to purchase, any right of first refusal to purchase, any right to terminate (except in the event of the destruction or condemnation of substantially all of the Property), any requirement for a non–disturbance or recognition agreement, or any other provision which might adversely affect the rights of Lender under the Loan Documents in any material respect. Borrower shall deliver to Lender copies of all Leases which are entered into pursuant to the preceding sentence together with Borrower's certification that it has satisfied all of the conditions of the preceding sentence within ten days after the execution of the Lease. With respect to any Lease or proposed renewal, extension or modification of an existing Lease that requires Lender's consent under this Section 5.9.3, provided that no Event of Default is continuing, if

30

**EXHIBIT 1**

Borrower provides Lender with a written request for approval (which written request shall specifically refer to this <u>Section 5.9.3</u> and shall explicitly state that failure by Lender to approve or disapprove within ten (10) Business Days will constitute a deemed approval) and Lender fails to reject the request in writing delivered to Borrower within ten (10) Business Days after receipt by Lender of the request, the proposed Lease or proposed renewal, extension or modification of an existing Lease shall be deemed approved by Lender, and Borrower shall be entitled to enter into such proposed Lease or proposed renewal, extension or modification of an existing Lease.

        **5.9.4**   <u>**Additional Covenants with respect to Leases**</u>. Borrower (i) shall observe and perform the material obligations imposed upon the lessor under the Leases and shall not do or permit anything to impair the value of the Leases as security for the Debt; (ii) shall promptly send copies to Lender of all notices of default that Borrower shall send or receive (A) under any Material Lease and (B) upon Lender's request, under any Minor Lease; (iii) shall enforce, in accordance with commercially reasonable practices for properties similar to the Property, the terms, covenants and conditions in the Leases to be observed or performed by the lessees, short of termination thereof; (iv) shall not collect any of the Rents more than one month in advance (other than security deposits); (v) shall not execute any other assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (vi) shall not modify any Lease in a manner inconsistent with the Loan Documents; (vii) shall not convey or transfer or suffer or permit a conveyance or transfer of the Property so as to effect a merger of the estates and rights of, or a termination or diminution of the obligations of, lessees under Leases; (viii) shall not consent to any assignment of or subletting under any Material Lease unless required in accordance with its terms without the prior consent of Lender, which, with respect to a subletting, may not, so long as no Event of Default is continuing, be unreasonably withheld or delayed; and (ix) shall not cancel or terminate any Lease or accept a surrender thereof without the prior consent of Lender, which consent shall not, so long as no Event of Default is continuing, be unreasonably withheld or delayed.

        **5.10**   <u>**Estoppel Statement**</u>. After request by Lender, Borrower shall within ten (10) days furnish Lender with a statement addressed to Lender, its successors and assigns, duly acknowledged and certified, setting forth (i) the unpaid Principal, (ii) the Interest Rate, (iii) the date installments of interest or Principal were last paid, (iv) any offsets or defenses to the payment of the Debt, (v) that no Default or Event of Default exists under the Loan Documents, and (vi) that the Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification.

        **5.11**   <u>**Property Management**</u>.

        **5.11.1**   <u>**Management Agreement**</u>. Borrower shall (i) cause the Property to be managed pursuant to the Management Agreement; (ii) promptly perform and observe all of the covenants required to be performed and observed by it under the Management Agreement and do all things necessary to preserve and to keep unimpaired its rights thereunder; (iii) promptly notify Lender of any default under the Management Agreement of which it is aware; (iv) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditure plan, and property improvement plan and any other notice, report and estimate received by Borrower under the Management Agreement; and (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement. Without Lender's prior written consent, Borrower shall not (a) surrender, terminate, cancel, extend or renew the Management Agreement or otherwise replace the Manager or enter into any other management agreement (except pursuant to <u>Section 5.11.2</u>); (b) reduce or consent to the reduction of the term of the Management Agreement; (c) increase or consent to the increase of the amount of any charges under the Management Agreement; (d) otherwise modify, change, supplement, alter or amend in any material respect, or waive or release any of its rights and remedies under, the Management Agreement; or (e) suffer or permit the occurrence and continuance of a default

<div align="center">31</div>

<div align="center">**EXHIBIT 1**</div>

beyond any applicable cure period under the Management Agreement (or any successor management agreement) if such default permits the Manager to terminate the Management Agreement (or such successor management agreement).

> 5.11.2 **Termination of Manager.** If (i) Borrower fails to maintain a Debt Service Coverage Ratio of at least 1.10:1, (ii) a Bankruptcy Action occurs with respect to Manager, (iii) an Event of Default shall be continuing, or (iv) Manager is in default under the Management Agreement, Borrower shall, at the request of Lender, terminate the Management Agreement and replace Manager with a replacement manager acceptable to Lender in Lender's discretion and the applicable Rating Agencies on terms and conditions satisfactory to Lender and the applicable Rating Agencies unless, in the case of the event described in clause (i) only, Borrower shall defease a portion of the unpaid Principal to a level such that the Debt Service Coverage Ratio of the unpaid Principal is restored to a level of not less than 1.10:1. All calculations of Debt Service Coverage Ratio for purposes of this Section 5.11.2 shall be subject to verification by Lender. Borrower's failure to appoint an acceptable manager within thirty (30) days after Lender's request of Borrower to terminate the Management Agreement shall constitute an immediate Event of Default. Borrower may from time to time appoint a successor manager to manage the Property, which successor manager and Management Agreement shall be approved in writing by Lender in Lender's discretion and the applicable Rating Agencies.

**5.12 Special Purpose Entity.** Borrower and Borrower Representative shall at all times be a Special Purpose Entity. A "*Special Purpose Entity*" shall have the meaning set forth on **Schedule 4** hereto.

**5.13 Intentionally Deleted.**

**5.14 Change In Business or Operation of Property.** Borrower shall not purchase or own any real property other than the Property and shall not enter into any line of business other than the ownership and operation of the Property, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business or otherwise cease to operate the Property as a multifamily property or terminate such business for any reason whatsoever (other than temporary cessation in connection with renovations to the Property).

**5.15 Certain Prohibited Actions.** Borrower shall not directly or indirectly do any of the following: (i) change its principal place of business or chief executive office without first giving Lender thirty (30) days' prior notice; (ii) cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business in its reasonable judgment; (iii) Transfer any License required for the operation of the Property; or (iv) maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any ERISA Affiliate of Borrower to, maintain, sponsor, contribute to or become obligated to contribute to, any Plan or any Welfare Plan or permit the assets of Borrower to become "plan assets," whether by operation of law or under regulations promulgated under ERISA.

**5.16 Prohibited Transfers.** Borrower shall not directly or indirectly make, suffer or permit the occurrence of any Transfer other than a Permitted Transfer. Notwithstanding the foregoing, Lender shall not unreasonably withhold its consent to a sale of the Property in its entirety (a "*Special Transfer*") to a Special Purpose Entity with organizational documents containing provisions satisfying Lender's then-current requirements of a Special Purpose Entity and otherwise acceptable to Lender (a "*Buyer*"), provided that:

> (a) No Default or Event of Default is then continuing;

32

(b)     Borrower gives Lender written notice of the terms of such prospective Special Transfer not less than sixty (60) days before the date on which such sale is scheduled to close, accompanied by all information concerning the proposed Buyer as Lender would require in evaluating an initial extension of credit to a borrower and such reasonable non–refundable application fee as shall be required by Lender.  Lender shall have the right to approve or disapprove the proposed Buyer in its reasonable discretion (it being acknowledged that Lender may, as a condition to approving any proposed Buyer, require a Rating Comfort Letter from each of the Rating Agencies);

(c)     Borrower pays Lender, concurrently with the closing of such Special Transfer, a non refundable assumption fee in an amount equal to all out–of–pocket costs and expenses, including, without limitation, reasonable attorneys' fees and disbursements, incurred by Lender in connection with the Special Transfer plus an amount equal to (i) one-half of one percent (0.5%) of the then outstanding Principal on the first such completed Special Transfer, or (ii) one percent (1.0%) of the then outstanding Principal on each completed Special Transfer thereafter;

(d)     Buyer assumes all of the obligations of Borrower under this Agreement, the Note and the other Loan Documents and, prior to or concurrently with the closing of such Special Transfer, Buyer executes, without any cost or expense to Lender, such documents and agreements as Lender shall reasonably require to evidence and effectuate said assumption and delivers such legal opinions as Lender may require;

(e)     Borrower and Buyer execute and cause to be filed in such public records as Lender deems appropriate, without any cost or expense to Lender, new financing statements or financing statement amendments and any additional documents reasonably requested by Lender;

(f)     Borrower causes to be delivered to Lender, without any cost or expense to Lender, such endorsements to Lender's title insurance policy, property and liability insurance endorsements or certificates and other similar materials as Lender may deem necessary at the time of the Special Transfer, all in form and substance satisfactory to Lender, including, without limitation, an endorsement or endorsements to Lender's title insurance policy insuring the Lien of the Security Instrument, extending the effective date of such policy to the date of execution and delivery (or, if later, of recording) of the assumption agreement referenced above in clause (d) of this Section 5.16, with no additional exceptions added to such policy and insuring that fee simple title to the Property is vested in Buyer;

(g)     Borrower executes and delivers to Lender, without any cost or expense to Lender, a release of Lender, its officers, directors, employees and agents, from all claims and liability relating to the transactions evidenced by the Loan Documents through and including the date of the closing of the Special Transfer, which agreement shall be in form and substance satisfactory to Lender and shall be binding upon Buyer;

(h)     Such Special Transfer is not construed so as to relieve Borrower of any personal liability under the Note or any of the other Loan Documents for any acts or events occurring or obligations arising prior to or simultaneously with the closing of such Special Transfer and Borrower executes, without any cost or expense to Lender, such documents and agreements as Lender shall reasonably require to evidence and effectuate the ratification of said personal liability.  Borrower shall be released from and relieved of any personal liability under the Note or any of the other Loan Documents for any acts or events occurring or obligations arising after the closing of such Special Transfer which are not caused by or arising out of any acts or events occurring or obligations arising prior to or simultaneously with the closing of such Special Transfer;

(i)     Such Special Transfer is not construed so as to relieve any Guarantor of its obligations under any Loan Document, until a direct or indirect member, partner or shareholder of Buyer approved by Lender in its sole discretion (a "*Successor Guarantor*") assumes the obligations of such Guarantor and executes such documents as may be required by Lender to evidence such assumption. Guarantor shall be released from and relieved of any of its obligations under any indemnity or guaranty executed in connection with the Loan for any acts or events occurring or obligations arising after the closing of such Special Transfer which are not caused by or arising out of any acts or events occurring or obligations arising prior to or simultaneously with the closing of such Special Transfer;

(j)     Buyer has furnished to Lender all appropriate documents and instruments evidencing Buyer's capacity and good standing, and the authority of the signers to execute the assumption of the Loan and the Loan Documents, which documents and instruments shall include certified copies of all documents and instruments relating to the organization and formation of Buyer and of the entities, if any, which are direct or indirect members, partners or shareholders of Buyer, all of which shall be satisfactory to Lender;

(k)     Buyer shall assume the obligations of Borrower under any management agreements pertaining to the Property, or shall cause the new manager and management agreement to satisfy the requirements of Section 5.11 hereof, as applicable;

(l)     Buyer shall furnish an opinion of counsel satisfactory to Lender that the acquisition of the Property and the assumption of the Loan and the Loan Documents by Buyer and, to the extent applicable, Successor Guarantor, was validly authorized, and duly executed and delivered, and constitutes the legal, valid and binding obligations of Buyer and Successor Guarantor, enforceable against each of them in accordance with their respective terms, and with respect to such other matters as Lender may require; and

(m)     Buyer shall provide Lender with a fully executed copy of (1) a deed covering the Property, (2) a bill of sale covering the personal property constituting a part of the Property and (3) an assignment and assumption agreement in respect of the Leases, in form and substance reasonably satisfactory to Lender.

    5.17     **Expenses.**  Borrower shall reimburse Lender upon receipt of notice for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with the Loan, including (i) the preparation, negotiation, execution and delivery of the Loan Documents and the consummation of the transactions contemplated thereby and all the costs of furnishing all opinions by counsel for Borrower; (ii) Borrower's and Lender's ongoing performance under and compliance with the Loan Documents, including confirming compliance with environmental and insurance requirements; (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications of or under any Loan Document and any other documents or matters requested by Lender or Borrower; (iv) filing and recording of any Loan Documents; (v) title insurance, surveys, inspections and appraisals; (vi) the creation, perfection or protection of Lender's Liens on the Property and the Cash Management Accounts (including fees and expenses for title and lien searches, intangibles taxes, personal property taxes, mortgage recording taxes, due diligence expenses, travel expenses, accounting firm fees, costs of appraisals, environmental reports and Lender's Consultant, surveys and engineering reports); (vii) enforcing or preserving any rights in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, the Loan Documents, the Property, or any other security given for the Loan; (viii) fees charged by Rating Agencies in connection with the Loan or any modification thereof; (ix) enforcing any obligations of or collecting any payments due from Borrower under any Loan Document or with respect to the Property or in connection with any refinancing or restructuring of the

**EXHIBIT 1**

Loan in the nature of a "work-out", or any insolvency or bankruptcy proceedings and (x) the fees and expenses of any special servicer retained in respect of the Loan. Any costs and expenses due and payable to Lender hereunder which are not paid by Borrower within ten (10) days after demand may be paid from any amounts in the Deposit Account, with notice thereof to Borrower. The obligations and liabilities of Borrower under this Section 5.17 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure.

**5.18    Indemnity.**  Borrower shall defend, indemnify and hold harmless Lender and each of its Affiliates and their respective successors and assigns, including the directors, officers, partners, members, shareholders, participants, employees, professionals and agents of any of the foregoing (including any Servicer) and each other Person, if any, who Controls Lender, its Affiliates or any of the foregoing (each, an "*Indemnified Party*"), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for an Indemnified Party in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto, court costs and costs of appeal at all appellate levels, investigation and laboratory fees, consultant fees and litigation expenses), that may be imposed on, incurred by, or asserted against any Indemnified Party (collectively, the "*Indemnified Liabilities*") in any manner, relating to or arising out of or by reason of the Loan, including: (i) any breach by Borrower of its obligations under, or any misrepresentation contained in, any Loan Document; (ii) the use or intended use of the proceeds of the Loan; (iii) any information provided by or on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Security Instrument or any of the other Loan Documents, or the Property or any interest therein, or receipt of any Rents; (v) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vi) any use, nonuse or condition in, on or about the Property or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Property; (viii) the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release, or threatened release of any Hazardous Substance on, from or affecting the Property; (ix) any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to such Hazardous Substance; (x) any lawsuit brought or threatened, settlement reached, or government order relating to such Hazardous Substance; (xi) any violation of the Environmental Laws which is based upon or in any way related to such Hazardous Substance, including the costs and expenses of any Remedial Work; (xii) any failure of the Property to comply with any Legal Requirement; (xiii) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof, or any liability asserted against Lender with respect thereto; and (xiv) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease; provided, however, that Borrower shall not have any obligation to any Indemnified Party hereunder if and to the limited extent that it is finally judicially determined that such Indemnified Liabilities arose solely from the gross negligence, illegal acts, fraud or willful misconduct of such Indemnified Party.  Any amounts payable to any Indemnified Party by reason of the application of this Section 5.18 shall be payable on demand and shall bear interest at the Default Rate from the date loss or damage is sustained by any Indemnified Party until paid.  The obligations and liabilities of Borrower under this Section 5.18 shall survive the Term and the exercise by Lender of any of its rights or remedies under the Loan Documents, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure; provided that notwithstanding the foregoing or anything else to the contrary herein, Borrower shall have no obligation or liability hereunder with respect to any Hazardous Substances that are wholly first used, generated, manufactured, stored, released, discharged or disposed of in, on, under or about the Property after Borrower has conveyed the Property and no longer holds title to or an ownership

**EXHIBIT 1**

interest (whether directly or indirectly) in the Property.

**5.19    Embargoed Person.** (a) At all times throughout the Term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (i) none of the funds or assets of Borrower, Borrower Representative or Guarantor, whether or not used to repay the Loan, shall constitute property of, or shall be beneficially owned directly or, to Borrower's best knowledge, indirectly, by any person, entity or government subject to sanctions or trade restrictions under United States law ("*Embargoed Person*" or "*Embargoed Persons*") that are identified on (A) the "List of Specially Designated Nationals and Blocked Persons" maintained by the Office of Foreign Assets Control ("*OFAC*"), U.S. Department of the Treasury's FINCEN list, or to Borrower's best knowledge, as of the date thereof, based upon reasonable inquiry by Borrower, on any other similar list maintained by OFAC or FINCEN pursuant to any authorizing statute including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Order or regulation promulgated thereunder, with the result that the investment in Borrower, Borrower Representative or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law, or the Loan made by Lender would be in violation of law, or (B) Executive Order 13224 (September 23, 2001) issued by the President of the United States ("Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), any related enabling legislation or any other similar Executive Orders, and (ii) no Embargoed Person shall have any direct interest or, to Borrower's best knowledge, indirect interest, of any nature whatsoever in Borrower, Borrower Representative or any Guarantor, as applicable, with the result that the investment in Borrower, Borrower Representative or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.

(b)    At all times throughout the Term of the Loan, none of any of Borrower, Borrower Representative or Guarantor, nor any Person Controlling, Controlled by or under common Control with any of Borrower, Borrower Representative or Guarantor, nor any Person having a beneficial interest in, or for whom any of Borrower, Borrower Representative or Guarantor is acting as agent or nominee in connection with the investment, is (a) a country, territory, person or entity named on an OFAC or FINCEN list, or is a Person that resides in or has a place of business in a country or territory named on such lists; (b) a Person residing in, or organized or chartered under the laws of a jurisdiction identified as non–cooperative by the Financial Action Task Force ("*FATF*"); or (c) a Person whose funds originate from or will be routed through , an account maintained at a foreign shell bank or "offshore bank."

(c)    None of Borrower, Borrower Representative or Guarantor, nor any Person Controlling, Controlled by or under common Control with Borrower, Borrower Representative or Guarantor is a "senior foreign political figure" or an "immediate family" member or "close associate" (as all such terms are defined below) of a senior foreign political figure within the meaning of the USA PATRIOT Act (i.e., the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, H.R. 3162, Public Law 107–56, as may be amended). For the purposes of this subsection (c), (i) "senior foreign political figure" means a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party or a senior executive of a foreign government–owned corporation, and such term also includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure, (ii) "immediate family" of a senior foreign political figure includes the figure's parents, siblings, spouse, children and in–laws, and (iii) "close associate" of a senior foreign political figure means a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

36

**EXHIBIT 1**

**5.20    Anti–Money Laundering.**  At all times throughout the Term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, none of the funds of Borrower, Borrower Representative or any Guarantor, as applicable, that are used to consummate this transaction or to repay the Loan shall be derived from or are the proceeds of any unlawful activity, with the result that the investment in Borrower, Borrower Representative or any Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law or may cause any of the Property to be subject to forfeiture or seizure.  Borrower has ascertained the identity of all persons and entities who have provided funds to capitalize Borrower and has conducted verification procedures which are sufficient to establish the identity and source of such funds.

**5.21    ERISA.**  At all times throughout the Term, upon the request of Lender or any of Lender's successors, assigns or participants in the Loan, the management of Borrower shall consult with Lender or any of Lender's successors, assigns or participants on significant business issues relating to the operation of the Property and make itself available quarterly either personally or by telephone at mutually agreeable times for such consultation; provided, however, that such consultation need not result in any change in Borrower's course of action, subject to Section 8.1.  The aforementioned consultation rights are intended to satisfy the requirement of management rights for purposes of the Department of Labor "plan assets" regulation 29 C.F.R., Section 2510.3–101.

**5.22    Low Income Tenants.**  At all times throughout the Term of the Loan, the percentage of units at any Individual Property and/or at the Property as a whole that are (i) subject to Low Income Restrictions, or (ii) leased to Section 8 Certificate Holders, shall not increase above the applicable percentage in effect as of the date hereof as reflected on Schedule 7.  Borrower shall comply with all terms of the Land Use Restrictions Agreement.

## 6.    NOTICES AND REPORTING.

**6.1    Notices.**  All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document (a *"Notice"*) shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, or by facsimile and confirmed by facsimile answer back, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by Notice to the other party):  If to Lender: Natixis Real Estate Capital LLC, 1251 Avenue of the Americas, New York, New York 10020; Attention: Real Estate Administration, Telecopier: (212) 891–5777 with copies to: Nelson Mullins Riley & Scarborough LLP, 301 S. College Street, Suite 2300, Charlotte, North Carolina 28202, Attention: D. Shane Gunter, Esq. Telecopier: (704) 417–3252; if to Borrower: c/o 220 Archer Drive, Sherman, Texas 75092, Attention: Mendi Salijeski, Telecopier: (903) 893-7107, with a copy to:  Sara J. Evans, Esq., 5009 Village Circle, Dallas, Texas 75248, Telecopier: (214) 279-3308.  A Notice shall be deemed to have been given: (a) in the case of hand delivery, at the time of delivery; (b) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; (c) in the case of overnight delivery, upon the first attempted delivery on a Business Day; or (d) in the case of facsimile transmission, when sent and electronically confirmed.

**6.2    Borrower Notices and Deliveries.**  Borrower shall (a) give prompt written notice to Lender of: (i) any litigation, governmental proceedings or claims or investigations pending or threatened against Borrower or Borrower Representative which might materially adversely affect Borrower's or Borrower Representative's condition (financial or otherwise) or business or the Property; (ii) any material adverse change in Borrower's or Borrower Representative's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge; and (b) furnish and

**EXHIBIT 1**

provide to Lender: (i) any Securities and Exchange Commission or other public filings, if any, of Borrower, Borrower Representative, Manager, or any Affiliate of any of the foregoing within two (2) Business Days of such filing and (ii) all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, reasonably requested, from time to time, by Lender. In addition, after request by Lender (but no more frequently than twice in any year), Borrower shall furnish to Lender (x) within ten (10) days, a certificate addressed to Lender, its successors and assigns reaffirming all representations and warranties of Borrower set forth in the Loan Documents as of the date requested by Lender or, to the extent of any changes to any such representations and warranties, so stating such changes, and (y) within thirty (30) days, Tenant estoppel certificates addressed to Lender, its successors and assigns from each Tenant at the Property in form and substance reasonably satisfactory to Lender.

### 6.3 Financial Reporting.

**6.3.1 Bookkeeping.** Borrower shall keep on a calendar year basis, in accordance with GAAP or any other accounting method, consistently applied, proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense and any services, Equipment or furnishings provided in connection with the operation of the Property, whether such income or expense is realized by Borrower, Manager or any Affiliate of Borrower. Lender shall have the right from time to time during normal business hours upon reasonable notice to examine such books, records and accounts at the office of Borrower or other Person maintaining them, and to make such copies or extracts thereof as Lender shall reasonably require. After an Event of Default, Borrower shall pay any costs incurred by Lender to examine such books, records and accounts, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest.

**6.3.2 Annual Reports.** Borrower shall furnish to Lender annually within ninety (90) days after each calendar year, a complete copy of Borrower's annual financial statements certified by Borrower in form and content reasonably acceptable to Lender, prepared in accordance with GAAP or any other accounting method, consistently applied, and containing balance sheets and statements of profit and loss for Borrower and the Property in such detail as Lender may reasonably request. Notwithstanding the foregoing during the pendency of an Event of Default, Borrower's annual financial statement must be reviewed by a "big four" accounting firm or another certified public accountant reasonably acceptable to Lender. Each such statement (x) shall be in form and substance reasonably satisfactory to Lender, (y) shall set forth the financial condition and the income and expenses for the Property for the immediately preceding calendar year, including statements of annual Net Operating Income as well as (1) a list of Tenants, if any, occupying more than twenty percent (20%) of the rentable space of the Property, (2) a breakdown showing (a) the year in which each Lease then in effect expires, (b) the percentage of rentable space covered by such Lease, (c) the percentage of base rent with respect to which Leases shall expire in each such year, expressed both on a per year and a cumulative basis and (z) shall be accompanied by an Officer's Certificate certifying (1) that such statement is true, correct, complete and accurate in all material respects and presents fairly the financial condition of the Property and has been prepared in accordance with GAAP or any other accounting method consistently applied and (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it. Notwithstanding anything contained in this Section 6.3.2 to the contrary, so long as no Event of Default is ongoing, review of the Borrower's financial statements by a certified public accountant shall not be required, subject to Lender's review of, and satisfaction with, the experience of the person signing the Officer's Certificate referred to above with preparing commercial real estate financial and operating statements in accordance with GAAP or such other generally recognized accounting methods consistently applied. In addition, Borrower shall furnish to Lender with a copy of each compliance report that Borrower provides to the TX Housing Agency in connection with the Land Use Restrictions Agreement within fifteen (15) days of submitting such report to the TX Housing

38

**EXHIBIT 1**

Agency together with an Officer's Certificate certifying that the Borrower and the Terrace Property are in compliance with the Land Use Restrictions Agreement.

6.3.3 **Monthly/Quarterly Reports.** Borrower shall furnish to Lender within twenty (20) days after the end of each calendar month or quarter, as applicable, the following items: (i) monthly and year–to–date operating statements, noting Net Operating Income and other information necessary and sufficient under GAAP or any other accounting method, consistently applied to fairly represent the financial position and results of operation of the Property during such calendar month, all in form satisfactory to Lender; (ii) quarterly, a balance sheet for such calendar quarter; (iii) quarterly, a comparison of the budgeted income and expenses and the actual income and expenses for each quarter and year–to–date for the Property, together with a detailed explanation of any variances of ten percent (10%) or more between budgeted and actual amounts for such period and year to date; (iv) quarterly, a statement of the actual Capital Expenses made by Borrower during each calendar quarter as of the last day of such calendar quarter; (v) quarterly, a statement that Borrower has not incurred any indebtedness other than indebtedness permitted hereunder; (vi) quarterly, an aged receivables report; and (vii) monthly, rent rolls identifying the leased premises, names of all Tenants, units leased, monthly rental and all other charges payable under each Lease, date to which paid, term of Lease, date of occupancy, date of expiration, material special provisions, concessions or inducements granted to Tenants, and a year–by–year schedule showing by percentage the rentable area of the Improvements and the total base rent attributable to Leases expiring each year) and a delinquency report for the Property. Each such statement shall be accompanied by an Officer's Certificate certifying (1) that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property in accordance with GAAP or any other accounting method, consistently applied (subject to normal year–end adjustments) and (2) whether there exists a Default or Event of Default, and if so, the nature thereof, the period of time it has existed and the action then being taken to remedy it.

6.3.4 **Other Reports.** Borrower shall furnish to Lender, within ten (10) Business Days after request, such further detailed information with respect to the operation of the Property and the financial affairs of Borrower, Borrower Representative or Manager as may be reasonably requested by Lender or any applicable Rating Agency.

6.3.5 **Annual Budget.** Borrower shall prepare and submit (or shall cause Manager to prepare and submit) to Lender within thirty (30) days after the commencement of a Cash Management Period and thereafter by November 15th of each year during the Term, until such Cash Management Period has ended, for approval by Lender, which approval shall not be unreasonably withheld or delayed, a proposed pro forma budget for the Property for the succeeding calendar year (the "*Annual Budget*"), and, promptly after preparation thereof, any revisions to such Annual Budget. Lender's failure to approve or disapprove any Annual Budget or revision within thirty (30) days after Lender's receipt thereof shall be deemed to constitute Lender's approval thereof. The Annual Budget shall consist of (i) an operating expense budget (the "*Operating Budget*") showing, on a month–by–month basis, in reasonable detail, each line item of Borrower's anticipated operating income and operating expenses (on a cash and accrual basis), including amounts required to establish, maintain or increase any monthly payments required hereunder, and (ii) a Capital Expense budget (the "*Capital Budget*") showing, on a month–by–month basis, in reasonable detail, each line item of anticipated Capital Expenses.

6.3.6 **Breach.** If Borrower fails to provide to Lender or its designee any of the financial statements, certificates, reports or information (the "*Required Records*") required by this Section 6.3 within thirty (30) days after the date upon which such Required Record is due, Borrower shall pay to Lender, at Lender's option and in its discretion, an amount equal to $2,500 for each Required Record that is not delivered; provided Lender has given Borrower at least fifteen (15) days prior notice of such failure. In addition, thirty (30) days after Borrower's failure to deliver any Required Records,

39
**EXHIBIT 1**

Lender shall have the option, upon fifteen (15) days notice to Borrower to gain access to Borrower's books and records and prepare or have prepared at Borrower's expense, any Required Records not delivered by Borrower.

7.    **INSURANCE; CASUALTY; AND CONDEMNATION**

    7.1    **Insurance.**

        7.1.1    **Coverage.**  Borrower, at its sole cost, for the mutual benefit of Borrower and Lender, shall obtain and maintain during the Term the following policies of insurance:

        (a)    Property insurance insuring against loss or damage customarily included under so called "all risk" or "special form" policies including fire, lightning, flood (if applicable), earthquake (if applicable), windstorm/hail, vandalism, and malicious mischief, boiler and machinery and coverage for damage or destruction caused by "War", if available, and the acts of terrorists, both foreign and domestic, whether considered "certified" under applicable laws and legislation or otherwise (or such policies shall have no exclusion from coverage with respect thereto) and such other insurable hazards as, under good insurance practices, from time to time are insured against for other property and buildings similar to the Property in nature, use, location, height, and type of construction.  Such insurance policy shall also provide coverage for Ordinance or Law, coverage for loss to the undamaged portion of the Improvements, demolition and increased cost of construction (which insurance for demolition and increased cost of construction may contain a sub–limit satisfactory to Lender).  Each such insurance policy shall (i) be in an amount equal to the greater of (A) one hundred percent (100%) of the then replacement cost of the Improvements without deduction for physical depreciation, and (B) such amount as is necessary so that the insurer would not deem Borrower a co–insurer under such policies, (ii) have deductibles no greater than $10,000 per occurrence, except for Wind/Hail and Named Storm for which the Lender has approved a $25,000 deductible, (iii) be paid annually in advance and (iv) contain either no coinsurance or an agreed amount endorsement and (v) a replacement cost endorsement with a waiver of depreciation, and shall cover, without limitation, all Tenant improvements and betterments that Borrower is required to insure pursuant to any Lease on a replacement cost basis.  If the insurance required under this subsection is not obtained by blanket insurance policies, the insurance policy shall be endorsed to also provide guaranteed building replacement cost to the Improvements and such Tenant improvements in an amount to be subject to the consent of Lender, which consent shall not be unreasonably withheld, but in all events, not less than would be required to restore the Property following a Casualty.  If policy is written as part of a blanket, Borrower will provide Lender with a complete schedule of locations and values for properties associated with the blanket policy.  Lender shall be named Mortgagee and Lender's Loss Payee on a Standard Mortgagee Endorsement.

        (b)    Flood insurance if any part of the Property is located in an area identified by the Federal Emergency Management Agency as an area having special flood hazards, in an amount at least equal to the lesser of: (i) the greater of (A) the then full replacement cost of the Property without deduction for physical depreciation and (B) the unpaid Principal and (ii) the maximum limit of coverage available under the National Flood Insurance Plan with respect to the Property; provided, however, that Lender shall be entitled to require flood insurance in amounts greater than the foregoing, in its discretion. If flood insurance is required, the maximum deductible allowable on the primary layer of coverage shall be $10,000.

        (c)    Public liability insurance, including terrorism, to be written on an occurrence basis with no deductible or self–insured retention on the General Liability, including (i) "Commercial General Liability Insurance", (ii) "Owned", "Hired" and "Non Owned Auto Liability"; and (iii) umbrella liability coverage for personal injury, bodily injury, death, accident and property damage, such insurance

<div align="center">40</div>

<div align="center">**EXHIBIT 1**</div>

providing in combination not less than $1,000,000 per occurrence, not less than $2,000,000 in the annual aggregate and not less than $20,000,000.00 umbrella, each on a per location basis. If aggregate limits are shared with other locations the coverage shall include either (A) a "Per Location Aggregate Endorsement" or (B) the amount of umbrella liability insurance to be provided shall be not less than $5,000,000 in excess of the umbrella coverage set forth in the preceding sentence. The policies described in this subsection shall also include coverage for elevators, escalators, independent contractors, "Contractual Liability" (covering, to the maximum extent permitted by law, Borrower's obligation to indemnify Lender as required under this Agreement and the other Loan Documents), "Products" and "Completed Operations Liability" coverage.

(d)     Rental loss or business interruption insurance including terrorism (i) with Lender being named as "Lender Loss Payee", (ii) in an amount equal to one hundred percent (100%) of the projected Rents from the Property during the period of restoration but not less than twelve (12) months; and (iii) containing an extended period of indemnity endorsement of not less than six (6) months which provides that after the physical loss to the Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of eighteen (18) months from the date that the Property is damaged, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period. The amount of such insurance shall be increased from time to time during the Term as and when the estimated or actual Rents increase.

(e)     To the extent such equipment exists on the Property, comprehensive boiler and machinery insurance covering all mechanical and electrical equipment against physical damage, rent loss and improvements loss and covering, without limitation, all Tenant improvements and betterments that Borrower is required to insure pursuant to the lease on a replacement cost basis or such other amount as approved by Lender in its discretion.

(f)     Worker's compensation insurance with respect to any employees of Borrower, as required by any Legal Requirement.

(g)     During any period of repair or restoration, builder's "all–risk" insurance on a "Completed Value Basis" in an amount equal to not less than the full, completed insurable value of the Property, against such risks (including fire and extended coverage and collapse of the Improvements to agreed limits) as Lender may request, in form and substance and with deductibles acceptable to Lender, and consistent with the insurance requirements set forth in Section 7.1.1(a).

(h)     Such other insurance or higher limits on the Property or on any replacements or substitutions thereof or additions thereto as may from time to time be required by Lender against other insurable hazards or casualties which at the time are commonly insured against in the case of property similarly situated including, without limitation, sinkhole, mine subsidence and environmental insurance, due regard being given to the height and type of buildings, their construction, location, use and occupancy.

     7.1.2  **Policies.**  Unless otherwise approved by Lender in writing in advance of placement, all policies of insurance (the "*Policies*") required pursuant to Section 7.1.1 shall (i) be issued by companies approved by Lender and licensed and/or authorized to do business in the State, with a claims paying ability rating of "A" or better by S&P (and the equivalent by any other Rating Agency) and a rating of A:X or better in the current Best's Insurance Reports; (ii) name Lender and its successors or assigns as their interests may appear as the Mortgagee and Lender's Loss Payee (in the case of property insurance including rent loss or business interruption insurance) and an additional insured (in the case of liability insurance); (iii) contain (in the case of property insurance) a Non–Contributory Standard Mortgagee Clause and a Lender's Loss Payable Endorsement, or their equivalents, naming Lender as the

41

**EXHIBIT 1**

Person to which all payments made by such insurance company shall be paid; (iv) contain provisions permitting Borrower to waive its right of subrogation against Lender; (v) be assigned and the originals thereof delivered to Lender; (vi) contain such provisions as Lender deems reasonably necessary or desirable to protect its interest, including (A) endorsements providing that neither Borrower, Lender nor any other party shall be a co-insurer under the Policies, (B) that Lender shall receive at least thirty (30) days' prior written notice of cancellation of any of the Property Policies, and when available, liability policies (provided, however, that if such notice provisions are not available in any of the liability Policies, Borrower shall provide the required notice to Lender), (C) an agreement whereby the insurer waives any right to claim any premiums and commissions against Lender, provided that the policy need not waive the requirement that the premium be paid in order for a claim to be paid to the insured, and (D) providing that Lender is permitted to make payments to effect the continuation of such Policy upon notice of cancellation due to non-payment of premiums; (vii) in the event any insurance policy (except for general public and other liability and workers compensation insurance) shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of Lender, such insurance policy shall not be invalidated by and shall insure Lender regardless of (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured, (B) the occupancy or use of the premises for purposes more hazardous than permitted by the terms thereof, or (C) any foreclosure or other action or proceeding taken by Lender pursuant to any provision of the Loan Documents; and (viii) be satisfactory in form and substance to Lender and approved by Lender as to amounts, form, risk coverage, deductibles, loss payees and insureds. Borrower shall pay the premiums for such Policies (the "*Insurance Premiums*") as the same become due and payable and furnish to Lender evidence of the renewal of each of the Policies together with (unless such Insurance Premiums have been paid by Lender pursuant to Section 3.3) receipts for or other evidence of the payment of the Insurance Premiums reasonably satisfactory to Lender. If Borrower does not furnish such evidence and receipts at least thirty (30) days prior to the expiration of any expiring Policy, then Lender may, but shall not be obligated to, procure such insurance and pay the Insurance Premiums therefor, and Borrower shall reimburse Lender for the cost of such Insurance Premiums promptly on demand, with interest accruing at the Default Rate. Borrower shall deliver to Lender a certified copy of each Policy within thirty (30) days after its effective date. Within thirty (30) days after request by Lender, Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by Lender, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices and the like.

**7.2     Casualty.**

**7.2.1     Notice; Restoration.** If the Property is damaged or destroyed, in whole or in part, by fire or other casualty (a "*Casualty*"), Borrower shall give prompt notice thereof to Lender. Following the occurrence of a Casualty, Borrower, regardless of whether insurance proceeds are available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to be of at least equal value and of substantially the same character as prior to such damage or destruction.

**7.2.2     Settlement of Proceeds.** If a Casualty covered by any of the Policies (an "*Insured Casualty*") occurs where the loss does not exceed $250,000, provided no Default or Event of Default has occurred and is continuing, Borrower may settle and adjust any claim without the prior consent of Lender; provided such adjustment is carried out in a competent and timely manner, and Borrower is hereby authorized to collect and receipt for the insurance proceeds (the "*Proceeds*"). In the event of an Insured Casualty where the loss equals or exceeds $250,000 (a "*Significant Casualty*"), Lender may, in its sole discretion, settle and adjust any claim without the consent of Borrower and agree with the insurer(s) on the amount to be paid on the loss. All Proceeds shall be due and payable solely to Lender and held by Lender in the Casualty/Condemnation Subaccount and disbursed in accordance

~#4825-6832-1881~

**EXHIBIT 1**

herewith. If Borrower or any party other than Lender is a payee on any check representing Proceeds with respect to a Significant Casualty, Borrower shall immediately endorse, and cause all such third parties to endorse, such check payable to the order of Lender. Borrower hereby irrevocably appoints Lender as its attorney–in–fact, coupled with an interest, to endorse such check payable to the order of Lender. The expenses incurred by Lender in the settlement, adjustment and collection of the Proceeds shall become part of the Debt and shall be reimbursed by Borrower to Lender upon demand.

**7.3     Condemnation.**

   **7.3.1     Notice; Restoration.** Borrower shall promptly give Lender notice of the actual or threatened commencement of any condemnation or eminent domain proceeding affecting the Property (a "*Condemnation*") and shall deliver to Lender copies of any and all papers served in connection with such Condemnation. Following the occurrence of a Condemnation, Borrower, regardless of whether an Award is available, shall promptly proceed to restore, repair, replace or rebuild the Property in accordance with Legal Requirements to the extent practicable to be of at least equal value and of substantially the same character (and to have the same utility) as prior to such Condemnation.

   **7.3.2     Collection of Award.** Lender is hereby irrevocably appointed as Borrower's attorney–in–fact, coupled with an interest, with exclusive power to collect, receive and retain any award or payment in respect of a Condemnation (an "*Award*") and to make any compromise, adjustment or settlement in connection with such Condemnation. Notwithstanding any Condemnation (or any transfer made in lieu of or in anticipation of such Condemnation), Borrower shall continue to pay the Debt at the time and in the manner provided for in the Loan Documents, and the Debt shall not be reduced unless and until any Award shall have been actually received and applied by Lender to expenses of collecting the Award and to discharge of the Debt. Lender shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided in the Note (or Undefeased Note, as the case may be). If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of such Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall be recoverable or shall have been sought, recovered or denied, to receive all or a portion of the Award sufficient to pay the Debt. Borrower shall cause any Award that is payable to Borrower to be paid directly to Lender. Lender shall hold such Award in the Casualty/Condemnation Subaccount and disburse such Award in accordance with the terms hereof.

**7.4     Application of Proceeds or Award.**

   **7.4.1     Application to Restoration.** If an Insured Casualty or Condemnation occurs where (i) the loss is in an aggregate amount less than fifteen percent (15%) of the unpaid Principal, (ii) in the reasonable judgment of Lender, the Property can be restored within the earliest to occur of (x) six (6) months from the date of the Insured Casualty or Condemnation, (y) six (6) months before the Stated Maturity Date and (z) the expiration of the rental or business interruption insurance with respect thereto, to the Property's pre–existing condition and utility as existed immediately prior to such Insured Casualty or Condemnation and to an economic unit not less valuable and not less useful than the same was immediately prior to the Insured Casualty or Condemnation, and after such restoration will adequately secure the Debt and (iii) no Default or Event of Default shall have occurred and be then continuing, then the Proceeds or the Award, as the case may be (after reimbursement of any expenses incurred by Lender), shall be applied to reimburse Borrower or pay for the cost of restoring, repairing, replacing or rebuilding the Property (the "*Restoration*"), in the manner set forth herein. Borrower shall commence and diligently prosecute such Restoration. Notwithstanding the foregoing, in no event shall Lender be obligated to apply the Proceeds or Award to reimburse Borrower or pay for the cost of Restoration unless, in addition to satisfaction of the foregoing conditions, both (x) Borrower shall pay (and if required by Lender, Borrower shall deposit with Lender in advance) all costs of such Restoration in excess of the net amount

43

**EXHIBIT 1**

of the Proceeds or the Award to be made available pursuant to the terms hereof; and (y) Lender shall have received evidence reasonably satisfactory to it that during the period of the Restoration, the Rents will be at least equal to the sum of the operating expenses and Debt Service, as reasonably determined by Lender.

        **7.4.2**    **Application to Debt.**  Except as provided in Section 7.4.1, any Proceeds or Award may, at the option of Lender in its discretion, be applied to the payment of (i) accrued but unpaid interest on the Note, (ii) the unpaid Principal and (iii) other charges due under the Note or any of the other Loan Documents, or applied to reimburse Borrower for the cost of any Restoration, in the manner set forth in Section 7.4.3.  Any such prepayment of the Loan shall be without any Yield Maintenance Premium, unless an Event of Default has occurred and is continuing at the time the Proceeds are received from the insurance company or the Award is received from the condemning authority, as the case may be, in which event Borrower shall pay to Lender an additional amount equal to the Yield Maintenance Premium, if any, that may be required with respect to the amount of the Proceeds or Award applied to the unpaid Principal.  After any such application to the unpaid Principal, the remaining unpaid Principal shall be reamortized over the remaining Term hereof.

        **7.4.3**    **Procedure for Application to Restoration.**  If Borrower is entitled to reimbursement out of the Proceeds or an Award held by Lender or to use such Proceeds or Award to pay for Restoration, such Proceeds or Award shall be disbursed from time to time from the Casualty/Condemnation Subaccount upon Lender being furnished with (i) evidence satisfactory to Lender of the estimated cost of completion of the Restoration, (ii) a fixed price or guaranteed maximum cost construction contract for Restoration satisfactory to Lender, (iii) prior to the commencement of Restoration, all immediately available funds in addition to the Proceeds or Award that in Lender's judgment are required to complete the proposed Restoration, (iv) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds, plats of survey, permits, approvals, licenses and such other documents and items as Lender may reasonably require and approve in Lender's discretion, and (v) all plans and specifications and construction contracts for such Restoration, such plans and specifications and construction contracts to be approved by Lender prior to commencement of any work.  Lender may, at Borrower's expense, retain a consultant to review and approve all requests for disbursements, which approval shall also be a condition precedent to any disbursement.  No payment made prior to the final completion of the Restoration shall exceed ninety percent (90%) of the value of the work performed from time to time; funds other than the Proceeds or Award shall be disbursed prior to disbursement of such Proceeds or Award; and at all times, the undisbursed balance of such Proceeds or Award remaining in the hands of Lender, together with funds deposited for that purpose or irrevocably committed to the satisfaction of Lender by or on behalf of Borrower for that purpose, shall be at least sufficient in the reasonable judgment of Lender to pay for the cost of completion of the Restoration, free and clear of all Liens or claims for Lien.  Provided no Default or Event of Default then exists, any surplus that remains out of the Proceeds held by Lender after payment of such costs of Restoration shall be paid to Borrower.  Any surplus that remains out of the Award received by Lender after payment of such costs of Restoration shall, in the discretion of Lender, be retained by Lender and applied to payment of the Debt or returned to Borrower.

        **7.4.4**    **Prepayment upon Partial Condemnation.**  Notwithstanding the foregoing provisions in this Section 7, if the Loan or any portion thereof is included in a REMIC Trust and immediately following a release of any portion of the Lien of the Security Instrument in connection with a Condemnation (but taking into account any proposed Restoration of the remaining portion of the Property that remains subject to the Lien), the Loan-to-Value ratio of the remaining portion of the Property that remains subject to the Lien is greater than 125% (such value to be determined, in Lender's sole discretion, by any commercially reasonable method permitted to a REMIC Trust, based solely on real property and excluding any personal property and going concern value, if any), then the principal balance of the Loan must be paid down by an amount equal to the least of the following amounts: (i) the net Condemnation

44

**EXHIBIT 1**

Award, (ii) the fair market value of the released property at the time of the release, or (iii) an amount such that the Loan-to-Value ratio (as so determined by Lender) does not increase after the release unless Lender receives an opinion of counsel that if such amount is not paid, the securitization will not fail to maintain its status as a REMIC Trust as a result of the related release of such portion of the Lien of the Security Instrument.

## 8. DEFAULTS

**8.1 Events of Default.** An "*Event of Default*" shall exist with respect to the Loan if any of the following shall occur:

(a) any portion of the Debt is not paid when due or any other amount under <u>Section 3.10(a)</u> is not paid in full when due (unless during any Cash Management Period, sufficient funds are available in the relevant Subaccount on the applicable date);

(b) any of the Taxes are not paid when due (unless Lender is paying such Taxes pursuant to <u>Section 3.3</u>), subject to Borrower's right to contest Taxes in accordance with <u>Section 5.2</u>;

(c) the Policies are not kept in full force and effect, or are not delivered to Lender upon request;

(d) a Transfer other than a Permitted Transfer occurs;

(e) any representation or warranty made in any Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished by Borrower or Guarantor in connection with any Loan Document, shall be false or misleading in any material respect as of the date the representation or warranty was made;

(f) Borrower, Borrower Representative or Guarantor shall (i) make an assignment for the benefit of creditors or (ii) generally not be paying its debts as they become due;

(g) a receiver, liquidator or trustee shall be appointed for Borrower, Borrower Representative or Guarantor; or Borrower, Borrower Representative or Guarantor shall be adjudicated a bankrupt or insolvent; or any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower, Borrower Representative or Guarantor, as the case may be; or any proceeding for the dissolution or liquidation of Borrower, Borrower Representative or Guarantor shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower, Borrower Representative or Guarantor, as the case may be, only upon the same not being discharged, stayed or dismissed within sixty (60) days;

(h) any covenant contained in <u>Sections 5.11.1 (a) – (e)</u>, <u>5.12</u>, <u>5.14</u>, <u>5.15</u> or <u>5.16</u> is breached;

(i) except as expressly permitted hereunder, the actual or threatened alteration, improvement, demolition or removal of all or any of portion of the Improvements without the prior written consent of Lender or the physical waste of any portion of the Property;

(j) an Event of Default as defined or described elsewhere in this Agreement or in any other Loan Document occurs; or any other event shall occur or condition shall exist, if the effect of

~#4825-6832-1981~
**EXHIBIT 1**

such event or condition is to accelerate or to permit Lender to accelerate the maturity of any portion of the Debt;

(k)     a default occurs under any term, covenant or provision set forth herein or in any other Loan Document which specifically contains a notice requirement or grace period and such notice has been given and such grace period has expired;

(l)     a default shall be continuing under any of the other terms, covenants or conditions of this Agreement or any other Loan Document not otherwise specified in this Section 8.1, for ten (10) days after notice to Borrower (or Guarantor, if applicable) from Lender, in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other default; provided, however, that if such non–monetary default is susceptible of cure but cannot reasonably be cured within such thirty (30)–day period, and Borrower (or Guarantor, if applicable) shall have commenced to cure such default within such thirty (30)–day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30)–day period shall be extended for an additional period of time as is reasonably necessary for Borrower (or Guarantor, if applicable) in the exercise of due diligence to cure such default, such additional period not to exceed sixty (60) days; or

(m)     Borrower fails to comply fully, completely and timely with the covenants and agreements set forth in Article 9.

**8.2     Remedies.**

**8.2.1     Acceleration.**  Upon the occurrence of an Event of Default (other than an Event of Default described in subsection (f) or (g) of Section 8.1) and at any time and from time to time thereafter, in addition to any other rights or remedies available to it pursuant to the Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property; including declaring the Debt to be immediately due and payable (including unpaid interest), Default Rate interest, Late Payment Charges, Yield Maintenance Premium and any other amounts owing by Borrower), without notice or demand; and upon any Event of Default described in subsection (f) or (g) of Section 8.1, the Debt (including unpaid interest, Default Rate interest, Late Payment Charges, Yield Maintenance Premium and any other amounts owing by Borrower) shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained in any Loan Document to the contrary notwithstanding.

**8.2.2     Remedies Cumulative.**  Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under the Loan Documents or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared, or be automatically, due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth in the Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing, (i) to the extent permitted by applicable law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property, the Security Instrument has been foreclosed, the Property has been sold or otherwise realized upon in satisfaction of

46

**EXHIBIT 1**

the Debt or the Debt has been paid in full. To the extent permitted by applicable law, nothing contained in any Loan Document shall be construed as requiring Lender to resort to any portion of the Property for the satisfaction of any of the Debt in preference or priority to any other portion, and Lender may seek satisfaction out of the entire Property or any part thereof, in its discretion.

          **8.2.3**   <u>**Severance.**</u>  Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (and, in connection therewith, to bifurcate or otherwise modify the nature of the collateral that secures such notes) in such denominations and priorities of payment and liens as Lender shall determine in its discretion for purposes of evidencing and enforcing its rights and remedies. Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such severance, Borrower ratifying all that such attorney shall do by virtue thereof.

          **8.2.4**  <u>**Delay.**</u>  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power consequent thereon. Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the foreclosure of the Security Instrument to the extent necessary to foreclose on all or any portion of the Property, the Rents, the Cash Management Accounts or any other collateral.

          **8.2.5**  <u>**Lender's Right to Perform.**</u>  If Borrower fails to perform any covenant or obligation contained herein and such failure shall continue for a period of five (5) Business Days after Borrower's receipt of written notice thereof from Lender, without in any way limiting Lender's right to exercise any of its rights, powers or remedies as provided hereunder, or under any of the other Loan Documents, Lender may, but shall have no obligation to, perform, or cause performance of, such covenant or obligation, and all costs, expenses, liabilities, penalties and fines of Lender incurred or paid in connection therewith shall be payable by Borrower to Lender upon demand and if not paid shall be added to the Debt (and to the extent permitted under applicable laws, secured by the Security Instrument and other Loan Documents) and shall bear interest thereafter at the Default Rate. Notwithstanding the foregoing, Lender shall have no obligation to send notice to Borrower of any such failure.

**9.**     <u>**SECONDARY MARKET PROVISIONS**</u>

     **9.1**   <u>**Transfer of Loan.**</u>

          (a)    Lender may, at any time, sell, transfer or assign the Loan, the Loan Documents and any or all servicing rights with respect thereto, or grant participations therein or issue mortgage pass–through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "*Securities*") secured by or evidencing ownership interests in the Note and the Security Instrument (each such sale, assignment, participation or securitization, a "*Secondary Market Transaction*"). Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor in such Securities or any NRSRO (all of the foregoing entities collectively referred to as the "*Investor*") and each prospective Investor, all documents and information which Lender now has or may hereafter

**EXHIBIT 1**

acquire relating to the Loan and to Borrower, Borrower Representative and Guarantor and the Property, whether furnished by Borrower, Borrower Representative, Guarantor or otherwise, as Lender determines necessary or appropriate.

(b)      Borrower, Borrower Representative and Guarantor agree to cooperate with Lender in connection with any transfer made or any Securities created pursuant to this Section 9.1. Borrower shall also promptly furnish, and Borrower, Borrower Representative and Guarantor consent to Lender furnishing, to such Investors or such prospective Investors or Rating Agency any and all available information concerning the Property, the Leases, the financial condition of Borrower, Borrower Representative and Guarantor as may be requested by Lender, any Investor or any prospective Investor or Rating Agency (including, but not limited to, copies of information previously supplied to Lender) in connection with any sale, transfer or participation interest. In addition to any other obligations Borrower may have hereunder, Borrower shall execute such amendments to the Loan Documents and Borrower's organizational documents as may be requested by the holder of the Note or any Investor to effect the assignment of the Note and the other Loan Documents or issuance of Securities including (i) bifurcating the Note into two or more notes or splitting the Security Instrument into two or more instruments of the same or different priorities or otherwise as determined by and acceptable to Lender or (ii) dividing the Note into multiple components corresponding to tranches of certificates to be issued in a Secondary Market Transaction each having a notional balance and an interest rate determined by Lender; provided, however, that Borrower shall not be required to modify or amend any Loan Document if the overall effect of such modification or amendment would (y) change the initial weighted average interest rate, the maturity or the amortization of principal set forth in the Note, or (z) modify or amend any other material economic term of the Note or the other Loan Documents.

(c)      If requested by Lender, Borrower shall provide Lender, promptly upon request, with any financial statements, financial, statistical or operating information or other information as Lender shall reasonably determine is necessary or appropriate (including items required (or items that would be required if the Securities issued in connection with a Secondary Market Transaction were offered publicly) to satisfy any and all disclosure requirements pursuant to the Securities Act (including, but not limited to, Regulation AB), the Exchange Act, any other applicable securities laws or any amendment, modification or replacement to any of the foregoing) or required by any other Legal Requirements, in each case, in connection with any Disclosure Document (as hereinafter defined) or any filings pursuant to the Exchange Act in connection with or relating to the Secondary Market Transaction (an "*Exchange Act Filing*") or as may otherwise be reasonably requested by Lender.

**9.2      Use of Information.**  Borrower understands that information provided to Lender by Borrower and its agents, counsel and representatives may be included in preliminary and final disclosure documents in connection with the Secondary Market Transaction, including an offering circular, a prospectus, prospectus supplement, private placement memorandum or other offering document (each, a "*Disclosure Document*") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "*Securities Act*"), or the Securities and Exchange Act of 1934, as amended (the "*Exchange Act*"), and may be made available to investors or prospective investors in the Securities, investment banking firms, NRSROs, accounting firms, law firms and other third-party advisory and service providers relating to the Secondary Market Transaction. Borrower also understands that the findings and conclusions of any third-party due diligence report obtained by the Lender, the Issuer (as hereinafter defined) or the placement agent or underwriter of the Secondary Market Transaction may be made publicly available if required, and in the manner prescribed, by Section 15E(s)(4)(A) of the Exchange Act and any rules promulgated thereunder.

**9.3      Borrower Indemnity.**

(a)     Borrower hereby agrees to indemnify Natixis, including its officers, directors, Affiliates and each Person who controls Natixis within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "*Natixis Group*"), the issuer of the Securities (the "*Issuer*" and for purposes of this Section 9.3, Issuer shall include its officers, director and each Person who controls the Issuer within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act), and any placement agent or underwriter with respect to the Secondary Market Transaction, each of their respective officers and directors and each Person who controls the placement agent or underwriter within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "*Underwriter Group*") for any losses, claims, damages or liabilities (collectively, the "*Liabilities*") to which Natixis, the Natixis Group, the Issuer or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon, (i) any untrue statement or alleged untrue statement of any material fact contained in the information provided to Natixis by Borrower and its agents, counsel and representatives, (ii) the omission or alleged omission to state therein a material fact required to be stated in such information or necessary in order to make the statements in such information, in light of the circumstances under which they were made, not misleading, or (iii) a breach of the representations and warranties made by Borrower in Section 4.8 of this Agreement (Full and Accurate Disclosure).  Borrower also agrees to reimburse Natixis, the Natixis Group, the Issuer and/or the Underwriter Group for any reasonable legal or other expenses reasonably incurred by Natixis, the Natixis Group, the Issuer and/or the Underwriter Group in connection with investigating or defending the Liabilities.  Borrower's liability under this paragraph will be limited to Liabilities that arise out of, or are based upon, an untrue statement or omission made in reliance upon, and in conformity with, information furnished to Natixis by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Property.  This indemnification provision will be in addition to any liability which Borrower may otherwise have.

(b)     In connection with any Exchange Act Filing or other reports containing comparable information that is required to be made "available" to holders of the Securities under Regulation AB or applicable Legal Requirements, Borrower agrees to (i) indemnify Natixis, the Natixis Group, the Issuer and the Underwriter Group for Liabilities to which Natixis, the Natixis Group, the Issuer and/or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon, an alleged untrue statement or alleged omission or an untrue statement or omission made in reliance upon, and in conformity with, information furnished to Natixis by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Property, and (ii) reimburse Natixis, the Natixis Group, the Issuer and/or the Underwriter Group for any legal or other expenses reasonably incurred by Natixis, the Natixis Group, the Issuer and/or the Underwriter Group in connection with defending or investigating the Liabilities.

(c)     Promptly after receipt by an indemnified party under this Section 9.3 of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this Section 9.3, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party.  In the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party.  After notice from the indemnifying party to such indemnified party under this Section 9.3, such indemnified party shall pay for

~#4825-6832-1881~

**EXHIBIT 1**

any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party at the cost of the indemnifying party. The indemnifying party shall not be liable for the expenses of more than one separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the indemnifying party. Without the prior written consent of Natixis (which consent shall not be unreasonably withheld or delayed), no indemnifying party shall settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not any indemnified party is an actual or potential party to such claim, action, suit or proceeding) unless the indemnifying party shall have given Natixis reasonable prior written notice thereof and shall have obtained an unconditional release of each indemnified party hereunder from all liability arising out of such claim, action, suit or proceedings.

(d)     In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in Section 9.3(a) or (b) is for any reason held to be unenforceable as to an indemnified party in respect of any Liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under Section 9.3(a) or (b), the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such Liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation. In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered: (i) the Issuer's and Borrower's relative knowledge and access to information concerning the matter with respect to which the claim was asserted; (ii) the opportunity to correct and prevent any statement or omission; and (iii) any other equitable considerations appropriate in the circumstances. Natixis and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(e)     The liabilities and obligations of both Borrower and Natixis under this Section 9.3 shall survive the termination of this Agreement and the satisfaction and discharge of the Debt.

**9.4     Restructuring of Loan.** Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion, shall have the right at any time to require Borrower to restructure the Loan into multiple notes (which may include component notes or senior and junior notes) or to create participation interests in the Loan, and which restructuring may include reallocation of principal amounts of the Loan (including, by way of example, the increase or decrease in the principal amount of the senior note and instrument securing same, and the corresponding decrease or increase in the principal amounts of the junior note(s) and the security instrument(s) securing same) or the restructuring of a portion of the Loan into a mezzanine loan (the "*New Mezzanine Loan*") to the owners of the direct equity interests in Borrower, secured by a pledge of such direct equity interests, the establishment of different interest rates and debt service payments for the Loan and the New Mezzanine Loan and the payment of the Loan and the New Mezzanine Loan in such order of priority as may be designated by Lender; provided, that (i) the total amounts of the Loan and the New Mezzanine Loan shall equal the amount of the Loan immediately prior to the restructuring, (ii) except in the case of an Event of Default under the Loan or the New Mezzanine Loan, the weighted average interest rate of the Loan and the New Mezzanine Loan, if any, shall, in the aggregate, equal the interest rate which was applicable to

**EXHIBIT 1**

the Loan immediately prior to the restructuring and (iii) except in the case of an Event of Default under the Loan or the New Mezzanine Loan, the debt service payments on the Loan and the New Mezzanine Loan shall equal the debt service payment which was due under the Loan immediately prior to the restructuring; provided that any such restructuring carried out after the closing of the Loan shall be at Borrower's sole cost and expense. Borrower shall cooperate with all reasonable requests of Lender in order to restructure the Loan and create the New Mezzanine Loan and shall (A) execute and deliver such documents including, in the case of the New Mezzanine Loan, a mezzanine note, a mezzanine loan agreement, a pledge and security agreement and a mezzanine deposit account agreement, (B) cause Borrower's counsel to deliver such legal opinions and (C) create such newly formed bankruptcy remote borrower under the New Mezzanine Loan as, in the case of each of (A), (B) and (C) above, shall be reasonably required by Lender and required by any Rating Agency in connection therewith, all in form and substance reasonably satisfactory to Lender and satisfactory to any such Rating Agency, including the severance of this Agreement, the Security Instrument and other Loan Documents if requested. In the event Borrower fails to execute and deliver such documents to Lender within ten (10) Business Days following such request by Lender, Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such transactions, Borrower ratifying all that such attorney shall do by virtue thereof. It shall be an Event of Default if Borrower fails to comply with any of the terms, covenants or conditions of this Section 9 after the expiration of ten (10) Business Days after notice thereof. Borrower covenants and agrees that any such reallocation (as described above) will be in compliance with the representations and warranties set forth in Section 4.1 and Section 5.12 hereof.

## 10. MISCELLANEOUS

**10.1 Exculpation.** Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest and rights under the Loan Documents, or in the Property, the Rents or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with any Loan Document. The provisions of this Section 10.1 shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any Loan Document; (ii) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Security Instrument; (iii) affect the validity or enforceability of any of the Loan Documents or any guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases; (vi) constitute a prohibition against Lender to commence any other appropriate action or proceeding in order for Lender to fully realize the security granted by the Security Instrument or to exercise its remedies against the Property; or (vii) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by Lender (including attorneys' fees and costs reasonably incurred) arising out of or in connection with the following (all such liability and obligation of Borrower for any or all of the following being referred to herein as "***Borrower's Recourse Liabilities***"):

(a) fraud or intentional misrepresentation by Borrower or any guarantor in connection with the Loan;

51

**EXHIBIT 1**

(b)     the gross negligence or willful misconduct of Borrower;

(c)     the breach of any representation, warranty, covenant or indemnification in any Loan Document concerning Environmental Laws or Hazardous Substances, including <u>Sections 4.19</u> and <u>5.7</u>, and clauses (viii) through (xi) of <u>Section 5.18</u>;

(d)     physical waste or after an Event of Default, the removal or disposal of any portion of the Property;

(e)     the misapplication or conversion by Borrower of (x) any Proceeds paid by reason of any Insured Casualty, (y) any Award received in connection with a Condemnation, or (z) any Rents, refund of Taxes or amounts in any Subaccount (including any distributions or payments to members/partners/shareholders of Borrower during a period which Lender did not receive the full amounts required to be paid to Lender under the Loan Documents);

(f)     failure to pay charges for labor or materials or other charges that can create Liens on any portion of the Property unless such charges are the subject of a bona fide dispute in which Borrower is contesting the amount or validity thereof;

(g)     any security deposits collected with respect to the Property which are not delivered to Lender upon a foreclosure of the Security Instrument or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof;

(h)     an act or omission of any of Borrower, Borrower Representative or Guarantor which hinders, delays or interferes with Lender's enforcement of its rights hereunder or under any other Loan Document or the realization of the collateral, including the assertion by any of Borrower, Borrower Representative or Guarantor of defenses or counterclaims;

(i)     Borrower's indemnifications of Lender set forth in <u>Section 9.3</u>;

(j)     following a Casualty, the inability to rebuild, replace or restore any portion of the Improvements in compliance with all Legal Requirements (x) to contain at least the same amount of rentable square feet and number of units as existed at the applicable Individual Property immediately prior to the Casualty and (y) in a manner that does not materially and adversely affect the value of the applicable Individual Property from the state it was in prior to the Casualty; and

(k)     Borrower's failure to comply with any Low Income Restrictions or Section 8 or any program pursuant thereto, in each case to the extent applicable to the Property or any Individual Property.

Notwithstanding anything to the contrary in this Agreement or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt in accordance with the Loan Documents, and (B) Lender's agreement not to pursue personal liability of Borrower as set forth above SHALL BECOME NULL AND VOID and shall be of no further force and effect, and the Debt shall be fully recourse to Borrower in the event that one or more of the following occurs (each, a "*Springing Recourse Event*"):

~#4825-6832-1881~

**EXHIBIT 1**

(a)        an Event of Default described in <u>Section 8.1(d)</u> shall have occurred;

(b)        a breach of the covenant set forth in <u>Section 5.12</u>; or

(c)        the occurrence of any condition or event described in either (y) <u>Section 8.1(f)</u> unless, with respect to the occurrence of the event described in clause (ii) of <u>Section 8.1(f)</u>, Borrower is unable to pay its debts generally as they become due, or (z) <u>Section 8.1(g)</u> and, with respect to such condition or event described in <u>Section 8.1(g)</u>, either Borrower, Borrower Representative, Guarantor or any Person owning an interest (directly or indirectly) in Borrower, Borrower Representative or Guarantor causes such event or condition to occur (by way of example, but not limitation, such Person seeks the appointment of a receiver or files a bankruptcy petition), consents to, aids, solicits, supports, or otherwise cooperates or colludes to cause such condition or event or fails to contest such condition or event.

**10.2**    <u>**Brokers and Financial Advisors**</u>.  Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders who will not be paid from the proceeds of the Loan at closing.  Borrower shall indemnify and hold Lender harmless from and against any and all claims, liabilities, costs and expenses (including attorneys' fees, whether incurred in connection with enforcing this indemnity or defending claims of third parties) of any kind in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower in connection with the transactions contemplated herein.  The provisions of this <u>Section 10.2</u> shall survive the expiration and termination of this Agreement and the repayment of the Debt.  Borrower, Borrower Representative, Key Principal and any sponsor of Borrower acknowledge and agree that Lender and any of Lender's agents or correspondents, reserve the right, in their sole and absolute discretion, to provide additional compensation to any broker, correspondent or originator of the Loan.

**10.3**    <u>**Retention of Servicer**</u>.  Lender reserves the right to retain the Servicer and any special servicer to act as its agent(s) hereunder with such powers as are specifically delegated to the Servicer and any special servicer by Lender, whether pursuant to the terms of this Agreement, any pooling and servicing agreement or similar agreement entered into as a result of a Secondary Market Transaction, the Deposit Account Agreement or otherwise, together with such other powers as are reasonably incidental thereto.  Borrower shall pay any fees and expenses of the Servicer and any reasonable third-party fees and expenses, including, without limitation, special servicing fees, work-out fees, liquidation fees and attorney's fees and disbursements and fees and expenses in connection with a prepayment, release of the Property, approvals under the Loan Documents requested by Borrower, assumption of Borrower's obligations or modification of the Loan, special servicing or work-out of the Loan or enforcement of the Loan Documents.

**10.4**    <u>**Survival**</u>.  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as any of the Debt is unpaid or such longer period if expressly set forth in this Agreement.  All Borrower's covenants and agreements in this Agreement shall inure to the benefit of the respective legal representatives, successors and assigns of Lender.

**10.5**    <u>**Lender's Discretion**</u>.  Whenever pursuant to this Agreement or any other Loan Document, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory to Lender or is to be in Lender's discretion, the decision of Lender to approve or disapprove, to consent or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender

~#4825-6832-1881~

**EXHIBIT 1**

and shall be final and conclusive.

10.6    <u>Governing Law.</u>

(a)    THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED, PROVIDED THAT, TO THE EXTENT ANY OF SUCH LAWS MAY NOW OR HEREAFTER BE PREEMPTED BY FEDERAL LAW, SUCH FEDERAL LAW SHALL SO GOVERN AND BE CONTROLLING.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT OF COMPETENT JURISDICTION OVER THE COUNTY IN WHICH THE PROPERTY IS LOCATED AND BORROWER WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY CONSENT AND AGREE TO SERVICE OF ANY SUMMONS, COMPLAINT OR OTHER LEGAL PROCESS IN ANY SUCH SUIT, ACTION OR PROCEEDING BY REGISTERED OR CERTIFIED U.S. MAIL, POSTAGE PREPAID, TO BORROWER AT THE ADDRESS FOR NOTICES DESCRIBED IN <u>SECTION 6.1</u> HEREOF, AND CONSENTS AND AGREES THAT SUCH SERVICE SHALL CONSTITUTE IN EVERY RESPECT VALID AND EFFECTIVE SERVICE (BUT NOTHING HEREIN SHALL AFFECT THE VALIDITY OR EFFECTIVENESS OF SUCH SERVICE).

10.7    <u>Modification, Waiver in Writing.</u>  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to or demand on Borrower shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under any Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under the Loan Documents, or to declare an Event of Default for failure to effect prompt payment of any such other amount.

10.8    <u>Trial by Jury.</u>  BORROWER AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EITHER PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS <u>SECTION 10.8</u> IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER.

EXHIBIT 1

**10.9   Headings/Exhibits.**  The Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. The Exhibits attached hereto, are hereby incorporated by reference as a part of the Agreement with the same force and effect as if set forth in the body hereof.

**10.10   Severability.**  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**10.11   Preferences.**  Upon the occurrence and continuance of an Event of Default, Lender shall have the continuing and exclusive right to apply or reverse and reapply (or having so applied, to reverse and reapply) any and all payments by Borrower to any portion of the Debt.  To the extent Borrower makes a payment to Lender, or Lender receives proceeds of any collateral, which is in whole or in part subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Debt or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.  This provision shall survive the expiration or termination of this Agreement and the repayment of the Debt.

**10.12   Waiver of Notice.**  Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or any other Loan Document specifically and expressly requires the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which no Loan Document specifically and expressly requires the giving of notice by Lender to Borrower.

**10.13   Remedies of Borrower.**  If a claim or adjudication is made that Lender or any of its agents, including Servicer, has acted unreasonably or unreasonably delayed acting in any case where by law or under any Loan Document, Lender or any such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents, including Servicer, shall be liable for any monetary damages, and Borrower's sole remedy shall be to commence an action seeking injunctive relief or declaratory judgment.  Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Borrower specifically waives any claim against Lender and its agents, including Servicer, with respect to actions taken by Lender or its agents on Borrower's behalf.

**10.14   Prior Agreements.**  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements, understandings and negotiations among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

**10.15   Offsets, Counterclaims and Defenses.**  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents, including Servicer, or otherwise offset any obligations to make payments required under the Loan Documents.  Any assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which Borrower may otherwise have

~#4825-6832-1881~

**EXHIBIT 1**

against any assignor of such documents, and no such offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**10.16    Publicity.**  All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public, which refers to the Loan Documents, the Loan, Lender, a Loan purchaser, the Servicer or the trustee in a Secondary Market Transaction, shall be subject to the prior written approval of Lender.  Lender shall have the right to issue any of the foregoing and use the same in its marketing efforts without Borrower's approval, and Borrower hereby consents thereto and to Lender's use of Borrower's name, the name and address of the Property, the amount of the Loan, and such other information, including but not limited to the reproduction, publication and distribution of photographs and other images, regarding the Property as were obtained or developed by or on behalf of Lender, or as were obtained, developed or provided by or on behalf of Borrower, its Affiliates, agents, counsel, representatives or brokers, including as may be available on any website or data site established or maintained by Borrower, its Affiliates, agents, representatives or brokers regarding the Property. Borrower represents and warrants to Lender that Borrower has sufficient rights in such information, including but not limited to such photographs and other images, to grant Lender and its Affiliates the above rights to use such information, and agrees to hold Lender and its Affiliates harmless from any claim resulting from the failure or alleged failure to maintain such rights.  Furthermore, Borrower agrees to cooperate with Lender in a reasonable manner in connection with the use of such other information as may be reasonably requested by Lender.

**10.17    No Usury.**  Borrower and Lender intend at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under state law) and that this Section 10.17 shall control every other agreement in the Loan Documents.  If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under the Note or any other Loan Document, or contracted for, charged, taken, reserved or received with respect to the Debt, or if Lender's exercise of the option to accelerate the maturity of the Loan or any prepayment by Borrower results in Borrower having paid any interest in excess of that permitted by applicable law, then it is Borrower's and Lender's express intent that all excess amounts theretofore collected by Lender shall be credited against the unpaid Principal and all other Debt (or, if the Debt has been or would thereby be paid in full, refunded to Borrower), and the provisions of the Loan Documents immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new document, so as to comply with applicable law, but so as to permit the recovery of the fullest amount otherwise called for thereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Debt does not exceed the maximum lawful rate from time to time in effect and applicable to the Debt for so long as the Debt is outstanding.  Notwithstanding anything to the contrary contained in any Loan Document, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

**10.18    Conflict; Construction of Documents.**  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that each is represented by separate counsel in connection with the negotiation and drafting of the Loan Documents and that the Loan Documents shall not be subject to the principle of construing their meaning against the party that drafted them.

**EXHIBIT 1**

**10.19** __No Third Party Beneficiaries.__ The Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in any Loan Document shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained therein.

**10.20** __Yield Maintenance Premium.__ Borrower acknowledges that (a) Lender is making the Loan in consideration of the receipt by Lender of all interest and other benefits intended to be conferred by the Loan Documents that is not prepayable prior to the Open Prepayment Date and (b) if payments of Principal are made to Lender prior to the regularly scheduled due date for such payment, for any reason whatsoever, including as a result of Lender's acceleration of the Loan after an Event of Default, by operation of law or otherwise, Lender will not receive all such interest and other benefits and may, in addition, incur costs. For these reasons, and to induce Lender to make the Loan, Borrower expressly waives any right or privilege to prepay the Loan except as otherwise may be specifically permitted herein and agrees that, except as expressly provided in Sections 2.3.4 and 7.4.2, all prepayments, if any, will be accompanied by the Yield Maintenance Premium. Such Yield Maintenance Premium shall be required whether payment is made by Borrower, by a Person on behalf of Borrower, or by the purchaser at any foreclosure sale, and may be included in any bid by Lender at such sale. Borrower further acknowledges that (A) it is a knowledgeable real estate developer or investor; (B) it fully understands the effect of the provisions of this Section 10.20, as well as the other provisions of the Loan Documents; (C) the making of the Loan by Lender at the Interest Rate and other terms set forth in the Loan Documents are sufficient consideration for Borrower's obligation to pay a Yield Maintenance Premium (if required); and (D) Lender would not make the Loan on the terms set forth herein without the inclusion of such provisions. Borrower also acknowledges that the provisions of this Agreement limiting the right of prepayment and providing for the payment of the Yield Maintenance Premium and other charges specified herein were independently negotiated and bargained for, and constitute a specific material part of the consideration given by Borrower to Lender for the making of the Loan except as expressly permitted hereunder.

**10.21** __Assignment.__ The Loan, the Note, the Loan Documents or Lender's rights, title, obligations and interests therein may be assigned by Lender and any of its successors and assigns to any Person at any time in its discretion, in whole or in part, whether by operation of law (pursuant to a merger or other successor in interest) or otherwise. Upon such assignment, all references to Lender in this Agreement and in any Loan Document shall be deemed to refer to such assignee or successor in interest and such assignee or successor in interest shall thereafter stand in the place of Lender. Borrower may not assign its rights, title, interests or obligations under this Agreement or under any of the Loan Documents.

**10.22** __Counterparts.__ This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument.

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

**EXHIBIT 1**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

SOUTH GATE APARTMENTS, LLC,
a Texas limited liability company

By: _____

Name:    Mendi Salijeski
Title:      Manager

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

*[Signature Page to Loan Agreement]*

**EXHIBIT 1**

**LENDER:**

NATIXIS REAL ESTATE CAPITAL LLC,
a Delaware limited liability company

By: _____
Name:   Christopher C. Colon
Title:    Vice President

By: _____
Name:   Andrew B. Levine
Title:    Managing Director

~#4825-6832-1881~

**EXHIBIT 1**

## Schedule 1

### Index of Other Definitions

"*Act*" – Schedule 4
"*Annual Budget*" – 6.3.5
"*Applicable Taxes*" – 2.2.3
"*Award*" – 7.3.2
"*Bankruptcy Action*" – Schedule 4
"*Bankruptcy Code*" – Security Instrument
"*Bankruptcy Proceeding*" – 4.7
"*Borrower's Recourse Liabilities*" – 10.1
"*Buyer*" – 5.16
"*Capital Budget*" – 6.3.5
"*Capital Reserve Subaccount*" – 3.4
"*Cash Collateral Reserve Subaccount*" – 3.11
"*Cash Management Accounts*" – 3.9
"*Casualty*" – 7.2.1
"*Casualty/Condemnation Prepayment*" – 2.3.2
"*Casualty/Condemnation Subaccount*" – 3.7
"*Condemnation*" – 7.3.1
"*Defeasance*" – 2.3.3(a)
"*Defeasance Date*" – 2.3.3(a)(i)
"*Defeasance Deposit*" – 2.3.3(a)(iv)
"*Defeasance Notice*" – 2.3.3(a)(i)
"*Defeased Note*" – 2.3.3(a)(vi)
"*Disclosure Document*" – 9.2
"*Embargoed Person*" – 5.19(a)
"*Environmental Laws*" – 4.19
"*Equipment*" – Security Instrument
"*Exchange Act*" – 9.2
"*Exchange Act Filing*" – 9.1(c)
"*Event of Default*" – 8.1
"*FATF*" – 5.19(b)
"*First Payment Date*" – 2.2.1
"*Full Defeasance*" – 2.3.3(a)
"*Hazardous Substances*" – 4.19
"*Improvements*" – Security Instrument
"*Indemnified Liabilities*" – 5.18
"*Indemnified Party*" 5.18
"*Independent Director*" – Schedule 4
"*Independent Manager*" – Schedule 4
"*Insurance Premiums*" – 7.1.2
"*Insured Casualty*" – 7.2.2
"*Issuer*" – 9.3(a)
"*Investor*" – 9.1
"*Late Payment Charge*" – 2.5.3
"*Lender's Consultant*" – 5.7.1
"*Liabilities*" – 9.3(a)
"*Licenses*" – 4.10
"*Loan*" – 2.1

"*Monthly Debt Service Subaccount*" – 3.10(a)
"*Natixis Group*" – 9.3(a)
"*New Mezzanine Loan*" – 9.4
"*Notice*" – 6.1
"*OFAC*" – 5.19(a)
"*Operating Budget*" – 6.3.5
"*Operating Expense Subaccount*" – 3.6
"*Partial Defeasance*" – 2.3.3(a)
"*Partial Release*" – 2.6
"*Policies*" – 7.1.2
"*Principal*" – 2.1
"*Proceeds*" – 7.2.2
"*Proposed Material Lease*" – 5.9.2
"*Remaining Property*" – 2.6
"*Remedial Work*" – 5.7.2(c)
"*Rent Roll*" – 4.15
"*Required Records*" – 6.3.6
"*Required Repairs*" – 3.2.1
"*Required Repairs Subaccount*" – 3.2.2
"*Restoration*" – 7.4.1
"*Rollover Reserve Subaccount*" – 3.5
"*Scheduled Defeasance Payments*" – 2.3.3(a)
"*Secondary Market Transaction*" – 9.1
"*Securities*" – 9.1
"*Securities Act*" – 9.2
"*Security Agreement*" – 2.3.3(a)(vii)
"*Security Deposit Account*" – 3.8
"*Security Deposit Subaccount*" – 3.8
"*Significant Casualty*" – 7.2.2
"*Single Member Bankruptcy Remote LLC*" – Schedule 4
"*Sole Member*" – Schedule 4
"*Special Member*" – Schedule 4
"*Special Purpose Entity*" – Schedule 4
"*Special Transfer*" – 5.16
"*Springing Recourse Event*" – 10.1
"*Subaccounts*" – 3.1
"*Successor Borrower*" – 2.3.3(b)
"*Successor Guarantor*" – 5.16(i)
"*Tax and Insurance Subaccount*" – 3.3
"*Title Policy*" – 2.6
"*Undefeased Note*" – 2.3.3(a)(vi)
"*Underwriter Group*" – 9.3(a)

Schedule 2

Required Repairs

| Property: | Required Action | Cost |
|---|---|---|
| Terrace Apartments | No smoke detectors were observed in the apartment unit bed room areas. Partner recommends that the smoke detectors should be installed in apartment unit bed room areas. | $1,875.00 |
| Westwood Gardens Apartments | Evidence of significant ponding covering access flatwork was evident in the central courtyard area. Repair. | $3,125.00 |
| Westwood Gardens Apartments | Evidence of paint and wood fascia trim deterioration was noted throughout the apartment buildings. Repair. | $6,937.50 |
| Southgate Apartments | The accessible parking space did not appear to be correctly configured and identified. Partner recommends renovation of the existing ADA parking stall to provide van-accessible signage with adjacent access aisle. | $312.50 |
| | **Total** | **$12,250.00** |

**EXHIBIT 1**

**Schedule 3**

**Organization of Borrower**



**EXHIBIT 1**

## Schedule 4

### Definition of Special Purpose Entity

A "*Special Purpose Entity*" means either (1) a limited liability company that is a Single Member Bankruptcy Remote LLC (as hereinafter defined) or (2) a corporation, limited partnership or limited liability company which at all times since its formation and at all times thereafter:

       (i)      was and will be organized solely for the purpose of (A) owning the Property or (B) acting as a general partner of the limited partnership that owns the Property or member of the limited liability company that owns the Property;

       (ii)     has not engaged and will not engage in any business unrelated to (A) the ownership of the Property, (B) acting as general partner of the limited partnership that owns the Property or (C) acting as a member of the limited liability company that owns the Property, as applicable;

       (iii)    has not had and will not have any assets other than those related to the Property or its partnership or member interest in the limited partnership or limited liability company that owns the Property, as applicable;

       (iv)    has not engaged, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, asset sale (except as expressly permitted by this Agreement), transfer of partnership or membership interests or the like, or amendment of its limited partnership agreement, articles of incorporation, articles of organization, certificate of formation or operating agreement (as applicable);

       (v)     if such entity is a limited partnership, has and will have, as its only general partner a Special Purpose Entity that is a corporation;

       (vi)    if such entity is a corporation has not caused or allowed and will not cause or allow the board of directors of such entity to take any action requiring the unanimous affirmative vote of one hundred percent (100%) of the members of its board of directors unless all of the directors (including any Independent Directors) shall have participated in such vote;

       (vii)   if such entity is a limited liability company other than a single member limited liability company, has and will have as its only managing member a Special Purpose Entity that is a corporation;

       (viii)  if such entity is a limited liability company, has and will have articles of organization, a certificate of formation or an operating agreement, as applicable, providing that (A) such entity will dissolve only upon the bankruptcy of the managing member, (B) the vote of a majority-in-interest of the remaining members is sufficient to continue the life of the limited liability company in the event of such bankruptcy of the managing member and (C) if the vote of a majority-in-interest of the remaining members to continue the life of the limited liability company following the bankruptcy of the managing member is not obtained, the limited liability company may not liquidate the Property without the consent of the applicable Rating Agencies for as long as the Loan is outstanding;

       (ix)    has not, and without the unanimous consent of all of its partners, directors or members (including any Independent Director or Independent Manager), as applicable, will not, with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest, take any Bankruptcy Action;

Schedule 4 - 1
**EXHIBIT 1**

(x)     has maintained and will intend to maintain adequate capital in light of its contemplated business operations, provided, however, the foregoing shall not require any direct or indirect member, partner or shareholder of Borrower to make any additional capital contributions to Borrower;

(xi)     has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(xii)     has maintained and will maintain its accounts, books and records separate from any other Person and will file its own tax returns separate from any other Person;

(xiii)     has maintained and will maintain its books, records, resolutions and agreements as official records separate from any other Person;

(xiv)     has not commingled and will not commingle its funds or assets with those of any other Person;

(xv)     has held and will hold its assets in its own name;

(xvi)     has conducted and will conduct its business in its name only, and has not and will not use any trade name,

(xvii)     has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person;

(xviii)     has paid and will pay its own liabilities, including the salaries of its own employees, out of its own funds and assets;

(xix)     has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(xx)     has maintained and will maintain an arm's–length relationship with its Affiliates;

(xxi)     (a)     if such entity owns the Property, has and will have no indebtedness other than the Permitted Indebtedness, or

(b)     if such entity acts as the general partner of a limited partnership which owns the Property, has and will have no indebtedness other than unsecured trade payables in the ordinary course of business relating to acting as general partner of the limited partnership which owns the Property which (1) do not exceed, at any time, $10,000 and (2) are paid within thirty (30) days of the date incurred, or

(c)     if such entity acts as a managing member of a limited liability company which owns the Property, has and will have no indebtedness other than unsecured trade payables in the ordinary course of business relating to acting as a member of the limited liability company which owns the Property which (1) do not exceed, at any time, $10,000 and (2) are paid within thirty (30) days of the date incurred;

(xxii)     has not and will not assume or guarantee or become obligated for the debts or obligations of any other Person or hold out its credit or assets as being available to satisfy the debts or obligations of any other Person except for the Loan;

(xxiii)   has not and will not acquire obligations or securities of its partners, members or shareholders;

(xxiv)   has allocated and will allocate fairly and reasonably shared expenses, including shared office space, and uses separate stationery, invoices and checks bearing its own name;

(xxv)   except in connection with the Loan, has not pledged and will not pledge its assets for the benefit of any other Person;

(xxvi)   has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name and not as a division or part of any other Person;

(xxvii)   has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xxviii)   has not made and will not make loans to any Person;

(xxix)   has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it;

(xxx)   has not entered into or been a party to, and will not enter into or be a party to, any transaction, contract or agreement with its partners, members, shareholders or Affiliates except in the ordinary course of its business and on terms which are intrinsically fair and are no less favorable to it than would be obtained in a comparable arm's–length transaction with an unrelated third party;

(xxxi)   has and will have no obligation to indemnify its partners, officers, directors, members or Special Members, as the case may be, or has such an obligation that is fully subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation; and

(xxxii)   will consider the interests of its creditors in connection with all corporate, partnership or limited liability company actions, as applicable.

"*Independent Director*" means in the case of a corporation, a natural person who, for the five (5) year period prior to his or her appointment as Independent Director has not been, and during the continuation of his or her service as Independent Director is not, directly or indirectly:

(i)   an employee, manager, stockholder, director, member, partner, officer, attorney or counsel of the corporation or any of its Affiliates (other than his or her service as an Independent Director of the corporation),

(ii)   a creditor, customer of, or supplier or other Person who derives any of its purchases or revenues from its activities with the corporation or any of its shareholders or Affiliates (other than his or her service as an Independent Director if such Person has been provided by a nationally–recognized company that provides professional independent directors),

(iii)   a Person controlling or under common Control with any such employee, manager, stockholder, director, member, partner, officer, attorney, counsel, customer, supplier or other Person, or

(iv)   any member of the immediate family (including a grandchild or sibling) of a person described in clauses (i), (ii) or (iii) immediately above.  A natural person who otherwise satisfies the

foregoing definition shall not be disqualified from serving as an Independent Director of the corporation because such person is an independent director of a "Special Purpose Entity" affiliated with the corporation that does not own a direct or indirect equity interest in the corporation or any entity that is a co-borrower with the corporation if such individual is an independent director provided by a nationally–recognized company that provides professional independent directors.

"*Independent Manager*" means in the case of a limited liability company, (a) a member that is a single purpose entity, (b) a single purpose entity  that is not a member or (c) a natural person who, for the five (5) year period prior to his or her appointment as Independent Manager is not, directly or indirectly:

        (i)     an employee, manager, stockholder, director, member, partner, officer, attorney or counsel of the limited liability company or any of its Affiliates (other than his or her service as an Independent Manager or Special Member of the limited liability company),

        (ii)    a creditor, customer of, or supplier or other Person who derives any of its purchases or revenues from its activities with the limited liability company or any of its members or Affiliates (other than his or her service as an Independent Manager if such Person has been provided by a nationally–recognized company that provides professional independent managers),

        (iii)   a Person controlling or under common Control with any such employee, manager, stockholder, director, member, partner, officer, attorney, counsel, customer, supplier or other Person, or

        (iv)   any member of the immediate family (including grandchildren or siblings) of a person described in clauses (i), (ii) or (iii) immediately above.  A natural person who otherwise satisfies the foregoing definition shall not be disqualified from serving as an Independent Manager of the limited liability company because such person is an independent manager of a "Special Purpose Entity" affiliated with the limited liability company that does not own a direct or indirect equity interest in the limited liability company or any entity that is a co-borrower with the limited liability company if such individual is an independent manager provided by a nationally–recognized company that provides professional independent managers.

"*Single Member Bankruptcy Remote LLC*" means a limited liability company organized under the laws of the State of Delaware which at all times since its formation and at all times thereafter

        (i)     complies with the following clauses of the definition of Special Purpose Entity above: (i)(A), (ii)(A), (iii), (iv), (ix), (x), (xi) and (xiii) through (xxxii);

        (ii)    has maintained and will maintain its accounts, books and records separate from any other person;

        (iii)   has and will have an operating agreement which provides that the business and affairs of Borrower shall be managed by or under the direction of:

                (A)   a board of one (1) or more managers designated by the sole member of the Single Member Bankruptcy Remote LLC (the "*Sole Member*"), and at all times there shall be at least one (1) duly appointed Independent Manager on the board of managers, and the board of managers will not take any action requiring the unanimous affirmative vote of one hundred percent (100%) of the members of its board of managers unless, at the time of such action there is at least one (1) member of the board of managers who is an Independent Manager, and all of the managers and the Independent Manager shall have participated in such vote; or

Schedule 4 - 4
**EXHIBIT 1**

(B)     Sole Member, provided that at all times there shall be at least one (1) Independent Manager designated by Sole Member and the operating agreement provides that Sole Member shall not take any Bankruptcy Actions without the affirmative vote of the Independent Manager;

(iv)     has and will have an operating agreement which provides that, as long as any portion of the Debt remains outstanding:

(A)     upon the occurrence of any event that causes Sole Member to cease to be a member of Borrower (other than (x) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (y) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), one of the Independent Managers shall, without any action of any Person and simultaneously with Sole Member ceasing to be a member of Borrower, automatically be admitted as the sole member of Borrower (the "*Special Member*") and shall preserve and continue the existence of Borrower without dissolution;

(B)     no Special Member may resign or transfer its rights as Special Member unless (x) a successor Special Member has been admitted to Borrower as a Special Member, and (y) such successor Special Member has also accepted its appointment as an Independent Manager; and

(C)     except as expressly permitted pursuant to the terms of this Agreement, Sole Member may not resign and no additional member shall be admitted to Borrower;

(v)     has and will have an operating agreement which provides that, as long as any portion of the Debt remains outstanding:

(A)     Borrower shall be dissolved, and its affairs shall be would up only upon the first to occur of the following: (x) the termination of the legal existence of the last remaining member of Borrower or the occurrence of any other event which terminates the continued membership of the last remaining member of Borrower in Borrower unless the business of Borrower is continued in a manner permitted by its operating agreement or the Delaware Limited Liability Company Act (the "*Act*") or (y) the entry of a decree of judicial dissolution under Section 18-802 of the Act;

(B)     upon the occurrence of any event that causes the last remaining member of Borrower to cease to be a member of Borrower or that causes Sole Member to cease to be a member of Borrower (other than (x) upon an assignment by Sole Member of all of its limited liability company interest in Borrower and the admission of the transferee, if permitted pursuant to the organizational documents of Borrower and the Loan Documents, or (y) the resignation of Sole Member and the admission of an additional member of Borrower, if permitted pursuant to the organizational documents of Borrower and the Loan Documents), to the fullest extent permitted by law, the personal representative of such member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in Borrower, agree in writing to continue the existence of Borrower and to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of Borrower, effective as of the occurrence of the event that terminated the continued membership of such member in Borrower;

(C)     the bankruptcy of Sole Member or a Special Member shall not cause such member or Special Member, respectively, to cease to be a member of Borrower and upon the occurrence of such an event, the business of Borrower shall continue without dissolution;

(D)    in the event of dissolution of Borrower, Borrower shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of Borrower in an orderly manner), and the assets of Borrower shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act; and

(E)    to the fullest extent permitted by law, each of Sole Member and the Special Members shall irrevocably waive any right or power that they might have to cause Borrower or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of Borrower, to compel any sale of all or any portion of the assets of Borrower pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of Borrower.

"**_Bankruptcy Action_**" means, with respect to any Person, if such Person:

(i)    makes an assignment for the benefit of creditors;

(ii)    files a voluntary petition in bankruptcy;

(iii)    is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings;

(iv)    consents to or files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

(v)    files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any bankruptcy or insolvency proceeding;

(vi)    seeks, consents to or acquiesces in the appointment of a trustee, receiver, liquidator, sequestrator, custodian or any similar official of or for such Person or of all or any substantial part of its properties;

(vii)    one hundred twenty (120) days after the commencement of any proceeding against such Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, if the proceeding has not been dismissed;

(viii)    within ninety (90) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within ninety (90) days after the expiration of any such stay, the appointment is not vacated; or

(ix)    takes any action in furtherance of any of the foregoing.

Schedule 5

**Service Contracts**

None

## Schedule 6

### Allocated Loan Amounts

| Property | Allocated Loan Amount |
|---|---|
| Terrace Apartments – 1920 W. Shields Street, Sherman, Texas | $1,008,893.00 |
| Southgate Apartments – 915 S. Travis Street, Sherman, Texas | $2,779,038.00 |
| Westwood Gardens Apartments – 221 Archer Circle, Sherman, Texas | $1,974,667.00 |

**Schedule 7**

**Low Income Units**

| Individual Property | Pool I | | | | |
|---|---|---|---|---|---|
| | Total Number of Units at Individual Property | Subject to Loan Income Restrictions | Percentage | Leased to Section 8 Certificate Holders | Percentage |
| Terrace Property | 22 | 9 | 41% | 5 | 22.7% |
| South Gate Property | 59 | 0 | 0% | 3 | 5% |
| Westwood Property | 37 | 0 | 0% | 5 | 13.5% |
| Total of All Individual Properties | 118 | 9 | 7.6% | 13 | 11% |

## PROMISSORY NOTE

$5,762,598.00                                                                                  January 31, 2018

For value received, SOUTH GATE APARTMENTS, LLC, a Texas limited liability company, having an address at 220 Archer Drive, Sherman, Texas 75092 ("*Borrower*"), promises to pay to the order of NATIXIS REAL ESTATE CAPITAL LLC, a Delaware limited liability company, at its principal place of business at 1251 Avenue of the Americas, New York, New York 10020 (together with its successors and assigns "*Lender*"), or at such place as the holder hereof may from time to time designate in writing, the principal sum of Five Million Seven Hundred Sixty-Two Thousand Five Hundred Ninety-Eight and No/100 Dollars ($5,762,598.00), in lawful money of the United States of America, with interest on the unpaid principal balance from time to time outstanding to be computed in the manner, at the times and, subject to the provisions of <u>Section 2.2.2</u> of the Loan Agreement (as hereinafter defined), at the Interest Rate provided in that certain Loan Agreement dated as of the date hereof between Borrower and Lender (as amended, modified, restated, consolidated, replaced or supplemented from time to time, the "*Loan Agreement*") or the Maximum Legal Rate (as hereinafter defined). Capitalized terms used but not defined herein shall have the respective meanings given such terms in the Loan Agreement.

1. **Payment Terms.** Borrower shall pay the Monthly Debt Service Payment Amount to Lender in the manner and at the times specified in <u>Article 2</u> of the Loan Agreement, which payments shall be applied in the order of priority set forth in said <u>Article 2</u>. Borrower shall also pay to Lender interest at the Default Rate, Late Payment Charges, the Yield Maintenance Premium, if any, and all other amounts due and payable as and when provided for in the Loan Agreement. The balance of the Principal, together with all accrued and unpaid interest thereon, and all other amounts payable to Lender hereunder, under the Loan Agreement and under the other Loan Documents shall be due and payable on the Maturity Date.

2. **Loan Documents.** This Promissory Note (this "*Note*") is evidence of that certain loan made by Lender to Borrower contemporaneously herewith and is executed pursuant to the terms and conditions of the Loan Agreement. This Note is secured by and entitled to the benefits of, among other things, the Security Instrument and the other Loan Documents. Reference is made to the Loan Documents for a description of the nature and extent of the security afforded thereby, the rights of the holder hereof in respect of such security, the terms and conditions upon which this Note is secured and the rights and duties of the holder of this Note. All of the agreements, conditions, covenants, provisions and stipulations contained in the Loan Agreement and the other Loan Documents are by this reference hereby made part of this Note to the same extent and with the same force and effect as if they were fully set forth in this Note, and Borrower covenants and agrees to keep and perform the same, or cause the same to be kept and performed, in accordance with their terms.

3. **Loan Acceleration; Prepayment.** The Debt shall, without notice, become immediately due and payable at the option of Lender upon the happening of any Event of Default. This Note may not be prepaid except as otherwise expressly provided in, and subject to the terms and conditions, of the Loan Agreement. It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on this Note or the Related Indebtedness (as defined below) (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If the applicable law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to this Note, any of the other Loan Documents or any other communication or writing by or between Borrower and Lender related to the transaction or transactions that are the subject matter of the Loan Documents, (ii) contracted for, charged or received by reason of Lender's exercise of the option to accelerate the maturity of this Note

~#4826-1865-3529~

**EXHIBIT 2**

and/or the Related Indebtedness, or (iii) Borrower will have paid or Lender will have received by reason of any voluntary prepayment by Borrower of this Note and/or the Related Indebtedness, then it is Borrower's and Lender's express intent that all amounts charged in excess of the Maximum Legal Rate shall be automatically cancelled, ab initio, and all amounts in excess of the Maximum Legal Rate theretofore collected by Lender shall be credited on the principal balance of this Note and/or the Related Indebtedness (or, if this Note and all Related Indebtedness have been or would thereby be paid in full, refunded to Borrower), and the provisions of this Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if this Note has been paid in full before the end of the stated term of this Note, then Borrower and Lender agree that Lender shall, with reasonable promptness after Lender discovers or is advised by Borrower that interest was received in an amount in excess of the Maximum Legal Rate, either refund such excess interest to Borrower and/or credit such excess interest against this Note and/or any Related Indebtedness then owing by Borrower to Lender. Borrower hereby agrees that as a condition precedent to any claim seeking usury penalties against Lender, Borrower will provide written notice to Lender, advising Lender in reasonable detail of the nature and amount of the violation, and Lender shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against this Note and/or the Related Indebtedness then owing by Borrower to Lender. All sums contracted for, charged or received by Lender for the use, forbearance or detention of any debt evidenced by this Note and/or the Related Indebtedness shall, to the extent permitted by applicable law, be amortized or spread, using the actuarial method, throughout the stated term of this Note and/or the Related Indebtedness (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of this Note and/or the Related Indebtedness does not exceed the Maximum Legal Rate from time to time in effect and applicable to this Note and/or the Related Indebtedness for so long as debt is outstanding. In no event shall the provisions of Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving tri-party accounts) apply to this Note and/or the Related Indebtedness. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

4.    **Revival.** To the extent that Borrower makes a payment or Lender receives any payment or proceeds for Borrower's benefit, which are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian or any other party under the Bankruptcy Code or any other bankruptcy law, common law or equitable cause, then, to such extent, the obligations of Borrower hereunder intended to be satisfied shall be revived and continue as if such payment or proceeds had not been received by Lender.

5.    **Amendments.** This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought. Whenever used, the singular number shall include the plural, the plural the singular, and the words "Lender" and "Borrower" shall include their respective successors, assigns, heirs, executors and administrators. If Borrower consists of more than one person or party, the obligations and liabilities of each such person or party shall be joint and several.

6.    **Waiver.** Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, protest, notice of protest, notice of nonpayment, notice of intent to accelerate the maturity hereof and of

2

acceleration. No release of any security for the Debt or any Person liable for payment of the Debt, no extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of the Loan Documents made by agreement between Lender and any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and any other Person or party who may become liable under the Loan Documents, for the payment of all or any part of the Debt.

       7.     <u>Exculpation</u>. It is expressly agreed that recourse against Borrower for failure to perform and observe its obligations contained in this Note shall be limited as and to the extent provided in <u>Section 10.1</u> of the Loan Agreement.

       8.     <u>Notices</u>. All notices or other communications required or permitted to be given pursuant hereto shall be given in the manner specified in the Loan Agreement directed to the parties at their respective addresses as provided therein.

       9.     <u>Governing Law</u>. **THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED AND THE APPLICABLE LAWS OF THE UNITED STATES OF AMERICA, WHICH LAWS OF THE UNITED STATES OF AMERICA SHALL, TO THE EXTENT THE SAME PREEMPT SUCH STATE LAWS, GOVERN AND BE CONTROLLING.**

       10.    <u>State-Specific Provisions</u>.

       (a)    <u>Definitions</u>. "*Maximum Legal Rate*" shall mean the maximum lawful rate of interest which may be contracted for, charged, taken, received or reserved by Lender in accordance with the applicable laws of the State of Texas (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law), taking into account all Charges (as defined herein) made in connection with the transaction evidenced by this Note and the other Loan Documents. As used herein, the term "*Charges*" shall mean all fees, charges and/or any other things of value, if any, contracted for, charged, received, taken or reserved by Lender in connection with the transactions relating to this Note and the other Loan Documents, which are treated as interest under applicable law. As used herein, the term "*Related Indebtedness*" shall mean any and all debt paid or payable by Borrower to Lender pursuant to the Loan Documents or any other communication or writing by or between Borrower and Lender related to the transaction or transactions that are the subject matter of the Loan Documents, except such debt which has been paid or is payable by Borrower to Lender under this Note.

       (b)    <u>Ceiling Election</u>. To the extent that Lender is relying on Chapter 303 of the Texas Finance Code to determine the Maximum Legal Rate payable on this Note and/or the Related Indebtedness, Lender will utilize the weekly ceiling from time to time in effect as provided in such Chapter 303, as amended. To the extent United States federal law permits Lender to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law, Lender will rely on United States federal law instead of such Chapter 303 for the purpose of determining the Maximum Legal Rate. Additionally, to the extent permitted by applicable law now or hereafter in effect, Lender may, at its option and from time to time, utilize any other method of establishing the Maximum Legal Rate under such Chapter 303 or under other applicable law by giving notice, if required, to Borrower as provided by applicable law now or hereafter in effect.

<center>[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]</center>

~#4826-1865-3529~

<center>**EXHIBIT 2**</center>

(c)    THIS NOTE AND THE OTHER LOAN DOCUMENTS EMBODY THE FINAL ENTIRE AGREEMENT AMONG THE PARTIES HERETO AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO.  THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO. THIS NOTE CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES RESPECTING THE MATTERS HEREIN SET FORTH AND SUPERSEDES ALL PRIOR AGREEMENTS, WHETHER WRITTEN OR ORAL, BETWEEN THE PARTIES RESPECTING SUCH MATTERS. ANY AMENDMENTS OR MODIFICATIONS HERETO, IN ORDER TO BE EFFECTIVE, SHALL BE IN WRITING AND EXECUTED BY THE PARTIES HERETO.  A DETERMINATION THAT ANY PROVISION OF THIS NOTE IS UNENFORCEABLE OR INVALID SHALL NOT AFFECT THE ENFORCEABILITY OR VALIDITY OF ANY OTHER PROVISION, AND ANY DETERMINATION THAT THE APPLICATION OF ANY PROVISION OF THIS NOTE TO ANY PERSON OR CIRCUMSTANCE IS ILLEGAL OR UNENFORCEABLE SHALL NOT AFFECT THE ENFORCEABILITY OR VALIDITY OF SUCH PROVISION AS IT MAY APPLY TO ANY OTHER PERSONS OR CIRCUMSTANCES.

IN WITNESS WHEREOF, Borrower has executed this Note as of the date first written above.

BORROWER:

SOUTH GATE APARTMENTS, LLC,
a Texas limited liability company

By: _____
Name:    Mendi Salijeski
Title:    Manager

*Signature Page to Promissory Note*

~94R26-1865-3529~

**EXHIBIT 2**

y42018CX11

# ALLONGE

ALLONGE to that certain Promissory Note dated as of January 31, 2018 in the original principal amount of $5,762,598.00, executed by SOUTH GATE APARTMENTS, LLC, a Texas limited liability company, payable to the order of NATIXIS REAL ESTATE CAPITAL LLC, a Delaware limited liability company.

Pay to the order of WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE REGISTERED HOLDERS OF CSAIL 2018-CX11 COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2018-CX11, without recourse.

Dated as of the ___ day of April, 2018

**NATIXIS REAL ESTATE CAPITAL LLC, a**
**Delaware limited liability company**

By: _____
Name: ... Tang
Title: ... tive Director

By: _____
Name: Delphine Clerjaud
Title: Vice President

Reference No : 6850M 024-026
Matter Name: SS1 Multifamily Portfolio
Pool: CSAIL 2018-CX11

EXHIBIT 2

## Grayson County
## Wilma Bush
### County Clerk

---

**Instrument Number:** 2018 - 2399

ERecordings-RP

---

Recorded On: February 05, 2018 03:27 PM          Number of Pages: 21

Parties: SOUTH GATE APARTMENTS, LLC

---

### " Examined and Charged as Follows: "

Total Recording: $102.00

---

*********** **THIS PAGE IS PART OF THE INSTRUMENT** ***********
Any provision herein which restricts the Sale, Rental or use of the described Document
because of color or race is invalid and unenforceable under federal law.

**File Information:**                                    **Record and Return To:**

Document Number:     2399                                eRx

Receipt Number:      20180205000181

Recorded Date/Time:  February 05, 2018 03:27 PM

User:                Misty G

Station:             CLERK05

---



STATE OF TEXAS
COUNTY OF GRAYSON

I hereby certify that this Instrument was FILED In the File Number sequence on the date/time
printed hereon, and was duly RECORDED in the Official Records of Grayson County, Texas.

Wilma Bush
County Clerk
Grayson County, TX

**EXHIBIT 3**

THIS INSTRUMENT PREPARED BY
AND WHEN RECORDED RETURN TO:

Nelson Mullins Riley & Scarborough LLP
301 S. College Street, Suite 2300
Charlotte, North Carolina 28202
Attn: D. Shane Gunter, Esq.

CHICAGO TITLE
GF# 859681700088 - DK

*(SPACE ABOVE THIS LINE FOR RECORDER'S USE)*

SOUTH GATE APARTMENTS, LLC
(Trustor)

to

THERESA B. LYONS
(Trustee)

for the Benefit of

NATIXIS REAL ESTATE CAPITAL LLC
(Beneficiary)

**DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS
AND SECURITY AGREEMENT**

Dated:               January 31, 2018

Property Locations:   Terrace Apartments – 1920 W. Shields Street, Sherman, Texas
Southgate Apartments – 915 S. Travis Street, Sherman, Texas
Westwood Gardens Apartments – 221 Archer Circle, Sherman, Texas
Grayson County

**NOTICE OF CONFIDENTIALITY RIGHTS:**

**IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM THIS INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**ATTENTION: COUNTY CLERK – THIS INSTRUMENT COVERS GOODS THAT ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY DESCRIBED HEREIN AND SHOULD BE APPROPRIATELY INDEXED, NOT ONLY AS A DEED OF TRUST, BUT ALSO AS A FINANCING STATEMENT COVERING GOODS THAT ARE OR ARE TO BECOME FIXTURES ON THE REAL PROPERTY DESCRIBED HEREIN.**

~#4824-5088-1369~

**EXHIBIT 3**

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS
## AND SECURITY AGREEMENT

This DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT (this "*Security Instrument*"), is made as of January 31, 2018, by SOUTH GATE APARTMENTS, LLC, a Texas limited liability company, having an office at 220 Archer Drive, Sherman, Texas 75092, as trustor ("*Borrower*"), to THERESA B. LYONS, having an address at c/o Lyons Law Firm, 181 Grand Avenue, Suite 236, Southlake, Texas 76092, as trustee ("*Trustee*"), for the benefit of NATIXIS REAL ESTATE CAPITAL LLC, a Delaware limited liability company, having an address at 1251 Avenue of the Americas, New York, New York 10020, as beneficiary (together with its successors and assigns, hereinafter referred to as "*Lender*").

Borrower and Lender have entered into that certain Loan Agreement, dated as of the date hereof (as amended, modified, restated, consolidated, replaced or supplemented from time to time, the "*Loan Agreement*"), pursuant to which Lender is making a secured loan to Borrower in the aggregate original principal amount of $5,762,598.00 (the "*Loan*"). Capitalized terms used herein without definition are used as defined in the Loan Agreement. The Loan is evidenced by that certain Promissory Note, dated the date hereof, made by Borrower to Lender in such principal amount (as the same may be amended, modified, restated, severed, consolidated, renewed, replaced, or supplemented from time to time, the "*Note*").

To secure the payment of the Note and all sums which may or shall become due thereunder or under any of the other documents evidencing, securing or executed in connection with the Loan (the Note, this Security Instrument, the Loan Agreement and such other documents, as any of the same may, from time to time, be modified, amended, restated, replaced or supplemented, being hereinafter collectively referred to as the "*Loan Documents*"), including (i) the payment of interest and other amounts which would accrue and become due but for the filing of a petition in bankruptcy (whether or not a claim is allowed against Borrower for such interest or other amounts in any such bankruptcy proceeding) or the operation of the automatic stay under Section 362(a) of Title 11 of the United States Code (the "*Bankruptcy Code*"), and (ii) the costs and expenses of enforcing any provision of any Loan Document (all such sums being hereinafter collectively referred to as the "*Debt*"), Borrower has given, granted, bargained, sold, alienated, enfeoffed, conveyed, confirmed, warranted, pledged, assigned and hypothecated and by these presents does hereby give, grant, bargain, sell, alien, enfeoff, convey, confirm, warrant, pledge, assign and hypothecate unto Trustee, in trust for the benefit of Lender, WITH POWER OF SALE, all of Borrower's right, title and interest in and to the land described in **Exhibit "A"** (the "*Premises*"), and the buildings, structures, fixtures and other improvements now or hereafter located thereon (the "*Improvements*");

TOGETHER WITH: all right, title, interest and estate of Borrower now owned, or hereafter acquired, in and to the following property, rights, interests and estates (the Premises, the Improvements, and the property, rights, interests and estates hereinafter described are collectively referred to herein as the "*Property*"):

(a)     all easements, rights-of-way, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights, rights to oil, gas, minerals, coal and other substances of any kind or character, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Premises and the Improvements; and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road, highway, alley or avenue, opened, vacated or proposed, in front of or adjoining the Premises, to the center line thereof; and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property,

~#4824-5088-1369~

**EXHIBIT 3**

possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Premises and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(b) all machinery, furniture, furnishings, equipment, computer software and hardware, fixtures (including all heating, air conditioning, plumbing, lighting, communications and elevator fixtures), inventory, materials, supplies and other articles of personal property and accessions thereof, renewals and replacements thereof and substitutions therefor, and other property of every kind and nature, tangible or intangible, owned by Borrower, or in which Borrower has or shall have an interest, now or hereafter located upon the Premises or the Improvements, or appurtenant thereto, and usable in connection with the present or future operation and occupancy of the Premises and the Improvements (hereinafter collectively referred to as the "*Equipment*"), including any leases of, deposits in connection with, and proceeds of any sale or transfer of any of the foregoing, and the right, title and interest of Borrower in and to any of the Equipment that may be subject to any "security interest" as defined in the Uniform Commercial Code, as in effect in the State where the Property is located (the "*UCC*"), superior in lien to the lien of this Security Instrument;

(c) all awards or payments, including interest thereon, that may heretofore or hereafter be made with respect to the Premises or the Improvements, whether from the exercise of the right of eminent domain or condemnation (including any transfer made in lieu of or in anticipation of the exercise of such right), or for a change of grade, or for any other injury to or decrease in the value of the Premises or Improvements;

(d) all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of, or the conduct of any activity upon or in, the Premises or the Improvements, including any extensions, renewals, modifications or amendments thereof (hereinafter collectively referred to as the "*Leases*") and all rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Proceeding) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Premises and/or the Improvements, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Premises or the Improvements, or rendering of services by Borrower or any of its agents or employees, and proceeds, if any, from business interruption or other loss of income insurance (hereinafter collectively referred to as the "*Rents*"), together with all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(e) all proceeds of and any unearned premiums on any insurance policies covering the Property, including the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(f) the right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(g) all accounts (including reserve accounts), escrows, documents, instruments, chattel paper, claims, deposits and general intangibles, as the foregoing terms are defined in the UCC, and all franchises, trade names, trademarks, symbols, service marks, books, records, plans, specifications, designs, drawings, surveys, title insurance policies, permits, consents, licenses, management agreements,

2

~#4824-5088-1369~

**EXHIBIT 3**

contract rights (including any contract with any architect or engineer or with any other provider of goods or services for or in connection with any construction, repair or other work upon the Property), approvals, actions, refunds of real estate taxes and assessments (and any other governmental impositions related to the Property) and causes of action that now or hereafter relate to, are derived from or are used in connection with the Property, or the use, operation, maintenance, occupancy or enjoyment thereof or the conduct of any business or activities thereon (hereinafter collectively referred to as the "*Intangibles*"); and

(h) all proceeds, products, offspring, rents and profits from any of the foregoing, including those from sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

Without limiting the generality of any of the foregoing, in the event that a case under the Bankruptcy Code is commenced by or against Borrower, pursuant to Section 552(b)(2) of the Bankruptcy Code, the security interest granted by this Security Instrument shall automatically extend to all Rents acquired by Borrower after the commencement of the case and shall constitute cash collateral under Section 363(a) of the Bankruptcy Code.

TO HAVE AND TO HOLD the Property unto and to the use and benefit of Lender and its successors and assigns, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Debt at the time and in the manner provided in the Loan Documents and shall well and truly abide by and comply with each and every covenant and condition set forth in the Loan Documents in a timely manner, these presents and the estate hereby granted shall cease, terminate and be void;

AND Borrower represents and warrants to and covenants and agrees with Lender as follows:

1.    **Payment of Debt and Incorporation of Covenants, Conditions and Agreements.** Borrower shall pay the Debt at the time and in the manner provided in the Loan Documents. All the covenants, conditions and agreements contained in the Loan Documents are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein. Without limiting the generality of the foregoing, Borrower (i) agrees to insure, repair, maintain and restore damage to the Property, pay Taxes, and comply with Legal Requirements, in accordance with the Loan Agreement, and (ii) agrees that the Proceeds of Insurance and Awards for Condemnation shall be settled, held and applied in accordance with the Loan Agreement.

2.    **Leases and Rents.**

(a)    Borrower does hereby absolutely and unconditionally assign to Lender all of Borrower's right, title and interest in all current and future Leases and Rents, it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only. Such assignment shall not be construed to bind Lender to the performance of any of the covenants or provisions contained in any Lease or otherwise impose any obligation upon Lender. Nevertheless, subject to the terms of this Section 2(a), Lender grants to Borrower a revocable license to operate and manage the Property and to collect the Rents subject to the requirements of the Loan Agreement (including the deposit of Rents into the Clearing Account). Upon an Event of Default, without the need for notice or demand, the license granted to Borrower herein shall automatically be revoked, and Lender shall immediately be entitled to possession of all Rents in (or required by the terms of the Loan Documents to be deposited in) the Clearing Account, the Deposit Account (including all Subaccounts thereof) and all

3

**EXHIBIT 3**

Rents collected thereafter (including Rents past due and unpaid), whether or not Lender enters upon or takes control of the Property. Borrower hereby grants and assigns to Lender the right, at its option, upon revocation of the license granted herein, to enter upon the Property in person, by agent or by court-appointed receiver to collect the Rents. Any Rents collected after the revocation of such license may be applied toward payment of the Debt in such priority and proportions as Lender in its sole discretion shall deem proper.

(b)     Borrower shall not enter into, modify, amend, cancel, terminate or renew any Lease except as provided in Section 5.9 of the Loan Agreement.

**3.     Use of Property.** Borrower shall not initiate, join in, acquiesce in or consent to any change in any private restrictive covenant, zoning law or other public or private restriction, limiting or defining the uses which may be made of the Property. If under applicable zoning provisions the use of the Property is or shall become a nonconforming use, Borrower shall not cause or permit such nonconforming use to be discontinued or abandoned without the consent of Lender. Borrower shall not (i) change the use of the Property, (ii) permit or suffer to occur any waste on or to the Property or (iii) take any steps to convert the Property to a condominium or cooperative form of ownership.

**4.     Transfer or Encumbrance of the Property.**

(a)     Borrower acknowledges that (i) Lender has examined and relied on the creditworthiness and experience of the principals of Borrower in owning and operating properties such as the Property in agreeing to make the Loan, (ii) Lender will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for the Debt, and (iii) Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt, Lender can recover the Debt by a sale of the Property. Borrower shall not sell, convey, alienate, mortgage, encumber, pledge or otherwise transfer the Property or any part thereof, or suffer or permit any Transfer to occur, other than a Permitted Transfer.

(b)     Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon any Transfer in violation of this Section 4. This provision shall apply to every sale, conveyance, alienation, mortgage, encumbrance, pledge or transfer of the Property (and every other Transfer) regardless of whether voluntary or not. Any Transfer made in contravention of this Section 4 shall be null and void and of no force and effect. Borrower agrees to bear and shall pay or reimburse Lender on demand for all reasonable expenses (including reasonable attorneys' fees and disbursements, title search costs and title insurance endorsement premiums) incurred by Lender in connection with the review, approval and documentation of any Permitted Transfer.

**5.     Changes in Laws Regarding Taxation.** If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay such tax, with interest and penalties thereon, if any. If Lender is advised by its counsel that the payment of such tax or interest and penalties by Borrower would be unlawful, taxable to Lender or unenforceable, or would provide the basis for a defense of usury, then Lender shall have the option, by notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

**6.     No Credits on Account of the Debt.** Borrower shall not claim or demand or be entitled to any credit on account of the Debt for any part of the Taxes assessed against the Property, and no deduction shall otherwise be made or claimed from the assessed value of the Property for real estate tax

4

EXHIBIT 3

purposes by reason of this Security Instrument or the Debt. If such claim, credit or deduction shall be required by law, Lender shall have the option, by notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

7. **Further Acts, Etc.** Borrower shall, at its sole cost, perform, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, mortgages, assignments, notices of assignment, transfers and assurances as Lender shall, from time to time, require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, given, granted, bargained, sold, alienated, enfeoffed, conveyed, confirmed, pledged, assigned and hypothecated or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument, or for filing, registering or recording this Security Instrument or for facilitating the sale and transfer of the Loan and the Loan Documents in connection with a "Secondary Market Transaction" as described in Section 9.1 of the Loan Agreement. Upon foreclosure, the appointment of a receiver or any other relevant action, Borrower shall, at its sole cost, cooperate fully and completely to effect the assignment or transfer of any license, permit, agreement or any other right necessary or useful to the operation of the Property. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including such rights and remedies available to Lender pursuant to this Section 7.

8. **Recording of Security Instrument, Etc.** Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, shall cause this Security Instrument, and any security instrument creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien or security interest hereof upon, and the interest of Lender in, the Property. Borrower shall pay all filing, registration or recording fees, all expenses incident to the preparation, execution and acknowledgment of and all federal, state, county and municipal, taxes, duties, imposts, documentary stamps, assessments and charges arising out of or in connection with the execution and delivery of, this Security Instrument, any supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, except where prohibited by law so to do. Borrower shall hold harmless and indemnify Lender, its successors and assigns, against any liability incurred by reason of the imposition of any tax on the making or recording of this Security Instrument.

9. **Right to Cure Defaults.** Upon the occurrence of any Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, perform the obligations in Default in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes or appear in, defend or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees and disbursements to the extent permitted by law), with interest thereon at the Default Rate for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender, shall constitute a portion of the Debt, shall be secured by this Security Instrument and the other Loan Documents and shall be due and payable to Lender upon demand.

10. **Remedies.**

(a) Upon the occurrence of any Event of Default, Lender may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, by Lender itself or otherwise, including the following actions, each of which may be

5

~#4824-5088-1369~

EXHIBIT 3

pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

    (i)    declare the entire Debt to be immediately due and payable;

    (ii)    institute a proceeding or proceedings, judicial or nonjudicial, to the extent permitted by law, by advertisement or otherwise, for the complete foreclosure of this Security Instrument, in which case the Property may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

    (iii)    with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien of this Security Instrument for the balance of the Debt not then due;

    (iv)    sell for cash or upon credit the Property and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to the power of sale, to the extent permitted by law, or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required by law;

    (v)    institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein or in any other Loan Document;

    (vi)    recover judgment on the Note either before, during or after any proceeding for the enforcement of this Security Instrument;

    (vii)    apply for the appointment of a trustee, receiver, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of the Borrower or of any Person liable for the payment of the Debt;

    (viii)    enforce Lender's interest in the Leases and Rents and enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and employees therefrom, and Lender may (A) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with the Property and conduct the business thereat; (B) complete any construction on the Property in such manner and form as Lender deems advisable; (C) make alterations, additions, renewals, replacements and improvements to or on the Property; (D) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive Rents; and (E) apply the receipts from the Property to the payment of the Debt, after deducting therefrom all expenses (including reasonable attorneys' fees and disbursements) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, insurance and other charges in connection with the Property, as well as just and reasonable compensation for the services of Lender, and its counsel, agents and employees;

EXHIBIT 3

       (ix)     require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of any portion of the Property occupied by Borrower, and require Borrower to vacate and surrender possession of the Property to Lender or to such receiver, and, in default thereof, evict Borrower by summary proceedings or otherwise; or

       (x)     pursue such other rights and remedies as may be available at law or in equity or under the UCC, including the right to receive and/or establish a lock box for all Rents and proceeds from the Intangibles and any other receivables or rights to payments of Borrower relating to the Property.

In the event of a sale, by foreclosure or otherwise, of less than all of the Property, this Security Instrument shall continue as a lien on the remaining portion of the Property.

       (b)     The proceeds of any sale made under or by virtue of this <u>Section 10</u>, together with any other sums which then may be held by Lender under this Security Instrument, whether under the provisions of this <u>Section 10</u> or otherwise, shall be applied by Lender to the payment of the Debt in such priority and proportion as Lender in its sole discretion shall deem proper.

       (c)     Lender may adjourn from time to time any sale by it to be made under or by virtue of this Security Instrument by announcement at the time and place appointed for such sale or for such adjourned sale or sales; and, except as otherwise provided by any applicable law, Lender, without further notice or publication, may make such sale at the time and place to which the same shall be so adjourned.

       (d)     Upon the completion of any sale or sales pursuant hereto, Lender, or an officer of any court empowered to do so, shall execute and deliver to the accepted purchaser or purchasers a good and sufficient instrument, or good and sufficient instruments, conveying, assigning and transferring all estate, right, title and interest in and to the property and rights sold. Lender is hereby irrevocably appointed the true and lawful attorney of Borrower, which appointment is coupled with an interest, in its name and stead, to make all necessary conveyances, assignments, transfers and deliveries of the Property and rights so sold and for that purpose Lender may execute all necessary instruments of conveyance, assignment and transfer, and may substitute one or more persons with like power, Borrower hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Any sale or sales made under or by virtue of this <u>Section 10</u>, whether made under the power of sale herein granted or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law or in equity, of Borrower in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Borrower and against any and all persons claiming or who may claim the same, or any part thereof, from, through or under Borrower.

       (e)     Upon any sale made under or by virtue of this <u>Section 10</u>, whether made under a power of sale or under or by virtue of judicial proceedings or of a judgment or decree of foreclosure and sale, Lender may bid for and acquire the Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the Debt the net sales price after deducting therefrom the expenses of the sale and costs of the action and any other sums which Lender is authorized to deduct under this Security Instrument or any other Loan Document.

       (f)     No recovery of any judgment by Lender and no levy of an execution under any judgment upon the Property or upon any other property of Borrower shall affect in any manner or to any extent the

7

**EXHIBIT 3**

lien of this Security Instrument upon the Property or any part thereof, or any liens, rights, powers or remedies of Lender hereunder, but such liens, rights, powers and remedies of Lender shall continue unimpaired as before.

(g)     Lender may terminate or rescind any proceeding or other action brought in connection with its exercise of the remedies provided in this Section 10 at any time before the conclusion thereof, as determined in Lender's sole discretion and without prejudice to Lender.

(h)     Lender may resort to any remedies and the security given by this Security Instrument or in any other Loan Document in whole or in part, and in such portions and in such order as determined in Lender's sole discretion. No such action shall in any way be considered a waiver of any rights, benefits or remedies evidenced or provided by any Loan Document. The failure of Lender to exercise any right, remedy or option provided in any Loan Document shall not be deemed a waiver of such right, remedy or option or of any covenant or obligation secured by any Loan Document. No acceptance by Lender of any payment after the occurrence of any Event of Default and no payment by Lender of any obligation for which Borrower is liable hereunder shall be deemed to waive or cure any Event of Default, or Borrower's liability to pay such obligation. No sale of all or any portion of the Property, no forbearance on the part of Lender, and no extension of time for the payment of the whole or any portion of the Debt or any other indulgence given by Lender to Borrower, shall operate to release or in any manner affect the interest of Lender in the remaining Property or the liability of Borrower to pay the Debt. No waiver by Lender shall be effective unless it is in writing and then only to the extent specifically stated. All costs and expenses of Lender in exercising its rights and remedies under this Section 10 (including reasonable attorneys' fees and disbursements to the extent permitted by law), shall be paid by Borrower immediately upon notice from Lender, with interest at the Default Rate for the period after notice from Lender, and such costs and expenses shall constitute a portion of the Debt and shall be secured by this Security Instrument.

(i)     The interests and rights of Lender under the Loan Documents shall not be impaired by any indulgence, including (x) any renewal, extension or modification which Lender may grant with respect to any of the Debt, (y) any surrender, compromise, release, renewal, extension, exchange or substitution which Lender may grant with respect to the Property or any portion thereof or (z) any release or indulgence granted to any maker, endorser, guarantor or surety of any of the Debt.

**11.     Right of Entry.** In addition to any other rights or remedies granted under this Security Instrument, Lender and its agents shall have the right to enter and inspect the Property at any reasonable time during the term of this Security Instrument. The cost of such inspections or audits shall be borne by Borrower should Lender determine that an Event of Default exists, including the cost of all follow up or additional investigations or inquiries deemed reasonably necessary by Lender. The cost of such inspections, if not paid for by Borrower following demand, may be added to the principal balance of the sums due under the Note and this Security Instrument and shall bear interest thereafter until paid at the Default Rate.

**12.     Security Agreement.** This Security Instrument is both a real property deed of trust and a "security agreement" within the meaning of the UCC. The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property. Borrower by executing and delivering this Security Instrument has GRANTED, BARGAINED, SOLD and CONVEYED and by these presents does GRANT, BARGAIN, SELL and CONVEY unto Lender and Trustee, as security for the Debt, a security interest in the Property to the full extent that the Property may be subject to the UCC (such portion of the Property so subject to the UCC being called in this Section 12 the "*Collateral*"). This Security Instrument shall also constitute a "fixture filing" for the purposes of the UCC. As such, this Security Instrument covers all items of the Collateral that are or are to become fixtures. Information concerning the security interest herein granted may be obtained from the

8

**EXHIBIT 3**

parties at the addresses of the parties set forth in the first paragraph of this Security Instrument. If an Event of Default shall occur, Lender, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the UCC, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Collateral. Upon request or demand of Lender, Borrower shall at its expense assemble the Collateral and make it available to Lender at a convenient place acceptable to Lender. Borrower shall pay to Lender on demand any and all expenses, including reasonable attorneys' fees and disbursements, incurred or paid by Lender in protecting the interest in the Collateral and in enforcing the rights hereunder with respect to the Collateral. Any notice of sale, disposition or other intended action by Lender with respect to the Collateral, sent to Borrower in accordance with the provisions hereof at least ten days prior to such action, shall constitute commercially reasonable notice to Borrower. The proceeds of any disposition of the Collateral, or any part thereof, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its sole discretion shall deem proper. In the event of any change in name, identity, structure or place of incorporation, organization or formation of Borrower, Borrower shall notify Lender thereof and promptly after request shall file and record such UCC forms as are necessary to maintain the priority of Lender's lien upon and security interest in the Collateral, and shall pay all expenses and fees in connection with the filing and recording thereof. If Lender shall require the filing or recording of additional UCC forms or continuation statements, Borrower shall, promptly after request, file and record such UCC forms or continuation statements as Lender shall deem necessary, and shall pay all expenses and fees in connection with the filing and recording thereof, it being understood and agreed, however, that no such additional documents shall increase Borrower's obligations under the Loan Documents. Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, to file with the appropriate public office on its behalf any financing or other statements naming Lender, as secured party, and Borrower, as debtor, in connection with the Collateral covered by this Security Instrument. This Security Instrument shall also be effective as a financing statement covering as-extracted collateral as defined in Section 9.102(a)(6) of the Texas Business and Commerce Code, as amended.

13.    **Actions and Proceedings.** Lender has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its sole discretion, decides should be brought to protect its or their interest in the Property. Lender shall, at its option, be subrogated to the lien of any mortgage, deed of trust or other security instrument discharged in whole or in part by the Debt, and any such subrogation rights shall constitute additional security for the payment of the Debt.

14.    **Marshalling and Other Matters.** Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each and every Person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all Persons to the extent permitted by applicable law. The lien of this Security Instrument shall be absolute and unconditional and shall not in any manner be affected or impaired by any acts or omissions whatsoever of Lender and, without limiting the generality of the foregoing, the lien hereof shall not be impaired by (i) any acceptance by Lender of any other security for any portion of the Debt, (ii) any failure, neglect or omission on the part of Lender to realize upon or protect any portion of the Debt or any collateral security therefor or (iii) any release (except as to the property released), sale, pledge, surrender, compromise, settlement, renewal, extension, indulgence, alteration, changing, modification or disposition of any portion of the Debt or of any of the collateral security therefor; and Lender may foreclose, or exercise any other remedy available to Lender

9

~#4824-5088-1369~

**EXHIBIT 3**

under other Loan Documents without first exercising or enforcing any of its remedies under this Security Instrument, and any exercise of the rights and remedies of Lender hereunder shall not in any manner impair the Debt or the liens of any other Loan Document or any of Lender's rights and remedies thereunder.

15. **Notices.** All notices, consents, approvals and requests required or permitted hereunder (a "*Notice*") shall be given in writing and shall be effective for all purposes if either hand delivered with receipt acknowledged, or by a nationally recognized overnight delivery service (such as Federal Express), or by certified or registered United States mail, return receipt requested, postage prepaid, or by facsimile and confirmed by facsimile answer back, in each case addressed as follows (or to such other address or Person as a party shall designate from time to time by Notice to the other party): If to Lender: Natixis Real Estate Capital LLC, 1251 Avenue of the Americas, New York, New York 10020; Attention: Real Estate Administration, Telecopier: (212) 891-5777, with copies to: Nelson Mullins Riley & Scarborough LLP, 301 S. College Street, Suite 2300, Charlotte, North Carolina 28202, Attention: D. Shane Gunter, Esq., Telecopier: (704) 417-3252; if to Borrower: c/o 220 Archer Drive, Sherman, Texas 75092, Attention: Mendi Salijeski, Telecopier: (903) 893-7107, with a copy to: Sara J. Evans, Esq., 5009 Village Circle, Dallas, Texas 75248, Telecopier: (214) 279-3308. A Notice shall be deemed to have been given: (a) in the case of hand delivery, at the time of delivery; (b) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; (c) in the case of overnight delivery, upon the first attempted delivery on a Business Day; or (d) in the case of facsimile transmission, when sent and electronically confirmed.

16. **Inapplicable Provisions.** If any term, covenant or condition of this Security Instrument is held to be invalid, illegal or unenforceable in any respect, this Security Instrument shall be construed without such provision.

17. **Headings.** The section headings in this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

18. **Duplicate Originals.** This Security Instrument may be executed in any number of duplicate originals and each such duplicate original shall be deemed to be an original.

19. **Definitions.** Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form; and the word "*Borrower*" shall mean "each Borrower and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "*Lender*" shall mean "Lender and any subsequent holder of the Note," the words "*Property*" shall include any portion of the Property and any interest therein, the word "*including*" means "including but not limited to" and the words "*attorneys' fees*" shall include any and all attorneys' fees, paralegal and law clerk fees, including, fees at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property and collateral and enforcing its rights hereunder.

20. **Homestead.** Borrower hereby waives and renounces all homestead and exemption rights provided by the Constitution and the laws of the United States and of any state, in and to the Property as against the collection of the Debt, or any part thereof.

21. **Assignments.** Lender shall have the right to assign or transfer its rights under this Security Instrument without limitation. Any assignee or transferee shall be entitled to all the benefits afforded Lender under this Security Instrument.

10

~#4824-5088-1369~

**EXHIBIT 3**

22. <u>Waiver of Jury Trial.</u> **BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS SECURITY INSTRUMENT OR ANY OTHER LOAN DOCUMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION 22 IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.**

23. <u>Consents.</u> Any consent or approval by Lender in any single instance shall not be deemed or construed to be Lender's consent or approval in any like matter arising at a subsequent date, and the failure of Lender to promptly exercise any right, power, remedy, consent or approval provided herein or at law or in equity shall not constitute or be construed as a waiver of the same nor shall Lender be estopped from exercising such right, power, remedy, consent or approval at a later date. Any consent or approval requested of and granted by Lender pursuant hereto shall be narrowly construed to be applicable only to Borrower and the matter identified in such consent or approval and no third party shall claim any benefit by reason thereof, and any such consent or approval shall not be deemed to constitute Lender a venturer or partner with Borrower nor shall privity of contract be presumed to have been established with any such third party. If Lender deems it to be in its best interest to retain assistance of persons, firms or corporations (including attorneys, title insurance companies, appraisers, engineers and surveyors) with respect to a request for consent or approval, Borrower shall reimburse Lender for all costs reasonably incurred in connection with the employment of such persons, firms or corporations.

24. <u>Employee Benefit Plan.</u> During the term of this Security Instrument, unless Lender shall have previously consented in writing, (i) Borrower shall take no action that would cause it to become an "*employee benefit plan*" as defined in 29 C.F.R. Section 2510.3-101, or "*assets of a governmental plan*" subject to regulation under the state statutes, and (ii) Borrower shall not sell, assign or transfer the Property, or any portion thereof or interest therein, to any transferee that does not execute and deliver to Lender its written assumption of the obligations of this covenant. Borrower shall protect, defend, indemnify and hold Lender harmless from and against all loss, cost, damage and expense (including all attorneys' fees, excise taxes and costs of correcting any prohibited transaction or obtaining an appropriate exemption) that Lender may incur as a result of Borrower's breach of this covenant. This covenant and indemnity shall survive the extinguishment of the lien of this Security Instrument by foreclosure or action in lieu thereof; furthermore, the foregoing indemnity shall supersede any limitations on Borrower's liability under any of the Loan Documents.

25. <u>Loan Repayment and Defeasance.</u> Provided no Event of Default exists, this Security Instrument will be satisfied and discharged of record by Lender prior to the Maturity Date only in accordance with the terms and provisions set forth in Section 2.3 of the Loan Agreement.

26. <u>Governing Law.</u> THIS SECURITY INSTRUMENT SHALL BE GOVERNED BY, AND BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED (WITHOUT REGARD TO CONFLICT OF LAW PROVISIONS THEREOF).

27. <u>Exculpation.</u> The liability of Borrower hereunder is limited pursuant to Section 10.1 of the Loan Agreement.

~#4824-5088-1369~

**EXHIBIT 3**

**28.**    <u>Trustee; Successor Trustee.</u>  Trustee shall not be liable for any error of judgment or act done by Trustee, or be otherwise responsible or accountable under any circumstances whatsoever, except if the result of Trustee's gross negligence or willful misconduct.  Trustee shall not be personally liable in case of entry by him or anyone acting by virtue of the powers herein granted him upon the Property for debts contracted or liability or damages or damages incurred in the management or operation of the Property.  Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by him hereunder or believed by him to be genuine.  Trustee shall be entitled to reimbursement for actual expenses incurred by him in the performance of his duties hereunder and to reasonable compensation for such of his services hereunder as shall be rendered.  Borrower will, from time to time, reimburse Trustee for and save and hold him harmless from and against any and all loss, cost, liability, damage and reasonable expense whatsoever incurred by him in the performance of his duties.  All monies received by Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were received, but need not be segregated in any manner from any other monies (except to the extent required by law) and Trustee shall be under no liability for interest on any monies received by him hereunder.  Trustee may resign by giving of notice of such resignation in writing to Lender.  If Trustee shall die, resign or become disqualified from acting in the execution of this trust or shall fail or refuse to exercise the same when requested by Lender or if for any or no reason and without cause Lender shall prefer to appoint a substitute trustee to act instead of the original Trustee named herein, or any prior successor or substitute trustee, Lender shall, without any formality or notice to Borrower or any other person, have full power to appoint a substitute trustee and, if Lender so elects, several substitute trustees in succession who shall succeed to all the estate, rights, powers and duties of the aforenamed Trustee.  Each appointment and substitution shall be evidenced by an instrument in writing which shall recite the parties to, and the book and page of record of, this Security Instrument, and the description of the real property herein described, which instrument, executed and acknowledged by Lender, shall (a) be conclusive proof of the proper substitution and appointment of such successor Trustee or Trustees, (b) duly assign and transfer all the estates, properties, rights, powers and trusts of Trustee so ceasing to act and (c) be notice of such proper substitution and appointment to all parties in interest.  In addition, such Trustee ceasing to act shall duly assign, transfer, and deliver any of the property and monies held by Trustee to the successor Trustee so appointed in its or his place.  The Trustee may act in the execution of this trust and may authorize one or more parties to act on his behalf to perform the ministerial functions required of him hereunder, including without limitation, the transmittal and posting of any notices and it shall not be necessary for any Trustee to be present in person at any foreclosure sale.

**29.**    <u>State-Specific Provisions.</u>

     (a)    <u>Principles of Construction.</u>  In the event of any inconsistencies between the terms and conditions of this <u>Section 29</u> and the terms and conditions of this Security Instrument, the terms and conditions of this <u>Section 29</u> shall control and be binding.

     (b)    <u>TEXAS FINANCE CODE SECTION 307.052 COLLATERAL PROTECTION NOTICE.</u>  (A) BORROWER IS REQUIRED TO: (I) KEEP THE PROPERTY INSURED AGAINST DAMAGE IN THE AMOUNT SPECIFIED HEREIN OR IN THE OTHER LOAN DOCUMENTS; (II) PURCHASE THE INSURANCE FROM AN INSURER THAT IS AUTHORIZED TO DO BUSINESS IN THE STATE OF TEXAS OR AN ELIGIBLE SURPLUS LINES INSURER; AND (III) NAME LENDER AS THE PERSON TO BE PAID UNDER THE POLICY IN THE EVENT OF A LOSS AS AND TO THE EXTENT REQUIRED HEREIN OR IN THE OTHER LOAN DOCUMENTS; (B) BORROWER MUST, IF REQUIRED BY LENDER, DELIVER TO LENDER A COPY OF THE POLICY AND PROOF OF THE PAYMENT OF PREMIUMS; AND (C) IF BORROWER FAILS TO MEET ANY REQUIREMENT LISTED IN PARAGRAPH (A) OR (B), LENDER MAY OBTAIN COLLATERAL PROTECTION INSURANCE ON BEHALF OF BORROWER AT BORROWER'S

**EXHIBIT 3**

EXPENSE AS AND TO EXTENT EXPLICITLY PERMITTED BY THIS SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS.

(c)　Chapter 64 of Subtitle B, Title 5 of the Texas Property Code.　Borrower and Lender acknowledge and agree that (i) to the extent that specific terms and requirements of this Security Instrument conflict with specific terms and requirements of Chapter 64 of Subtitle B, Title 5 of the Texas Property Code (the "*Assignment of Leases Statute*"), and such terms and requirements of the Assignment of Leases Statute are permitted under the Assignment of Leases Statute to be superseded by an agreement between Borrower and Lender, the specific terms and requirements of this Security Instrument hereby supersede such specific terms and requirements of the Assignment of Leases Statute, and (ii) to the extent that specific terms and requirements of this Security Instrument conflict with specific terms and requirements of the Assignment of Leases Statute, and such terms and requirements of the Assignment of Leases Statute are not permitted by the Assignment of Leases Statute to be superseded by an agreement between Borrower and Lender, the specific terms and requirements of the Assignment of Leases Statute shall control, and Borrower and Lender further agree that the all other terms and requirements of this Security Instrument shall not otherwise be impaired or superseded thereby and shall remain in full force and effect.

(d)　Additional Waiver.　In the event an interest in any of the Property is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, Borrower agrees that the following shall be the basis for the finder of fact's determination of the fair market value of the Property as of the date of the foreclosure sale in proceedings governed by Sections 51.003, 51.004 and 51.005 of the Texas Property Code (as amended from time to time): (i) the Property shall be valued in an "as is" condition as of the date of the foreclosure sale, without any assumption or expectation that the Property will be repaired or improved in any manner before a resale of the Property after foreclosure; (ii) the valuation shall be based upon an assumption that the foreclosure purchaser desires a resale of the Property for cash promptly (but no later than twelve (12) months) following the foreclosure sale; (iii) all reasonable closing costs customarily borne by the seller in commercial real estate transactions should be deducted from the gross fair market value of the Property, including, without limitation, brokerage commissions, title insurance, a survey of the Property, tax prorations, attorneys' fees, and marketing costs; (iv) the gross fair market value of the Property shall be further discounted to account for any actual holding costs associated with maintaining the Property pending sale, including, without limitation, utilities expenses, property management fees, taxes and assessments (to the extent not accounted for in (iii) above), and other maintenance, operational and ownership expenses; and (v) any expert opinion testimony given or considered in connection with a determination of the fair market value of the Property must be given by persons having at least five (5) years experience in appraising property similar to the Property and who have conducted and prepared a complete written appraisal of the Property taking into consideration the factors set forth above.

(e)　Sale of Property.　Trustee, at the request of Lender, shall have the power to sell the Property or any part thereof at public auction to the highest bidder for cash, in such manner, at such time, and place, upon such terms and notice to Borrower as provided in Section 51.002 of the Texas Property Code, as amended, or if and to the extent such statute is not then in force, with the applicable requirements at the time of sale of the successor statute or statutes, if any governing sales of Texas real property under power of sale conferred by deeds of trust.　If there is no statute in force at the time of sale governing sales of Texas real property under powers of sale conferred by deeds of trust, such sale shall comply with applicable law at the time of sale.

(f)　Maximum Interest.

~#4824-5088-1369~

EXHIBIT 3

    (i) <u>Savings Clause</u>. It is expressly stipulated and agreed to be the intent of Borrower and Lender at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on the Note or the Related Indebtedness (as hereinafter defined), or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law. If the applicable law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to the Note, any of the other Loan Documents or any other communication or writing by or between Borrower and Lender related to the transaction or transactions that are the subject matter of the Loan Documents, (ii) contracted for, charged or received by reason of Lender's exercise of the option to accelerate the maturity of the Note and/or the Related Indebtedness, or (iii) Borrower will have paid or Lender will have received by reason of any voluntary prepayment by Borrower of the Note and/or the Related Indebtedness, then it is Borrower's and Lender's express intent that all amounts charged in excess of the Maximum Legal Rate shall be automatically cancelled, ab initio, and all amounts in excess of the Maximum Legal Rate theretofore collected by Lender shall be credited on the principal balance of the Note and/or the Related Indebtedness (or, if the Note and all Related Indebtedness have been or would thereby be paid in full, refunded to Borrower), and the provisions of the Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; *provided, however,* if the Note has been paid in full before the end of the stated term of the Note, then Borrower and Lender agree that Lender shall, with reasonable promptness after Lender discovers or is advised by Borrower that interest was received in an amount in excess of the Maximum Legal Rate, either refund such excess interest to, Borrower and/or credit such excess interest against the Note and/or any Related Indebtedness then owing by Borrower to Lender. Borrower hereby agrees that as a condition precedent to any claim seeking usury penalties against Lender, Borrower will provide written notice to Lender, advising Lender in reasonable detail of the nature and amount of the violation, and Lender shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Borrower or crediting such excess interest against the Note and/or the Related Indebtedness then owing by Borrower to Lender. All sums contracted for, charged or received by Lender for the use, forbearance or detention of any debt evidenced by the Note and/or the Related Indebtedness shall, to the extent permitted by applicable law, be amortized, or spread, using the actuarial method, throughout the stated term of the Note and/or the Related Indebtedness (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of the Note and/or the Related Indebtedness does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Note and/or the Related Indebtedness for so long as debt is outstanding. In no event shall the provisions of Chapter 346 of the Texas Finance Code (which regulates certain revolving credit loan accounts and revolving triparty accounts) apply to the Note and/or the Related Indebtedness. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Lender to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

    (ii) <u>Definitions</u>. As used herein, the term "***Maximum Legal Rate***" shall mean the maximum lawful rate of interest which may be contracted for, charged, taken, received or reserved by Lender in accordance with the applicable laws of the State of Texas (or applicable United States federal law to the extent that it permits Lender to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law), taking into account all Charges (as herein defined) made in connection with the transaction evidenced by the Note and the other

<div align="center">14</div>

<div align="center">**EXHIBIT 3**</div>

Loan Documents. As used herein, the term "*Charges*" shall mean all fees, charges and/or any other things of value, if any, contracted for, charged, received, taken or reserved by Lender in connection with the transactions relating to the Note and the other Loan Documents, which are treated as interest under applicable law. As used herein, the term "*Related Indebtedness*" shall mean any and all debt paid or payable by Borrower to Lender pursuant to the Loan Documents or any other communication or writing by or between Borrower and Lender related to the transaction or transactions that are the subject matter of the Loan Documents, except such debt which has been paid or is payable by Borrower to Lender under the Note.

(iii)     Ceiling Election. To the extent that Lender is relying on Chapter 303 of the Texas Finance Code to determine the Maximum Legal Rate payable on the Note and/or the Related Indebtedness, Lender will utilize the weekly ceiling from time to time in effect as provided in such Chapter 303, as amended. To the extent United States federal law permits Lender to contract for, charge, take, receive or reserve a greater amount of interest than under Texas law, Lender will rely on United States federal law instead of such Chapter 303 for the purpose of determining the Maximum Legal Rate. Additionally, to the extent permitted by applicable law now or hereafter in effect, Lender may, at its option and from time to time, utilize any other method of establishing the Maximum Legal Rate under such Chapter 303 or under other applicable law by giving notice, if required, to Borrower as provided by applicable law now or hereafter in effect.

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

**EXHIBIT 3**

(f) <u>Entire Agreement and Modification</u>.  THIS SECURITY INSTRUMENT AND THE OTHER LOAN DOCUMENTS EMBODY THE FINAL, ENTIRE AGREEMENT AMONG THE PARTIES HERETO AND SUPERSEDE ANY AND ALL PRIOR COMMITMENTS, AGREEMENTS, REPRESENTATIONS AND UNDERSTANDINGS, WHETHER WRITTEN OR ORAL, RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES HERETO.  THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES HERETO.  This Security Instrument and the other Loan Documents may not be amended, revised, waived, discharged, released or terminated orally but only by a written instrument or instruments executed by the party against which enforcement of the amendment, revision, waiver, discharge, release or termination is asserted.  Any alleged amendment, revision, waiver, discharge, release or termination which is not so documented shall not be effective as to any party.

NOTICE OF INDEMNIFICATION:  BORROWER HEREBY ACKNOWLEDGES AND AGREES THAT THIS SECURITY INSTRUMENT CONTAINS INDEMNIFICATION PROVISIONS PURSUANT TO <u>SECTIONS 8</u> AND <u>24</u> HEREOF.

IN WITNESS WHEREOF, Borrower has executed this Security Instrument as of the day and year first above written.

**BORROWER:**

SOUTH GATE APARTMENTS, LLC,
a Texas limited liability company

By: _____
Name:    Mendi Salijeski
Title:    Manager

**EXHIBIT 3**

STATE OF *TEXAS* )
                                        )SS.
COUNTY OF *GRAYSON* )

Before me, *Mendi Salijeski*, on this day personally appeared Mendi Salijeski, known to me to be the person whose name is subscribed to the foregoing instrument as the Manager of SOUTH GATE APARTMENTS, LLC, a Texas limited liability company, and acknowledged to me that he/she executed the same on behalf of said limited liability company, for the purposes and consideration therein expressed, as the act and deed of said limited liability company.

Given under my hand and seal of office this 26 day of *Jan*, 2018.

*Ronnie L. Hall*

Printed Name: *Ronnie L. Hall*

[SEAL]

My Commission Expires: *02 - 23 - 21*

RONNIE L HALL
NOTARY PUBLIC
ID# 7303385
State of Texas
Comm. Exp. 02-23-2021

~#4824-5088-1369~

**EXHIBIT 3**

**Exhibit "A"**
[LEGAL DESCRIPTION]

(Grayson County)

TRACT ONE: TERRACE APARTMENTS

Being Lot 1, Block 2 of the Replat of a portion of Westwood Sixth Addition, an addition of the City of Sherman, Grayson County, Texas according to the plat thereof recorded in Volume 3, Page 31, Plat Records, Grayson County, Texas and being more particularly described as follows:

Being at a 1/2" iron rod set at the intersection of the north R.O.W. of Archer Drive (60' R.O.W.) with the west R.O.W. of Shields Drive (50' R.O.W.);

Thence North 82° 00' 00" West along the north RO.W. of Archer Drive a distance of 139.92 feet to a 1/2" iron rod found for corner, said point being the southeast corner of Lot 2 of said Replat of Westwood Sixth Addition;

Thence North 07° 55' 55" East along the east line of Lot 2, a distance of 119.80 feet to a 1/2" iron rod found for the beginning of a curve to the left with radius of 1053.06 feet and central angle of 05° 26' 10";

Thence northerly along said curve to the left and the east line of Lot 2 an arc distance of 99.91 feet to a 1/2" iron rod found for corner, said point being the southwest corner of Lot 4 of said Replat of Westwood Sixth Addition;

Thence South 81 ° 59' 38" East along the south line of Lot 4 a distance of 140.56 feet to a 1/2" iron rod found for corner, said point being in the west R.O.W. of Shields Drive;

Thence southerly along the west R.O.W. of Shields Drive in a curve to the right with radius of 1193.06 feet and central angle of 04° 47' 10" an arc distance of 99.66 feet to a 1/2" iron rod found for corner;

Thence South 07° 56' 40" West continuing along the west R.O.W. of Shields Drive a distance of 120.00 feet to the Place of Beginning and containing 30,756 feet or 0.71 acre of land.

TRACT TWO: SOUTHGATE APARTMENTS

Being a tract of land out of the SAMUEL BLAGG SURVEY, Abstract No. 56, City of Sherman, Grayson County, Texas and being the same 1.6370 acre tract of land conveyed to Vernon B. Mullins by Substitute Trustee's Deed dated recorded in Volume 2001, Page 217, Real Property Records, Grayson County, Texas, and being more particularly described as follows:

BEGINNING at a 1" iron pipe found at the intersection of the east R.O.W. of Travis Street (50' R.O.W.) with the North R.O.W. of Spring Street (50' R.O.W.);

THENCE North 16° 00' 00" West along the east R.O.W. of Travis Street a distance of 239.63 feet to a nail in washer found for corner, said point being at the intersection of the east R.O.W. of Travis Street with the south line of a 10 foot alley;

THENCE North 74° 08' 44" East along the south line of said 10 foot alley a distance of 298.55 feet to a nail in washer for corner, said point being the intersection of the south line of said 10 foot alley with the west R.O.W. of Walnut Street (50' R.O.W.);

~#4824-5088-1369~

**EXHIBIT 3**

THENCE South 16° 03' 16" East along the west R.O.W. of Walnut Street a distance of 237.65 feet to a 1" iron rod found for corner, said point bieng the intersection of the west R.O.W. of Walnut Street with the north R.O.W. of Spring Street;

THENCE South 73° 46' 00" West along the north R.O.W. of Spring Street, a distance of 298.78 feet to the Place of Beginning and containing 71,272 square feet or 1.64 acres of land.

TRACT THREE: WESTWOOD GARDENS APARTMENTS

Being all of Lots 1 and 2 in Block 1 of the Replat of Lots 1,2, 3,18,19, 20 & 21 of Block 1, Lots 1,2, 3, 4, 27, 28, & 29 in Block 2 and Lots 1,2 & 3 in Block 3 of the Westwood Sixth Addition, an addition to the City of Sherman, Grayson County, Texas according to the plat thereof recorded in Volume 3, Page 31 of the Plat Records of Grayson County, Texas, and containing 61,420 square feet or 1.41 acres of land.

~#4824-5088-1369~

**EXHIBIT 3**

# Grayson County
## Wilma Bush
### County Clerk

---

**Instrument Number:** 2018 - 9622

ERecordings-RP

Recorded On: May 01, 2018 03:10 PM                    Number of Pages: 6

Parties: NATIXIS REAL ESTATE CAPITAL LLC

---

### " Examined and Charged as Follows: "

Total Recording: $42.00

---

### *********** THIS PAGE IS PART OF THE INSTRUMENT ***********

Any provision herein which restricts the Sale, Rental or use of the described Document
because of color or race is invalid and unenforceable under federal law.

**File Information:**                                 **Record and Return To:**

Document Number:    9622                              eRx
Receipt Number:     20180501000162
Recorded Date/Time: May 01, 2018 03:10 PM
User:               Misty G
Station:            CLERK05

---



STATE OF TEXAS
COUNTY OF GRAYSON

I hereby certify that this Instrument was FILED In the File Number sequence on the date/time
printed hereon, and was duly RECORDED in the Official Records of Grayson County, Texas.

Wilma Bush
County Clerk
Grayson County, TX

**EXHIBIT 4**

**ASSIGNMENT OF DEED OF TRUST,**
**ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT**

NATIXIS REAL ESTATE CAPITAL LLC,
a Delaware limited liability company
(Assignor)

to

WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE
REGISTERED HOLDERS OF CSAIL 2018-CX11 COMMERCIAL MORTGAGE TRUST,
COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2018-CX11
(Assignee)

Effective as of April 18, 2018

County of Grayson
State of Texas

DOCUMENT PREPARED BY AND WHEN RECORDED, RETURN TO:
McCoy & Orta, P.C.
100 North Broadway, 26th Floor
Oklahoma City, Oklahoma 73102
Telephone: 888-236-0007

EXHIBIT 4

**ASSIGNMENT OF DEED OF TRUST,
ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT**

As of the 18th day of April, 2018, NATIXIS REAL ESTATE CAPITAL LLC, a Delaware limited liability company, having an address at 1251 Avenue of the Americas, 5th Floor, New York, NY 10020 ("Assignor"), as the holder of the instrument hereinafter described and for valuable consideration hereby endorses, assigns, sells, transfers and delivers to WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE REGISTERED HOLDERS OF CSAIL 2018-CX11 COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2018-CX11, having an address at 9062 Old Annapolis Road, Columbia, MD 21045 ("Assignee"), its successors, participants and assigns, without recourse or warranty, all right, title and interest of Assignor in and to that certain:

DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND SECURITY AGREEMENT made by SOUTH GATE APARTMENTS, LLC, a Texas limited liability company to Assignor dated as of January 31, 2018 and recorded on February 5, 2018, as Instrument Number 2018-2399 in the Recorder's Office of the Recorder of Grayson County, Texas (as the same has heretofore been amended, modified, restated, supplemented, renewed or extended), securing payment of note(s) of even date therewith, in the original principal amount of $5,762,598.00, and creating a first lien on the property described in Exhibit A attached hereto and by this reference made a part hereof.

Together with any and all other liens, privileges, security interests, rights, entitlements, equities, claims and demands as to which Assignor hereunder possesses or to which Assignor is otherwise entitled as additional security for the payment of the notes and other obligations described herein.

This instrument shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

[SIGNATURE(S) ON THE FOLLOWING PAGE]

18th IN WITNESS WHEREOF, the Assignor has caused this instrument to be executed this ___ day of April, 2018.

<div style="text-align: right">

**ASSIGNOR:**

NATIXIS REAL ESTATE CAPITAL LLC, a
Delaware limited liability company

By: _____
Name: Gregory A. Murphy
Title:  Managing Director

By: _____
Name: Jerry Tang
Title:  Director

</div>

STATE OF NEW YORK    §
                     §
COUNTY OF NEW YORK   §

On the 18th day of April, 2018, before me, the undersigned, a Notary Public in and for said state, personally appeared Gregory A. Murphy, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

TAMEKA F. ANDERSON
Notary Public, State of New York
Registration #01AN6324831
Qualified in New York County
Commission Expires June 8, 2019

WITNESS my hand and official seal.

Signature: _____
Notary Public Tameka F. Anderson

My Commission Expires: June 8 2019

STATE OF NEW YORK    §
                     §
COUNTY OF NEW YORK   §

On the 18th day of April, 2018, before me, the undersigned, a Notary Public in and for said state, personally appeared Jerry Tang, personally known to me or proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

TAMEKA F. ANDERSON
Notary Public, State of New York
Registration #01AN6324831
Qualified in New York County
Commission Expires June 8, 2019

WITNESS my hand and official seal.

Signature: _____
Notary Public Tameka F. Anderson

My Commission Expires: June 8 2019

Reference No.: 6850M.024-026
Matter Name: SS1 Multifamily Portfolio
Pool: CSAIL 2018-CX11

<div style="text-align: center">

EXHIBIT 4

</div>

# EXHIBIT A
## LEGAL DESCRIPTION

TRACT ONE: TERRACE APARTMENTS

Being Lot 1, Block 2 of the Replat of a portion of Westwood Sixth Addition, an addition of the City of Sherman, Grayson County, Texas according to the plat thereof recorded in Volume 3, Page 31, Plat Records, Grayson County, Texas and being more particularly described as follows:

Being at a 1/2" iron rod set at the intersection of the north R.O.W. of Archer Drive (60' R.O.W.) with the west R.O.W. of Shields Drive (50' R.O.W.);

Thence North 82° 00' 00" West along the north RO.W. of Archer Drive a distance of 139.92 feet to a 1/2" iron rod found for corner, said point being the southeast corner of Lot 2 of said Replat of Westwood Sixth Addition;

Thence North 07° 55' 55" East along the east line of Lot 2, a distance of 119.80 feet to a 1/2" iron rod found for the beginning of a curve to the left with radius of 1053.06 feet and central angle of 05° 26' 10";

Thence northerly along said curve to the left and the east line of Lot 2 an arc distance of 99.91 feet to a 1/2" iron rod found for corner, said point being the southwest corner of Lot 4 of said Replat of Westwood Sixth Addition;

Thence South 81 ° 59' 38" East along the south line of Lot 4 a distance of 140.56 feet to a 1/2" iron rod found for corner, said point being in the west R.O.W. of Shields Drive;

Thence southerly along the west R.O.W. of Shields Drive in a curve to the right with radius of 1193.06 feet and central angle of 04° 47' 10" an arc distance of 99.66 feet to a 1/2" iron rod found for corner;

Thence South 07° 56' 40" West continuing along the west R.O.W. of Shields Drive a distance of 120.00 feet to the Place of Beginning and containing 30,756 feet or 0.71 acre of land.

TRACT TWO: SOUTHGATE APARTMENTS

Being a tract of land out of the SAMUEL BLAGG SURVEY, Abstract No. 56, City of Sherman, Grayson County, Texas and being the same 1.6370 acre tract of land conveyed to Vernon B. Mullins by Substitute Trustee's Deed dated recorded in Volume 2001, Page 217, Real Property Records, Grayson County, Texas, and being more particularly described as follows:

BEGINNING at a 1" iron pipe found at the intersection of the east R.O.W. of Travis Street (50' R.O.W.) with the North R.O.W. of Spring Street (50' R.O.W.);

THENCE North 16° 00' 00" West along the east R.O.W. of Travis Street a distance of 239.63 feet to a nail in washer found for corner, said point being at the intersection of the east R.O.W. of Travis Street with the south line of a 10 foot alley;

THENCE North 74° 08' 44" East along the south line of said 10 foot alley a distance of 298.55 feet to a nail in washer for corner, said point being the intersection of the south line of said 10 foot alley with the west R.O.W. of Walnut Street (50' R.O.W.);

THENCE South 16° 03' 16" East along the west R.O.W. of Walnut Street a distance of 237.65 feet to a 1" iron rod found for corner, said point bieng the intersection of the west R.O.W. of Walnut Street with the north R.O.W. of Spring Street;

THENCE South 73° 46' 00" West along the north R.O.W. of Spring Street, a distance of 298.78 feet to the Place of Beginning and containing 71,272 square feet or 1.64 acres of land.

TRACT THREE: WESTWOOD GARDENS APARTMENTS

Being all of Lots 1 and 2 in Block 1 of the Replat of Lots 1,2, 3,18,19, 20 & 21 of Block 1, Lots 1,2, 3, 4, 27, 28, & 29 in Block 2 and Lots 1,2 & 3 in Block 3 of the Westwood Sixth Addition, an addition to the City of Sherman, Grayson County, Texas according to the plat thereof recorded in Volume 3, Page 31 of the Plat Records of Grayson County, Texas, and containing 61,420 square feet or 1.41 acres of land.

## GENERAL ASSIGNMENT

As of the 18th day of April, 2018, NATIXIS REAL ESTATE CAPITAL LLC, a Delaware limited liability company, having an address at 1251 Avenue of the Americas, 5th Floor, New York, NY 10020, ("Assignor") hereby endorses, assigns, sells, transfers and delivers to WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE REGISTERED HOLDERS OF CSAIL 2018-CX11 COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2018-CX11, having an address at 9062 Old Annapolis Road, Columbia, MD 21045 ("Assignee"), its successors, participants and assigns, without recourse or warranty, all right, title and interest of Assignor in and to the Loan (as defined below) and all other agreements, including but not limited to guaranty agreements, and certificates and documents entered into or delivered in connection with the Loan (as the same have heretofore been amended, modified, restated, supplemented, renewed or extended).

Additionally, Assignor hereby assigns all other documents and instruments relating to the Loan, including, without limitation, all certificates and receipts executed by Borrower, all appraisal reports, all environmental, engineering and other reports relating to the operation or condition of the property securing said Loan, and all casualty insurance policies, liability insurance policies, title insurance policies and opinions of counsel (as the same have heretofore been amended, modified, restated, supplemented, renewed or extended).

This instrument is given in connection with, and in consideration of, Assignee's purchase of a loan ("Loan") made by Assignor to SOUTH GATE APARTMENTS, LLC, a Texas limited liability company ("Borrower"), dated as of January 31, 2018, in the original principal amount of $5,762,598.00 as more specifically described in the agreements, certificates and documents entered into in connection with the Loan.

Assignor agrees to execute and deliver to Assignee such additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this assignment.

Assignor has caused this instrument to be executed this 18 day of April, 2018.

NATIXIS REAL ESTATE CAPITAL LLC, a
Delaware limited liability company

By: _____
                    Jerry Tang
Name:           Executive Director
Title:

By: _____
                    Delphine Clerjaud
Name:           Vice President
Title:

Reference No.: 6850M.024-026
Matter Name: SS1 Multifamily Portfolio
Pool: CSAJL 2018-CX11

**EXHIBIT 4**

## Grayson County
## Wilma Bush
### County Clerk
Sherman, TX 75090

---

Instrument Number:   2020 - 33106

ERecordings-RP

Recorded On: November 25, 2020 03:14 PM                    Number of Pages: 39

Parties: SOUTH GATE APARTMENTS LLC

---

" Examined and Charged as Follows: "

Total Recording: $164.00

---

*********** THIS PAGE IS PART OF THE INSTRUMENT ***********
Any provision herein which restricts the Sale, Rental or use of the described Document
because of color or race is invalid and unenforceable under federal law.

File Information:                                          Record and Return To:
Document Number:    33106                                  Simplifile
Receipt Number:     20201125000080
Recorded Date/Time: November 25, 2020 03:14 PM
User:               Cort M
Station:            CLERK07

---



STATE OF TEXAS
COUNTY OF GRAYSON

I hereby certify that this Instrument was FILED In the File Number sequence on the date/time
printed hereon, and was duly RECORDED in the Official Records of Grayson County, Texas.

Wilma Bush
County Clerk
Grayson County, TX

**EXHIBIT 4**

This instrument prepared by
and when recorded, return to:

Kilpatrick Townsend & Stockton LLP
214 North Tryon Street, Suite 2400
Charlotte, NC 28202
Attn: RE Finance & Capital Markets
Ref: Argentic/South Gate Apartments

<div align="right"><strong>ABOVE SPACE FOR RECORDER'S USE</strong></div>

<div align="center">

## ASSUMPTION AGREEMENT
### (CSAIL 2018-CX11/Loan No. 30314467)

</div>

THIS ASSUMPTION AGREEMENT (this "**Agreement**") is entered into and made effective as of November **23** 2020 (the "**Effective Date**"), by and among SOUTH GATE APARTMENTS, LLC, a Texas limited liability company, with a mailing address at 220 Archer Drive, Sherman, Texas 75092, Attn: Mendi Salijeski ("**Original Borrower**"), APEX SOUTH GATE LLC, a Delaware limited liability company, with a mailing address at c/o Apex Equity Group LLC, 10 Hill Street, Newark, New Jersey 07102, Attn: David Helfgott ("**New Borrower**"), WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE REGISTERED HOLDERS OF CSAIL 2018-CX11 COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2018-CX11 ("**Lender**"), with a mailing address at c/o Argentic Services Company LP, 500 North Central Expressway, Suite 261, Plano, Texas 75074, Attn. Asset Manager for Loan No. 30314467, MENDI SALIJESKI, an individual, and FIKRIJE SHEMO, an individual, whose address is 220 Archer Drive, Sherman, Texas 75092 (individually and/or collectively, as the context may require, "**Original Guarantor**"), and DAVID HELFGOTT, an individual, whose address is c/o Apex Equity Group LLC, 10 Hill Street, Newark, New Jersey 07102 ("**New Guarantor**").

<div align="center">

## RECITALS:

</div>

The following recitals are a material part of this Agreement:

A.     Natixis Real Estate Capital LLC, a Delaware limited liability company ("**Original Lender**"), made a real estate loan (the "**Loan**") to Original Borrower, which Loan is evidenced

by that certain Promissory Note dated January 31, 2018, from Original Borrower in the original principal amount of $4,631,732.00 (together with all addenda, modifications, amendments, riders, exhibits and supplements thereto, the "**Note**"). The Loan is evidenced, governed and/or secured by, among other things, the following agreements and documents, all dated as of the date of the Note (unless otherwise noted):

    1. that certain Deed of Trust, Assignment of Leases and Rents and Security Agreement made by Original Borrower to Theresa B. Lyons, as Trustee for the benefit of Original Lender (together with all addenda, modifications, amendments, riders, exhibits and supplements thereto, the "**Security Instrument**"), recorded on February 5, 2018 as Instrument No. 2018-2404 in the official land records of Grayson County, Texas (the "**Recorder's Office**"), encumbering the real property described on **Exhibit A** attached hereto and by this reference incorporated herein and as more particularly described in the Security Instrument (together with all other property, real and personal, encumbered by the Security Instrument, the "**Property**"); and

    2. that certain Loan Agreement by and between Original Borrower and Original Lender (together with all addenda, modifications, amendments, riders, exhibits and supplements thereto, the "**Loan Agreement**");

    3. that certain Assignment of Leases and Rents made by Original Borrower to Original Lender (together with all addenda, modifications, amendments, riders, exhibits and supplements thereto, the "**Assignment of Leases**"), recorded on February 5, 2018 as Instrument No. 2018-2405 in the Recorder's Office;

    4. that certain Deposit Account Agreement by and between Original Borrower, Original Lender and Wells Fargo Bank, N.A. (together with all addenda, modifications, amendments, riders, exhibits and supplements thereto, the "**Original Deposit Account Agreement**"); and

    5. that certain Assignment of Licenses, Permits and Contracts made by Original Borrower to Original Lender (together with all addenda, modifications, amendments, riders, exhibits and supplements thereto, the "**Assignment of Contracts**").

    B. In connection with the Loan, Original Borrower and/or Original Guarantor, as applicable, also executed and delivered, or caused to be executed and delivered, the following agreements and documents for the benefit of Original Lender, all dated as of the date of the Note (unless otherwise noted):

    1. that certain UCC-1 Financing Statement naming Original Borrower as debtor and Original Lender as secured party recorded on February 5, 2018 as Instrument No. 2018-2406 in the Recorder's Office ("**Local UCC**");

    2. that certain UCC-1 Financing Statement naming Original Borrower as debtor and Original Lender as secured party filed with the Texas Secretary of State ("**State UCC**");

<div align="center">2</div>

East Coast Portfolio Management
Loan Number: 30114473
Assumption Agreement

<div align="center">**EXHIBIT 4**</div>

3.      that certain Guaranty of Recourse Obligations by Original Guarantor in favor of Original Lender (together with all addenda, modifications, amendments, riders, exhibits and supplements thereto, "**Original Guaranty**");

4.      that certain Assignment and Subordination of Management Agreement by and between Original Borrower, Original Lender and S.S. Partners Management, LLC (together with all addenda, modifications, amendments, riders, exhibits and supplements thereto, the "**Subordination Agreement**");

5.      that certain Deposit Account Control Agreement by and between Original Borrower, Original Lender and Wells Fargo Bank, N.A. (together with all addenda, modifications, amendments, riders, exhibits and supplements thereto, the "**Original Clearing Account Agreement**"); and

6.      that certain Post Closing Agreement by and between Original Borrower and Original Lender (together with all addenda, modifications, amendments, riders, exhibits and supplements thereto, the "**Original Post Closing Agreement**").

The agreements and documents set forth in Recital A and B above, together with any and all other documents and agreements executed or assumed by Original Borrower or Original Guarantor in connection with the Loan, are hereinafter referred to, collectively, as the "**Original Borrower's Loan Documents**."

C.      Upon the Effective Date, New Borrower and/or New Guarantor are executing and delivering, or are causing to be delivered, to Lender the following documents (together with any and all other documents and agreements executed by New Borrower and New Guarantor in connection with the Loan, collectively, the "**New Loan Documents**"), all dated as of the Effective Date (unless otherwise noted):

1.      those certain undated UCC Financing Statements naming New Borrower as debtor therein and naming Lender as secured party therein, to be filed in the Recorder's Office and with the Secretary of State of Delaware;

2.      that certain Guaranty of Recourse Obligations executed by New Guarantor in favor of Lender (the "**New Guaranty**");

3.      that certain Assignment and Subordination of Management Agreement executed by Aloft MGT LLC, a New York limited liability company ("**Property Manager**"), and New Borrower for the benefit of Lender;

4.      that certain Deposit Account Control Agreement executed by New Borrower, Wells Fargo Bank, N.A and Lender (the "**New DACA**");

5.      that certain Amendment to Deposit Account Agreement executed by New Borrower, PNC Bank, National Association and Lender (the "**First Amendment**" and together with the Original Deposit Account Agreement, collectively, the "**Deposit Account Agreement**"); and

3

**EXHIBIT 4**

6.      this Agreement.

The agreements and documents set forth in Recital A and Recital C above, together with all other documents evidencing, securing or otherwise pertaining to the Loan (other than the documents and agreements set forth in Recital B), and such other agreements and documents as Lender may reasonably require, are hereinafter referred to, collectively, as the "**Loan Documents**" and, individually, as a "**Loan Document**."

      D.      Original Lender assigned, sold and transferred its interest in the Loan and the Original Borrower's Loan Documents to Lender, and Lender is the current holder of all of Original Lender's interest in the Loan and the Original Borrower's Loan Documents.

      E.      Original Borrower and New Borrower are parties to an agreement for the purchase and sale of the Property (as amended from time to time, the "**Purchase Agreement**"), pursuant to which the Property is to be transferred to New Borrower and New Borrower is to assume the Loan.

      F.      Lender, as the holder of the Note and beneficiary under the Security Instrument, has been asked to consent to (i) the transfer of the Property to New Borrower, (ii) the assumption by New Borrower and New Guarantor of the obligations of Original Borrower and Original Guarantor, respectively, under the Loan Documents, (iii) New Borrower entering into a management agreement for the Property with Property Manager, and (iv) certain other modifications to the Loan Documents (collectively, the "**Transactions**"), all on the terms hereinafter set forth.

      G.      Lender has agreed to consent to the Transactions, acting by and through its servicer, Argentic Services Company LP ("**Argentic**"), subject to the terms and conditions stated below, including, without limitation, the execution and delivery of the agreements and documents set forth in Recital C above and such other documents and instruments as may be reasonably required by Lender.

      H.      Unless the context requires otherwise, references in this Agreement to the Loan Documents shall be deemed to refer to such documents as amended by this Agreement, and as such documents and the other Loan Documents may be further amended, modified, extended or replaced from time to time.

## CONTRACTUAL PROVISIONS:

      NOW, THEREFORE, in consideration of the Recitals, which are incorporated herein as if set forth below in full as a substantive, contractual part of this Agreement, and the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

East Coast Portfolio Management
Loan Number: 30114473
Assumption Agreement

**EXHIBIT 4**

1. Acknowledgement of Debt.

(a)    Original Borrower and New Borrower confirm and acknowledge that the outstanding principal balance under the Note immediately prior to the Effective Date is $4,592,159.03, and the balances of all reserve and escrow accounts required under the Loan Documents are set forth on **Schedule 1**, attached hereto and made a part hereof. In the event of any error in, or omission from, the foregoing, Lender shall not be prejudiced, limited, or estopped, in any way in its right to charge, collect and receive any and all monies lawfully due to Lender under the Loan Documents. New Borrower declares and acknowledges, for the specific reliance and benefit of Lender, that (i) New Borrower has no right, claim, defense or right of offset of any kind or in any amount with respect to the Note, the Security Instrument or any of the other Loan Documents, and (ii) no amounts paid by New Borrower or Original Borrower to Lender pursuant to or in connection with the execution and delivery of this Agreement shall be applied to or set off against the principal balance of the Note.

(b)    The parties acknowledge and agree that Lender shall continue to hold the balances in escrow and reserve accounts, if any, in accordance with the terms of the Loan Documents. Original Borrower and Original Guarantor covenant and agree that Lender has no further duty or obligation of any nature to Original Borrower or Original Guarantor relating to such escrow and/or reserve balances, all of which Original Borrower does hereby assign, transfer and convey to New Borrower. All escrow and reserve balances held by Lender in connection with the Loan Documents shall, from and after the Effective Date, be for the account of New Borrower. New Borrower hereby pledges, assigns and grants a security interest to Lender, as security for payment of all sums due under the Loan Documents and the performance of all other terms, conditions and covenants of the Loan Documents to be paid and performed by New Borrower, in all of New Borrower's right, title and interest in and to each of the escrow and reserve accounts established pursuant to the terms of the Loan Documents and all sums now or hereafter deposited therein.

2. Conditions Precedent; Consent to Transfer.

(a)    Original Borrower represents and warrants to Lender as of the Effective Date that Original Borrower has satisfied all requirements in connection with the assumption of the Loan set forth in the Original Borrower's Loan Documents and in that certain conditional approval letter issued by Lender to, and acknowledged by, Original Borrower in connection with the Transactions.

(b)    In reliance upon the representations, warranties and covenants set forth herein by Original Borrower, Original Guarantor, New Borrower and New Guarantor, Lender hereby consents to the Transactions and waives its right to accelerate the Loan pursuant to any provision of the Original Borrower's Loan Documents which might otherwise provide such right to Lender solely on account of such Transactions. Lender's consent to the Transactions is not intended to be and shall not be construed as a consent to any subsequent transfer or assumption which requires Lender's consent pursuant to the terms of the Security Instrument or any other Loan Document.

5

3.  Assumption of Obligations; Grant of Security Interest.

(a)  As of the Effective Date, Original Borrower does hereby assign, transfer and convey to New Borrower all of its right, title and interest in and to the Loan Documents, and New Borrower hereby unconditionally assumes the Loan Documents and agrees to comply with all covenants and obligations therein, including, without limitation, the obligation to pay the unpaid balance due and owing on the Loan and all interest thereon. Without limiting the foregoing, New Borrower agrees to keep and observe all of the covenants, terms and conditions required to be kept, observed and performed pursuant to the Note, the Security Instrument and all of the other Loan Documents, to the same effect as if New Borrower was the original maker of, and a party to, the Loan Documents including, but not limited to, payment of all sums presently outstanding under the Note. New Borrower hereby adopts, ratifies and confirms as of the Effective Date all of the representations, warranties and covenants of Original Borrower contained in the Loan Documents.

(b)  New Borrower hereby grants to Lender a security interest in its respective right, title and interest in, to, and under the Property. New Borrower hereby authorizes Lender to file any and all UCC financing statements and UCC financing statement amendments as Lender may deem necessary from time to time, including, without limitation, financing statements containing the description "all assets of Debtor" or "all personal property of Debtor" or similar language.

4.  Limited Release of Original Borrower and Original Guarantor; Reaffirmation.

(a)  In reliance upon the representations, warranties and covenants set forth herein by Original Borrower, Original Guarantor, New Borrower and New Guarantor, Lender hereby releases: (i) Original Borrower from any liability for repayment of the principal and interest under the terms of the Note, the Security Instrument and the other Original Borrower's Loan Documents, and other obligations under the Original Borrower's Loan Documents, to the extent such obligations arise from matters not otherwise caused by it (or them) first occurring from and after the Effective Date; and (ii) Original Guarantor from any liability under the Original Guaranty to the extent arising from matters not otherwise caused by it (or them) first occurring from and after the Effective Date; provided, however, that neither Original Borrower nor Original Guarantor are hereby released from (A) any environmental or other damage to the Property occurring prior to the Effective Date, (B) any obligations of Original Borrower arising from the Purchase Agreement, (C) any liability related to or arising from Original Borrower's or Original Guarantor's acts or omissions occurring prior to the Effective Date, and (D) any liability related to or arising from fraudulent or tortious conduct by Original Borrower or Original Guarantor, including intentional misrepresentation of financial data presented to Lender (the foregoing (A) through (D) being referred to herein as the "**Retained Obligations**"). Lender hereby reserves all rights it may have against Original Borrower and Original Guarantor for acts, omissions or events occurring prior to the Effective Date and the other Retained Obligations.

(b)  The release of Original Borrower and Original Guarantor provided for in Section 4(a) above shall be deemed withdrawn and shall have no effect to the extent that

6

**EXHIBIT 4**

this Agreement is held to be void or is determined to be unenforceable by any court in a final non-appealable order as a result of any action or inaction by or on behalf of Original Borrower or Original Guarantor, or if any representation or warranty by Original Borrower or Original Guarantor made in connection with this Agreement is false or misleading in any material respect when made. In all cases, Original Borrower and Original Guarantor, as applicable, shall bear the burden of proof on the issue of the time at which an act or event first occurred or an obligation first arose which is the subject of claimed liability under any of the Loan Documents.

(c)     Notwithstanding anything to the contrary contained herein, and subject to the release contained in <u>Section 4(a)</u> hereof, Original Borrower and Original Guarantor do hereby ratify and confirm (i) their respective obligations under the Original Borrower's Loan Documents to the extent arising or resulting from acts, omissions or events occurring prior to the Effective Date, and (ii) the truth and accuracy of all representations and warranties in the Original Borrower's Loan Documents, in all material respects, as if made on the Effective Date.

5.     <u>Representations.</u>

(a)     As a material inducement to Lender to enter into this Agreement and to consent to the Transactions, each of New Borrower and New Guarantor, jointly and severally, represents, warrants and covenants to Argentic and Lender as of the Effective Date as follows, with the understanding and intention that Lender has relied on such representations, warranties and covenants for such purposes:

(i)     New Borrower is duly organized, validly existing and in good standing under the laws of its state of formation or organization, is duly qualified, authorized to conduct business and in good standing under the laws of the state in which the Property is located, and has full power and authority to own, lease and operate the Property, and to conduct its affairs as now being conducted and as proposed to be conducted.

(ii)     New Guarantor has full legal capacity to conduct his affairs as now being conducted and as proposed to be conducted.

(iii)     Each of New Borrower and New Guarantor has full power and authority to execute and deliver this Agreement and the other Loan Documents contemplated herein to which it is a party and to perform its respective obligations hereunder and thereunder, and such execution, delivery and performance (A) have been duly and validly authorized by all necessary actions on the part of New Borrower and New Guarantor, (B) do not conflict with or result in a violation of New Borrower's organizational documents or any judgment, order or decree of any court or arbiter in any proceeding to which New Borrower or New Guarantor is a party, and (C) do not conflict with, or constitute a material breach of, or constitute a material default under, any contract, agreement or other instrument by which New Borrower or New Guarantor is bound or to which New Borrower or New Guarantor is a party.

7

**EXHIBIT 4**

(iv)    Any court or third-party consents and/or approvals necessary for New Borrower or New Guarantor to enter into this Agreement and the other New Loan Documents and to consummate the Transactions and the other transactions contemplated hereby and thereby have been obtained and remain in full force and effect.

(v)    The entities and/or persons, as applicable, executing and delivering this Agreement and the other New Loan Documents on behalf of New Borrower are duly authorized to so execute and deliver this Agreement and such other New Loan Documents on behalf of New Borrower.

(vi)    Each of New Borrower and New Guarantor have duly executed and delivered this Agreement and the other New Loan Documents executed in connection herewith. This Agreement and the other Loan Documents constitute legal, valid and binding obligations of New Borrower and New Guarantor, enforceable against New Borrower and New Guarantor in accordance with their respective terms, subject to bankruptcy, insolvency and other similar laws affecting the rights of creditors generally.

(vii)    New Borrower and New Guarantor have received and reviewed copies of all of the Loan Documents.

(viii)    There is no seller financing in connection with the Transactions and no equity interest in New Borrower has been pledged, hypothecated or otherwise encumbered as security for any obligation, and none of the capital contributed to New Borrower was made in the form of a loan.

(ix)    There is no litigation or other proceeding against New Borrower or New Guarantor pending or overtly threatened by written communication, wherein an unfavorable decision might reasonably result in a material adverse change in the financial condition of New Borrower or New Guarantor or their ability to legally perform their respective obligations under this Agreement and the other Loan Documents.

(x)    There is no bankruptcy, receivership or insolvency proceeding pending or threatened against New Borrower or New Guarantor.

(xi)    No proceeding is pending for the dissolution or annulment of New Borrower or, if applicable, New Guarantor, and all license, income and franchise taxes due and payable by New Borrower and, if applicable, New Guarantor have been paid in full.

(xii)    New Borrower and New Guarantor have not taken, and have no future intention to take within the 180 days following the Effective Date, any of the following actions: (i) seek entry of any order for relief as debtor and a

8

**EXHIBIT 4**

proceeding under the any Chapter of the Bankruptcy Code, Title 11, U.S.C.A. ("**Bankruptcy Code**"), (ii) seek consent to or not contest the appointment of a receiver or trustee for itself or for all or any part of its property, (iii) file a petition seeking relief under any bankruptcy, arrangement, reorganization or other debtor relief laws, (iv) make a general assignment for the benefit of its creditors, (v) directly or indirectly cause any involuntary petition under any Chapter of the Bankruptcy Code to be filed against New Borrower, New Guarantor or any partners, members, managers, directors, officers or shareholders thereof, or (vi) directly or indirectly cause the Property or any portion or any interest of New Borrower in the Property to become the property of any bankrupt estate or the subject of any proceeding under the Bankruptcy Code.

(xiii)    There is no existing Event of Default or event or condition that, with the giving of notice or passage of time or both, would constitute an Event of Default.

(xiv)    There is no existing Cash Management Period or event or condition that, with the giving of notice or passage of time or both, would constitute the commencement of a Cash Management Period.

(xv)    Neither New Borrower nor New Guarantor has obtained any tenant estoppel certificates from the tenants located at the Property or any third-party reports with respect to the Property that have not been delivered to Lender.

(xvi)    The organizational chart attached hereto as **Schedule 2** is a true and correct representation of New Borrower's ownership structure.

(xvii)    New Borrower's principal places of business are located in the towns of Denison and Sherman in Grayson County, Texas.

(xviii)    All representations and warranties of New Borrower in the Purchase Agreement are true and correct as of the Effective Date.

(xix)    This Agreement and the execution of other contemplated documents do not constitute the creation of a new debt or the extinguishment of the debt evidenced by the Loan Documents, and they shall not in any way affect or impair the liens and security interests created by the Loan Documents, which each of New Borrower and New Guarantor acknowledges to be valid and existing liens and security interests in the Property. New Borrower and New Guarantor each agrees that the lien and security interests created by the Loan Documents continue to be in full force and effect, unaffected and unimpaired by this Agreement or by the transfer of the Property or any collateral described in financing statements filed in connection with the Loan Documents and that said liens and security interests shall so continue in their perfection and priority until the debt secured by the Loan Documents is fully discharged. New Borrower and

9

**EXHIBIT 4**

New Guarantor have no defenses, affirmative defenses, setoffs, claims, counterclaims, crossclaims or causes of action of any kind or nature whatsoever against Lender, Midland Loan Services, a Division of PNC Bank, N.A. ("**Master Servicer**"), Argentic and any and all other parties appointed and/or serving as servicers of the Loan (together with Master Servicer and Argentic, individually and collectively, "**Servicer**"), all subsidiaries, parents and affiliates of Lender and Servicer and each of the foregoing parties' predecessors in interest, and each and all of their respective past, present and future partners, members, certificateholders, officers, directors, employees, agents, contractors, representatives, participants and heirs and each and all of the successors and assigns of each of the foregoing (collectively, "**Lender Parties**") or with respect to (i) the Loan, (ii) the indebtedness due under the Loan Documents ("**Debt**"), (iii) the Loan Documents, or (iv) the Property. To the extent New Borrower or New Guarantor would be deemed to have any such defenses, affirmative defenses, setoffs, claims, counterclaims, crossclaims or causes of action as of the Effective Date, New Borrower and New Guarantor each knowingly waives and relinquishes them..

(xx)     All representations and warranties made herein shall be true as of the Effective Date and shall survive the closing of the Transactions.

(b)     As a material inducement to Lender to enter into this Agreement and to consent to the Transactions, each of Original Borrower and Original Guarantor, jointly and severally, represents, warrants and covenants to Argentic and Lender as of the Effective Date as follows, with the understanding and intention that Lender has relied on such representations, warranties and covenants for such purposes:

(i)     Original Borrower is duly organized, validly existing and in good standing under the laws of its state of formation or organization, is duly qualified, authorized to conduct business and in good standing under the laws of the state in which the Property is located, and has full power and authority to sell the Property, and to conduct its affairs as now being conducted and as proposed to be conducted.

(ii)     Original Guarantor has full legal capacity to conduct his or her affairs as now being conducted and as proposed to be conducted.

(iii)     Each of Original Borrower and Original Guarantor has full power and authority to execute and deliver this Agreement and the other Loan Documents contemplated herein to which it is a party and to perform its respective obligations hereunder and thereunder, and such execution, delivery and performance (A) have been duly and validly authorized by all necessary actions on the part of Original Borrower and Original Guarantor, (B) do not conflict with or result in a violation of Original Borrower's organizational documents or any judgment, order or decree of any court or arbiter in any proceeding to which Original Borrower or Original Guarantor is a party, and (C) do not conflict with,

East Coast Portfolio Management
Loan Number: 30114473
Assumption Agreement

**EXHIBIT 4**

or constitute a material breach of, or constitute a material default under, any contract, agreement or other instrument by which Original Borrower or Original Guarantor is bound or to which Original Borrower or Original Guarantor is a party.

(iv) Any court or third-party consents and/or approvals necessary for Original Borrower or Original Guarantor to enter into this Agreement and to consummate the Transactions and the other transactions contemplated hereby have been obtained and remain in full force and effect.

(v) The entities and/or persons, as applicable, executing and delivering this Agreement on behalf of Original Borrower are duly authorized to so execute and deliver this Agreement on behalf of Original Borrower.

(vi) This Agreement has been duly executed and delivered by Original Borrower and Original Guarantor and constitutes Original Borrower's and Original Guarantor's legal, valid and binding obligations, enforceable against Original Borrower and Original Guarantor in accordance with its terms, subject to bankruptcy, insolvency and other similar laws affecting the rights of creditors generally.

(vii) Original Borrower has not received a security instrument or security agreement from New Borrower encumbering the Property to secure the payment of any sums due Original Borrower or obligations to be performed by New Borrower.

(viii) The Original Borrower's Loan Documents are in full force and effect.

(ix) Lender has not waived any requirements of the Original Borrower's Loan Documents nor any of Lender's rights thereunder.

(x) Original Borrower and Original Guarantor have not taken, and have no intention to take within the 180 days following the Effective Date, any of the following actions: (i) seek entry of any order for relief as debtor and a proceeding under the any Chapter of the Bankruptcy Code, (ii) seek consent to or not contest the appointment of a receiver or trustee for itself or for all or any part of its property, (iii) file a petition seeking relief under any bankruptcy, arrangement, reorganization or other debtor relief laws, (iv) make a general assignment for the benefit of its creditors, (v) directly or indirectly cause any involuntary petition under any Chapter of the Bankruptcy Code to be filed against Original Borrower, Original Guarantor or any partners, members, managers, directors, officers or shareholders thereof, or (vi) directly or indirectly cause the Property or any portion or any interest of Original Borrower in the Property to become the property of any bankrupt estate or the subject of any proceeding under the Bankruptcy Code.

11

(xi)     There is no existing Event of Default or event or condition that, with the giving of notice or passage of time or both, would constitute an Event of Default.

(xii)    There is no existing Cash Management Period or event or condition that, with the giving of notice or passage of time or both, would constitute the commencement of a Cash Management Period.

(xiii)   There are no subordinate liens of any kind covering or relating to the Property, nor are there any mechanics' liens or liens for delinquent taxes or assessments encumbering the Property, nor has notice of a lien or notice of intent to file a lien been received.

(xiv)   There are no pending or, to either Original Borrower's or Original Guarantor's knowledge, threatened condemnation or annexation proceedings affecting the Property, or any agreements to convey any portion of the Property or any rights thereto not disclosed in this Agreement, including, without limitation, to any governmental agency.

(xv)    The certified rent roll (the "**Rent Roll**") for the Property provided to Lender of even date herewith, is a true, complete and accurate list of all tenant leases ("**Tenant Leases**" or, individually, a "**Tenant Lease**") affecting the Property as of the Effective Date hereof.

(xvi)   Original Borrower has not been notified of any landlord default under any of the Tenant Leases. There are no leasing broker's or finder's commissions of any kind due or to become due with respect to the Tenant Leases or the Property. The rents and security deposits under the Tenant Leases shown on the Rent Roll are true and correct. Original Borrower has not received any prepaid rents or given any concessions for free or reduced rent under the Tenant Leases.

(xvii)  Contemporaneously with the execution and delivery hereof, Original Borrower has conveyed and transferred to New Borrower all of Original Borrower's rights, title and interest in and to the following, and Original Borrower has retained no rights therein or thereto: (A) the Property, (B) all Tenant Leases, (C) all rights as named insured under all casualty and liability insurance policies (and all endorsements in connection therewith) relating to the Property (unless, but only to the extent that, New Borrower is obtaining its own such insurance policies), (D) all reciprocal easement agreements, Property-level operating agreements, and declarations of conditions, covenants and restrictions related to the Property, (E) all prepaid rents and security deposits, if any, held by Original Borrower in connection with the Tenant Leases; and (F) all funds, if any, deposited in impound accounts held by or for the benefit of Lender pursuant to the terms of the Loan Documents.

12

**EXHIBIT 4**

(xviii) Original Borrower has no knowledge of any lead-based paint and/or lead-based paint hazards in the Improvements and, except as delivered to Lender in writing, Original Borrower has no reports or records pertaining to any lead-based paint and/or lead-based paint hazards at the Property.

(xix) There is no litigation or other proceeding against Original Borrower, Original Guarantor or the Property pending or overtly threatened by written communication, wherein an unfavorable decision might reasonably result in a material adverse change in the financial condition of either of Original Borrower or Original Guarantor or its ability to legally perform its respective obligations under this Agreement and Original Borrower's Loan Documents.

(xx) There is no bankruptcy, receivership or insolvency proceeding pending or threatened against Original Borrower or Original Guarantor.

(xxi) No proceeding is pending for the dissolution or annulment of Original Borrower and all license, income and franchise taxes due and payable by Original Borrower have been paid in full.

(xxii) To Original Borrower's knowledge, all permits, licenses, franchises or other evidences of authority to use and operate the Property as it is presently being operated and as contemplated by the Loan Documents are current, valid and in full force and effect. Original Borrower has not received any written notice from any governmental entity claiming that Original Borrower or the Property is not presently in compliance with any laws, ordinances, rules and regulations bearing upon the use and operation of the Property, including, without limitation, any notice relating to any violations of zoning, building, environmental, fire, health, or other laws, ordinances, rules, codes or regulations.

(xxiii) All representations and warranties of Original Borrower in the Purchase Agreement are true and correct as of the Effective Date.

(xxiv) Original Borrower has timely and fully completed all Required Repairs and all requirements under the Original Post Closing Agreement and has provided Original Lender or Lender with evidence of such completion and compliance.

(xxv) The Original Borrower's Loan Documents constitute valid and legally binding obligations of Original Borrower and Original Guarantor (as applicable) enforceable against Original Borrower and Original Guarantor in accordance with their terms. Each of Original Borrower and Original Guarantor acknowledges and agrees that nothing in this Agreement, nor Lender's consent to the Transactions, shall release or relieve Original Borrower or Original Guarantor from their respective obligations and liabilities under the Original Borrower's Loan Documents arising prior to the Effective Date. Original Borrower and

13

**EXHIBIT 4**

Original Guarantor have no defenses, setoffs, claims, counterclaims or causes of action of any kind or nature whatsoever against the Lender Parties or with respect to (i) the Loan, (ii) the Loan Documents, (iii) the Debt, or (iv) the Property. To the extent Original Borrower or Original Guarantor would be deemed to have any such defenses, setoffs, claims, counterclaims or causes of action as of the Effective Date, Original Borrower and Original Guarantor knowingly waives and relinquishes them.

(xxvi) All representations and warranties made herein shall be true as of the Effective Date and shall survive the closing of the Transactions.

6. Financial Information. New Borrower and New Guarantor hereby each represents and warrants to Lender that all information and materials regarding New Guarantor, New Borrower and their affiliates provided by or on behalf of New Borrower or New Guarantor to Servicer (a) were true and correct in all material respects as of the date of delivery thereof and remain materially true and correct as of the Effective Date, (b) are sufficiently complete to give Lender accurate knowledge of their subject matter, and (c) do not contain any misrepresentation of a material fact or omission of a material fact which omission makes the provided information misleading. New Borrower and New Guarantor further represent and warrant to Lender that, since the date of the most recent financial statements of New Guarantor, New Borrower and their affiliates provided to Lender, there has been no material adverse change in the financial condition of any of such parties, nor have any assets or properties reflected on such financial statements been sold, transferred, assigned, mortgaged, pledged or encumbered except as previously disclosed in writing by New Borrower and New Guarantor to Lender and approved in writing by Lender.

7. Addresses. Lender, New Borrower and New Guarantor agree that all notice provisions contained in the Loan Documents are hereby modified to amend the notice addresses for Lender, New Borrower and New Guarantor, and that, from and after the Effective Date, the notice addresses for Lender, New Borrower and New Guarantor are as follows:

If to Lender:      Wells Fargo Bank, National Association, as Trustee, on behalf of the Registered Holders of CSAIL 2018-CX11 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2018-CX11
c/o Midland Loan Services
CMBS Surveillance Department
10851 Mastin, Suite 300, Bldg 82
Overland Park, KS 66210
Attn: Asset Manager for CSAIL 2018-CX11/Loan No. 30314473

If to New Borrower:   Apex East Coast LLC
c/o Apex Equity Group LLC
10 Hill Street
Newark, New Jersey 07102
Attn: David Helfgott

14

East Coast Portfolio Management
Loan Number: 30114473
Assumption Agreement

**EXHIBIT 4**

If to New Guarantor:  David Helfgott
c/o Apex Equity Group LLC
10 Hill Street
Newark, New Jersey 07102

8.    Additional Modifications to Loan Documents.  On and subject to the terms and conditions of this Agreement and in strict reliance on the representations, warranties, acknowledgements and covenants set forth in this Agreement, the Loan Documents are hereby modified and amended as set forth on **Schedule 3** attached hereto and incorporated herein by this reference.

9.    Release of Servicer and Lender.   Original Borrower, New Borrower, Original Guarantor and New Guarantor hereby each unconditionally and irrevocably releases and forever discharges Lender and each Servicer (including, without limitation, Argentic and Master Servicer) and their respective successors, assigns, agents, directors, officers, employees, and attorneys (collectively, the "**Indemnitees**") from all Claims, as hereinafter defined, and agrees to indemnify the Indemnitees, hold the Indemnitees harmless, and defend the Indemnitees with counsel reasonably acceptable to the Indemnitees from and against any and all claims, losses, causes of action, costs and expenses of every kind or character in connection with the Claims and/or the transfer of the Property in connection with this Agreement. As used in this Agreement, the term "**Claims**" shall mean any and all possible claims, demands, actions, costs, expenses and liabilities whatsoever, known or unknown, at law or in equity, originating in whole or in part on or before the Effective Date, which Original Borrower, New Borrower, Original Guarantor or New Guarantor or any of their respective directors, partners, principals, affiliates, members, shareholders, officers, agents, employees or successors, may now or hereafter have against the Indemnitees, if any, and irrespective of whether any such Claims arise out of contract, tort, violation of laws, or regulations, or otherwise in connection with the Loan or any of the Loan Documents or the Original Borrower's Loan Documents, including, without limitation, any contracting for, charging, taking, reserving, collecting or receiving interest in excess of the highest lawful rate applicable thereto and any loss, cost or damage, of any kind or character, arising out of or in any way connected with or in any way resulting from the acts, actions or omissions of any of the Indemnitees, including any requirement that the Loan Documents or the Original Borrower's Loan Documents be modified as a condition to the transactions contemplated by this Agreement. Original Borrower, New Borrower, Original Guarantor and New Guarantor agree that Servicer and Lender have no fiduciary or similar obligations to Original Borrower, New Borrower, Original Guarantor or New Guarantor or either of them and that their relationship is strictly that of creditor and debtor. This release is accepted by Servicer and Lender pursuant to this Agreement and shall not be construed as an admission of liability on the part of either of them. Original Borrower, New Borrower, Original Guarantor and New Guarantor each hereby represents and warrants that it is the current legal and beneficial owner of all Claims, if any, and has not assigned, pledged or contracted to assign or pledge any such Claim to any other person.

10.   New Borrower Entity Requirements. New Borrower represents, warrants agrees and covenants to and with Argentic and Lender as follows as of the Effective Date:

15

        (a)     New Borrower is currently a bankruptcy-remote single purpose entity and will take all necessary company action (including, but not limited to, revising and filing charter and control documents in form, substance and structure as may be reasonably required by Lender) in order for the New Borrower to continue as a bankruptcy-remote single purpose entity.

        (b)     New Borrower has not transacted any business in New Borrower's name since its formation. New Borrower is and will continue to be in full compliance with all of its organizational documents and the single purpose entity and separateness requirements of the Loan Documents, and such organizational documents do not conflict with any of such single purpose entity and separateness requirements of the Loan Documents.

        (c)     New Borrower understands that any approval by Lender of any limited liability company operating agreement, partnership agreement, articles of formation or organization, or any other organizational documents of New Borrower, or any amendments thereto, in connection with the Transactions shall not be deemed to constitute a waiver or modification of any term or provision of the Loan Documents (including, without limitation, those restricting or relating to (i) any further sale, transfer, conveyance, mortgage, encumbrance, pledge, assignment, or disposition of any legal or beneficial interest in "Borrower", (ii) separateness or single purpose entity requirements, (iii) the incurring of debt, or (iv) commingling of the assets of "Borrower", except as may otherwise be expressly set forth in this Agreement.

        (d)     New Borrower understands that, notwithstanding the terms of any of the organizational documents of any of New Borrower, any entity New Guarantor or any other entity owning a direct or indirect legal or beneficial interest in New Borrower (collectively, the "**New Borrower Entities**"), relating to the voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, grant of any options with respect to or any other transfer or disposition of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) of a legal or beneficial interest in any of the New Borrower Entities (the foregoing shall be referred to as a "**New Borrower Entity Transfer**"), any such New Borrower Entity Transfer shall be subject to the restrictions set forth in the Loan Documents.

        (e)     Since New Borrower is a single member limited liability company, to the extent that the sole member of New Borrower ("**New Borrower Member**") files a tax return instead of New Borrower, New Borrower will provide Lender with the tax returns for New Borrower Member instead of New Borrower. Similarly, to the extent that the balance sheets and financial statement of New Borrower are consolidated with those of New Borrower Member, the consolidated balance sheets and financial statements will clearly identify the assets and liabilities of New Borrower as belonging to New Borrower and will provide Lender with copies of said consolidated balance sheets and financial statements.

        (f)     Without limiting any covenants set forth in the existing Loan Documents, New Borrower covenants and agrees with Lender that any New Borrower that is a Delaware single member limited liability company shall not have the power to divide pursuant to

16

**EXHIBIT 4**

the Limited Liability Company Act of the State of Delaware, as amended, and as it may be further amended from time to time, and any successor statutes thereto (the "**Act**") (including, without limitation, Section 18-217 of the Act), and the organizational documents of any such New Borrower shall provide an express acknowledgment that it does not have the power to divide pursuant to the Act (including, without limitation, Section 18-217 of the Act).

11.     CFIUS.  New Borrower hereby represents and warrants to Lender that either (a) New Borrower's ownership of the Property after giving effect to the Transactions is not a Covered Transaction, or (b) New Borrower has obtained CFIUS Approval with respect to the matters described in the foregoing clause (a). During the term of the Loan, New Borrower shall cause the holders of any indirect legal and/or beneficial interests in New Borrower of 10% or more and the holders of any percentage direct legal and/or beneficial interests in New Borrower to (a) within five (5) days of receipt of the same, notify Lender, and provide Lender with a copy of, any inquiry received from CFIUS (as hereinafter defined) or any other governmental authority related to New Borrower's ownership of the Property after giving effect to the Transactions, (b) make any filing requested by CFIUS related to New Borrower's ownership of the Property after giving effect to the Transactions, (c) cooperate with, and fully respond to any inquiries received from, CFIUS or any governmental authority related to CFIUS's review and/or investigation related to New Borrower's ownership of the Property after giving effect to the Transactions, in each case within the time permitted by CFIUS or such governmental authority, as applicable, and (d) subject to the terms and conditions of the Security Instrument, take any mitigation measures requested by CFIUS and/or any Governmental Authority in connection with the CFIUS Review.

For purposes hereof,

"**CFIUS**" shall mean (i) the Committee on Foreign Investment in the United States first established pursuant to Executive Order 11858 of May 7, 1975, and (ii) any replacement or successor thereto, including, without limitation, pursuant to FIRRMA.

"**CFIUS Approval**" shall mean (a) written confirmation provided by CFIUS that each of the Transactions (collectively, the "**Subject Transaction**") is not a Covered Transaction under the DPA, (b) written confirmation provided by CFIUS that it has completed its review or, if applicable, investigation of the matter in question under the DPA, and determined that there are no unresolved national security concerns with respect to the Subject Transaction or (c) CFIUS shall have sent a report to the President of the United States requesting the President's decision under the DPA, and the President shall have announced a decision not to take any action to suspend, prohibit or place any limitations on the Subject Transaction.

"**CFIUS Review**" shall mean CFIUS's review and/or investigation, including any inquiries received from, CFIUS or any governmental authority related to CFIUS's review and/or investigation.

"**Covered Transaction**" shall have the meaning set forth in the DPA.

17

**EXHIBIT 4**

"**DPA**" shall mean the Defense Production Act of 1950, 50 U.S.C. § 4565, as amended by FIRRMA, H. R. 5515-538 (as the same may have been or may hereafter be amended, restated, supplemented or otherwise modified), all laws and regulations related thereto and all mandates, requirements, powers and similar requirements imposed or exercised thereunder (including, without limitation, any of the foregoing implemented by and/or otherwise relating to CFIUS), as the foregoing may be amended from time to time, any successor statute or statutes and all rules and regulations from time to time promulgated in connection with the foregoing.

"**FIRRMA**" shall mean the Foreign Investment Risk Review Modernization Act of 2018.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or authority of any nature whatsoever or any governmental unit (federal, state, county, district, municipal, city, foreign or otherwise) whether now or hereafter in existence.

12.     Compliance with Anti-Terrorism Orders.   New Borrower covenants and agrees with Lender as follows:

(a)     New Borrower will not permit the transfer of any interest in New Borrower to any person or entity who is listed on the Lists (as hereinafter defined) or whose beneficial owners are listed on the specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Asset Control, Department of the Treasury ("**OFAC**") pursuant to Executive Order No. 13224, 66 Fed. Reg. 49079 (September 25, 2001) and/or any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Executive Orders (such lists are collectively referred to as the "**Lists**").

(b)     New Borrower will not knowingly enter into a Lease with any party who is either (i) listed on the Lists or (ii) engaged in illegal activities.

(c)     New Borrower shall immediately notify Lender if it becomes known to New Borrower that any member or beneficial owner of New Borrower is listed on the Lists or (i) is indicted of, or (ii) arraigned and held over on charges involving money laundering or predicate crimes to money laundering.

(d)     New Borrower shall immediately notify Lender if it becomes known to New Borrower that any tenant at the Property is listed on the Lists or (i) is convicted on, (ii) pleads nolo contendere to, (iii) is indicted on or (iv) is arraigned and held over on charges involving money laundering or predicate crimes to money laundering.

(e)     If and to the extent that any of the other Loan Documents contain any anti-terrorism provisions or similar provisions, this Section 12 shall not be deemed to limit any such provisions but shall be in addition thereto.

13.     Anti-Money Laundering Provisions.

18

**EXHIBIT 4**

(a) New Borrower and New Guarantor hereby warrant and represent to Lender that no Covered Entity (as hereinafter defined) is a Sanctioned Person (as hereinafter defined), and that no Covered Entity, either in its own right or through any third party, (i) has any of its assets in a Sanctioned Country (as hereinafter defined) or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law (as hereinafter defined); (ii) does business in or with, or derives any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; or (iii) engages in any dealings or transactions prohibited by any Anti-Terrorism Law.

(b) New Borrower and New Guarantor hereby covenant and agree with Lender that no Covered Entity will become a Sanctioned Person, and that no Covered Entity, either in its own right or through any third party, will (i) have any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (ii) do business in or with, or derive any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; (iii) engage in any dealings or transactions prohibited by any Anti-Terrorism Law; or (iv) use the Advances (as hereinafter defined) to fund any operations in, finance any investments or activities in, or, make any payments to, a Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law. New Borrower and New Guarantor hereby further covenant and agree with Lender that the funds used to repay the Debt will not be derived from any unlawful activity, and that each Covered Entity shall comply with all Anti-Terrorism Laws. New Borrower covenants and agrees with Lender that New Borrower shall promptly notify Lender in writing upon the occurrence of a Reportable Compliance Event (as hereinafter defined).

(c) It shall be an Event of Default under the Loan Documents if (i) any representation or warranty contained in Section 13(a) above is or becomes false or misleading at any time, or (ii) any covenant or agreement contained in Section 13(b) above is breached by New Borrower or New Guarantor, and, notwithstanding any provision to the contrary contained in any of the other Loan Documents, none of New Borrower or New Guarantor shall be entitled to (x) any notice of any such false or misleading warranty or representation or of any breach of any such covenant or agreement, or (y) any grace period or any cure right with respect to any such false or misleading warranty or representation or any such breach of any such covenant or agreement.

(d) If and to the extent that any of the other Loan Documents contain any anti-money laundering provisions or similar provisions, this Section 13 shall not be deemed to limit any such provisions but shall be in addition thereto.

(e) For purposes of this Section 13:

"**Advances**" shall mean any and all disbursement of proceeds of the Loan funded by Lender to or for the benefit of New Borrower in accordance with the terms and conditions set forth in the Loan Documents; provided, that Lender has no further obligation to so disburse any such proceeds.

19

**EXHIBIT 4**

"**Anti-Terrorism Laws**" shall mean any Laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering or bribery, and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws, all as amended, supplemented or replaced from time to time.

"**Collateral**" shall mean all real property and personal property now or hereafter securing the Loan, including, without limitation, the Property.

"**Covered Entity**" shall mean (a) New Borrower, each of New Borrower's subsidiaries, all guarantors under the Loan, and all pledgors of Collateral, and (b) each Person that, directly or indirectly, is in control of a Person described in clause (a) above. For purposes of this definition, control of a Person shall mean the direct or indirect (x) ownership of, or power to vote, twenty-five percent (25%) or more of the issued and outstanding equity interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for such Person, or (y) power to direct or cause the direction of the management and policies of such Person whether by ownership of equity interests, contract or otherwise.

"**Governmental Body**" shall mean any nation or government, any state or other political subdivision thereof or any entity, authority, agency, division or department exercising the executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to a government (including any supra-national bodies such as the European Union or the European Central Bank) and any group or body charged with setting financial accounting or regulatory capital rules or standards (including, without limitation, the Financial Accounting Standards Board, the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing).

"**Law(s)**" shall mean any law(s) (including common law), constitution, statute, treaty, regulation, rule, ordinance, opinion, issued guidance, release, ruling, order, executive order, injunction, writ, decree, bond, judgment, authorization or approval, lien or award of or any settlement arrangement, by agreement, consent or otherwise, with any Governmental Body, foreign or domestic.

"**Reportable Compliance Event**" shall mean that any Covered Entity becomes a Sanctioned Person, is charged by indictment, criminal complaint or similar charging instrument, arraigned, or custodially detained in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or has knowledge of facts or circumstances to the effect that it is reasonably likely that any aspect of its operations is in actual or probable violation of any Anti-Terrorism Law.

20

**EXHIBIT 4**

"**Sanctioned Country**" shall mean a country subject to a sanctions program maintained under any Anti-Terrorism Law.

"**Sanctioned Person**" shall mean any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person, group, regime, entity or thing, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any Anti-Terrorism Law.

14.    Fees. Original Borrower, New Borrower and Lender have agreed that, simultaneously with the execution hereof, all fees, costs, and charges arising in connection with the execution of this Agreement, including without limitation, all reasonable attorneys' fees, title company fees, title insurance premiums, recording costs, assumption and/or transfer fees and other closing costs incurred by Lender in connection with this Agreement, will be paid by Original Borrower and/or New Borrower as of the Effective Date, and that Lender shall have no obligation whatsoever for payment thereof. New Borrower acknowledges and agrees that none of the fees, costs, and charges paid in connection with the execution of this Agreement shall be applied to or set off against the principal balance of the Note.

15.    Taxes; Indemnification.

(a)    Original Borrower, Original Guarantor, New Borrower and New Guarantor represent and acknowledge that, to their knowledge based on reasonable due diligence, certain transfer taxes, deed taxes or similar taxes may be due to one or more taxing authorities (state, county, city or otherwise) in connection with or as a result of the consummation of the Transactions. Original Guarantor and New Guarantor hereby represent, warrant, covenant and agree that they have paid, or are paying simultaneously herewith (or have caused or are causing simultaneously herewith to be paid by a party other than Original Borrower and New Borrower), any and all Taxes (as hereinafter defined) that were due, become due or are ever assessed or imposed or required to be paid under any applicable Legal Requirements, as a result of the Transactions, or any aspect of the Transactions. As used in this Section 15, the term "**Taxes**" shall mean any and all transfer taxes, note or intangibles taxes, documentary stamps, recording taxes, or other fees or taxes of any type or nature whatsoever charged, assessed, imposed or otherwise required to be paid to any taxing authority or other governmental entity in connection with the execution of this Agreement or the Transactions or any aspect of the Transactions, including, without limitation, any interest, penalty, late fee or similar charge imposed thereon.

(b)    New Borrower and New Guarantor, jointly and severally, hereby agree to indemnify, defend and save and hold harmless Lender, its successors and assigns and any purchaser of the Property at a foreclosure sale, deed in lieu of foreclosure or receiver's sale from and against any and all liabilities, judgments, costs, claims, damages, penalties, expenses, losses or charges (including, but not limited to, all legal fees and court costs), which may now or in the future be undertaken, suffered, paid, awarded, assessed or otherwise incurred or payable by Lender, its successors or assigns or any such purchaser as a result of or arising out of any

21

failure of New Guarantor to pay (or to cause to be paid) on or prior to the Effective Date any and all Taxes to any taxing authority or other governmental entity.

(c) Original Borrower and Original Guarantor, jointly and severally, hereby agree to indemnify, defend and save and hold harmless Lender, its successors and assigns and any purchaser of the Property at a foreclosure sale, deed in lieu of foreclosure or receiver's sale from and against any and all liabilities, judgments, costs, claims, damages, penalties, expenses, losses or charges (including, but not limited to, all legal fees and court costs), which may now or in the future be undertaken, suffered, paid, awarded, assessed or otherwise incurred or payable by Lender, its successors or assigns or any such purchaser as a result of or arising out of any failure of Original Guarantor to pay (or to cause to be paid) on or prior to the date of this Agreement any and all Taxes to any taxing authority or other governmental entity.

16. Cash Management Arrangements.

(a) New Borrower agrees and acknowledges that (i) the Deposit Account Agreement is in full force and effect, (ii) all actions have been taken to open any new accounts required thereunder for New Borrower, and (iii) immediately following the Effective Date and at all such times as required under the terms of the Loan Documents, New Borrower shall deliver written notices to all tenants and other parties as set forth in the Deposit Account Agreement and/or the other Loan Documents of the requirements of the Deposit Account Agreement.

(b) Each of Original Borrower and New Borrower acknowledges and agrees that: (i) the restricted lockbox account established prior to the Effective Date pursuant to the terms of the Original Clearing Account Agreement (the "**Original Lockbox Account**") shall be terminated as of last day of the calendar month following the Effective Date (the "**Account Termination Date**"); and (ii) any funds held and/or received in the Original Lockbox Account on or after the Effective Date (including any minimum balance remaining after payment of any fees and charges due under the Original Clearing Account Agreement through the Account Termination Date) will be transferred to the new Lockbox Account established on or about the Effective Date pursuant to the terms of the New DACA. Original Borrower agrees that it shall have no further interest in any funds held or received in the Original Lockbox Account. Original Borrower hereby releases each of Lender and the bank under the Original Clearing Account Agreement from any further responsibility to Original Borrower with respect to the Original Lockbox Account.

17. Intentionally Omitted.

18. Confirmation of Waivers. New Borrower, without limiting the generality of its obligations under the Loan Documents, hereby confirms and ratifies the submission to jurisdiction, waiver of jury trial and other waivers set forth in the Loan Documents.

19. Binding Effect. This Agreement shall be binding upon the parties and their respective heirs, executors, administrators, successors, permitted assigns and representatives.

20. <u>Ratification</u>. Lender and New Borrower hereby ratify and affirm all of the Loan Documents and all of its or the other's, as applicable, respective rights, agreements, obligations, priorities, reservations, promises and waivers as made and agreed and contained therein and as assumed pursuant to this Agreement by New Borrower, all of which shall remain in full force and effect.

21. <u>No Impairment of Lien; No Satisfaction</u>. Nothing set forth herein shall affect the priority or extent of the lien of the Security Instrument or any of the other Loan Documents, nor, except as expressly set forth herein, release or change the liability of any party who may now be or after the Effective Date become liable, primarily or secondarily, under the Loan Documents. This Agreement does not, and shall not be construed to, constitute the creation of new indebtedness or the satisfaction, discharge or extinguishment of the debt secured by the Loan Documents.

22. <u>Third Party Beneficiary Status of Argentic</u>. New Borrower, Original Borrower, Original Guarantor and New Guarantor hereby each acknowledges and agrees that Argentic and its successors and assigns are all intended third party beneficiaries of this Agreement.

23. <u>Environmental Matters</u>. The provisions of Sections 4.19 and 5.7 and clauses (viii) through (xi) of Section 5.18 of the Loan Agreement (collectively, the "<u>Environmental Liabilities</u>") are incorporated herein by reference, and New Borrower hereby makes such representations, warranties and covenants contained in the Environmental Liabilities as if it were the original party to the Loan Agreement making such representations, warranties and covenants.

24. <u>Miscellaneous</u>.

(a) <u>Choice of Law</u>. This Agreement shall be governed and construed in accordance with the terms of Section 10.6 of the Loan Agreement.

(b) <u>Severability</u>. This Agreement is intended to be performed in accordance with and only to the extent permitted by applicable law. If any provisions of this Agreement or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

(c) <u>Modifications</u>. No change or modification of this Agreement shall be valid unless the same is in writing and signed by all parties hereto.

(d) <u>Complete Agreement</u>. This Agreement and the Loan Documents represent the complete agreement among the parties with regard to the items set forth herein, and there are no representations, covenants, warranties, agreements or conditions, oral or written, between the parties not set forth in this Agreement and the Loan Documents.

23

**EXHIBIT 4**

(e)   **Headings.** Section, paragraph or other headings contained in this Agreement are for reference purposes only and are not intended to affect in any way the meaning or interpretation of this Agreement.

(f)   **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when taken together shall be deemed an original constituting one and the same document.

(g)   **Joint and Several Liability.** If New Borrower consists of more than one person or entity, each is jointly and severally liable to perform the obligations of New Borrower hereunder, and all representations, warranties, covenants and agreements made by New Borrower are joint and several.

25.   **Supremacy Clause.** It is hereby agreed that the terms and conditions of the Security Instrument, the Note and other Loan Documents, as modified by this Agreement, shall remain in full force and effect and shall be binding upon New Borrower. It is understood and agreed that in the event there are any conflicting or omitted provisions or variations between the terms, conditions, rights, or remedies in the Security Instrument, the Note or any other Loan Document (other than this Agreement) and the terms of this Agreement, those terms, conditions, rights or remedies which are most favorable to Lender shall remain in full force and effect and shall prevail. A default under the terms and conditions of this Agreement shall constitute a default under the terms and conditions of the Security Instrument, the Note and other Loan Documents.

26.   **Waiver of Trial by Jury.** ORIGINAL BORROWER, NEW BORROWER, ORIGINAL GUARANTOR AND NEW GUARANTOR HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER IN CONTRACT, TORT OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO THE LOAN, THE APPLICATION FOR THE LOAN, THE NOTE, THE LOAN DOCUMENTS OR ANY ACTS OR OMISSIONS OF LENDER, ITS OFFICERS, EMPLOYEES, DIRECTORS OR AGENTS IN CONNECTION THEREWITH.

27.   **No Representations of Lender; Third Party Reports.** The parties hereto agree that (a) Lender has made no representations or warranties, either express or implied regarding Original Borrower, New Borrower, any guarantor, the Loan, the Loan Documents or the Property and has no responsibility whatsoever with respect to the Property, including, without limitation, its value, its condition, or its use, occupancy or status, and (b) no claims relating to the Property, including, without limitation, its value, its condition, or its use, occupancy or status, will be asserted against Lender or its agents, employees, professional consultants, affiliated entities, successors or assigns, either affirmatively or as a defense. In addition, notwithstanding any delivery or notice to Lender, Servicer or their respective legal counsel of updated or new surveys, property inspection reports, zoning reports, environmental reports, tax reports, or any other diligence materials or information relating to the Property or any Person, the parties hereto agree that (i) in no event shall such delivery, or any review of any such materials by Lender, Servicer or their respective legal counsel, be deemed to constitute a

24

**EXHIBIT 4**

waiver or modification of any term or provision of the Loan Documents, and (ii) without limitation, any reference in the Loan Documents to environmental reports or similar reports, assessments, or similar materials shall not be deemed to include any new or updated environmental reports, assessments, or similar materials obtained or delivered in connection with the Transactions.

        28.    <u>Further Assurances</u>. At its own expense, each of Original Borrower, Original Guarantor, New Borrower and New Guarantor shall cooperate with Lender and shall execute and deliver, or cause to be executed and delivered, all such other documents and instruments, and shall take all such other action that Lender may request from time to time in order to accomplish and satisfy the provisions and purposes of this Agreement, including such confirmations and/or corrective instruments as Lender reasonably may require.

<p align="center">[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]</p>

East Coast Portfolio Management
Loan Number: 30114471
Assumption Agreement

<p align="center"><b>EXHIBIT 4</b></p>

**IN WITNESS WHEREOF**, the parties hereto have executed this Assumption Agreement as of Effective Date.

**ORIGINAL BORROWER:**  
**SOUTH GATE APARTMENTS, LLC,** a Texas limited liability company

By: _____

Name: Mendi Salijeski

Title: Manager

STATE OF _Texas_ )

                     ) SS:

COUNTY OF _Grayson_ )

On this the __22__ day of __Oct_____, 2020, on this day personally appeared Mendi Salijeski, known to me to be the person whose name is subscribed to the foregoing instrument as the Manager of SOUTH GATE APARTMENTS, LLC, a Texas limited liability company, and acknowledged to me that he executed the same on behalf of said limited liability company, for the purposes and consideration therein expressed, as the act and deed of said limited liability company.

WITNESS my hand and seal the day and year aforesaid.

_____

Printed Name: _Ronnie L. Hall_

My Commission Expires: _02-23-21_

(SEAL)

RONNIE L HALL
NOTARY PUBLIC
ID# 7303385
State of Texas
Comm. Exp. 02-23-2021

**[Signatures continue on next page]**

**EXHIBIT 4**

NEW BORROWER:

APEX SOUTH GATE LLC, a Delaware limited liability company

By: APEX SHERMAN TX LP, a Texas limited partnership, its Sole Member

By: _____

Name: David Helfgott

Title: General Partner

STATE OF *New Jersey* )

                         ) SS:

COUNTY OF *Essex* )

     On this the *26th* day of *October*, 2020, on this day personally appeared David Helfgott, known to me to be the person whose name is subscribed to the foregoing instrument as the General Partner of APEX SHERMAN TX LP, a Texas limited partnership, the Sole Member of APEX SOUTH GATE LLC, a Delaware limited liability company, and acknowledged to me that he executed the same on behalf of each of the said entities, for the purposes and consideration therein expressed, as the act and deed of each of the said entities.

     WITNESS my hand and seal the day and year aforesaid.

Printed Name: *Jawana Johnson*

My Commission Expires:

(SEAL)

> JAWANA JOHNSON
> NOTARY PUBLIC OF NEW JERSEY
> My Commission Expires 1/16/2025

[Signatures continue on next page]

South Gate Apartments
Loan Number: 30114467
Assumption Agreement

**EXHIBIT 4**

LENDER:

WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE REGISTERED HOLDERS OF CSAIL 2018-CX11 COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2018-CX11

By: Argentic Services Company LP, not individually but solely in its authorized capacity as special servicer

By: _____
Bruce Rickert
Authorized Person

By: _____
Andrew Hundertmark
Authorized Person

STATE OF __Texas__ )
)  SS:
COUNTY OF __Dallas__ )

On this the __27th__ day of __October__, 2020, on this day personally appeared __Bruce Rickert__, known to me to be the person whose name is subscribed to the foregoing instrument as an Authorized Person of Argentic Services Company LP, the Special Servicer of WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE REGISTERED HOLDERS OF CSAIL 2018-CX11 COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2018-CX11, and acknowledged to me that he executed the same on behalf of each of the said entities, for the purposes and consideration therein expressed, as the act and deed of each of the said entities.

WITNESS my hand and seal the day and year aforesaid.

_____
Printed Name: __Susie L Smith__

My Commission Expires: __5|11|24__

SUSIE L SMITH
Notary Public
STATE OF TEXAS
ID#6453508
My Comm. Exp. May 11, 2024

[Signatures continue on next page]

South Gate Apartments
Loan Number: 30114467
Assumption Agreement

EXHIBIT 4

LENDER:

WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE REGISTERED HOLDERS OF CSAIL 2018-CX11 COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2018-CX11

By: Argentic Services Company LP, not individually but solely in its authorized capacity as special servicer

By: _____
     Bruce Rickeri
     Authorized Person

By: _____
     Andrew Hundertmark
     Authorized Person

STATE OF _Maryland_ )
                  ) SS:
COUNTY OF _Baltimore_ )

On this the __28__ day of __October__, 2020, on this day personally appeared _ANDREW JOHN HUNDERTMARK_ known to me to be the person whose name is subscribed to the foregoing instrument as an Authorized Person of Argentic Services Company LP, the Special Servicer of WELLS FARGO BANK, NATIONAL ASSOCIATION, AS TRUSTEE, ON BEHALF OF THE REGISTERED HOLDERS OF CSAIL 2018-CX11 COMMERCIAL MORTGAGE TRUST, COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2018-CX11, and acknowledged to me that he executed the same on behalf of each of the said entities, for the purposes and consideration therein expressed, as the act and deed of each of the said entities.

WITNESS my hand and seal the day and year aforesaid.

Victoria M. Hu
NOTARY PUBLIC MARYLAND
Baltimore County
Commission Expires: 8/12/2023

Printed Name: _Victoria M. Hu_

My Commission Expires: _08/12/2023_

[Signatures continue on next page]

South Gate Apartments
Loan Number: 30114467
Assumption Agreement

**EXHIBIT 4**

**ORIGINAL GUARANTOR:**

Name:  MENDI  SALIJESKI,  an  individual resident of the state of Texas

Name: FIKRIJE SHEMO, an individual resident of the state of Texas

STATE OF _Texas_ )
)  SS:
COUNTY OF _Grayson_ )

    On this the ___22___ day of ___OCT___, 2020, on this day personally appeared MENDI SALIJESKI and FIKRIJE SHEMO, known to me to be the persons whose names are subscribed to the foregoing instrument, and acknowledged to me that each executed the same for the purposes and consideration therein expressed as his own act and deed.

    WITNESS my hand and seal the day and year aforesaid.

Printed Name: ___RONNIE L HALL___

My Commission Expires: ___02-23-21___

(SEAL)

RONNIE L HALL
NOTARY PUBLIC
ID# 7303385
State of Texas
Comm. Exp. 02-23-2021

**[Signatures continue on next page]**

South Gate Apartments
Loan Number: 30114467
Assumption Agreement

**EXHIBIT 4**

**NEW GUARANTOR:**

Name: DAVID HELFGOTT, an individual resident of the state of New ~~Jersey~~ York

STATE OF New Jersey )
                           )  SS:
COUNTY OF Essex      )

On this the 26th day of October, 2020, on this day personally appeared DAVID HELFGOTT, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed as his own act and deed.

WITNESS my hand and seal the day and year aforesaid.

Printed Name: Jawana Johnson

My Commission Expires:

JAWANA JOHNSON
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 1/16/2025

(SEAL)

South Gate Apartments
Loan Number: 30114467
Assumption Agreement

**EXHIBIT 4**

## SCHEDULE 1

### RESERVE BALANCES

Immediately prior to the Effective Date:

| | |
|---|---|
| Real Estate Taxes Escrow Balance: | $61,991.76 |
| Hazard Insurance Escrow Balance: | $41,585.32 |
| Required Repairs Escrow Balance: | $938.87 |
| Capital Expense Escrow Balance: | $19,751.56 |
| Total Escrow; | $124,267.51 |

## SCHEDULE 2

## NEW BORROWER'S ORGANIZATIONAL STRUCTURE CHART

(on following page)

EXHIBIT 4



## SCHEDULE 3

## LOAN DOCUMENT MODIFICATIONS

Notwithstanding anything to the contrary contained in the existing Loan Documents, effective as of the Effective Date and for so long as New Borrower is the "borrower" obligated under the terms of the Loan Documents, the Loan Documents are hereby modified and amended as follows:

      (a)    All Loan Documents:

          (i)    All references to the terms "Borrower," "Grantor", "Trustor" and "Mortgagor" or similar terms in each of the Loan Documents shall mean and refer to Apex South Gate LLC, a Delaware limited liability company.

          (ii)    All references to the terms "Lender", "Indemnitee", "Beneficiary" or "Mortgagee" or similar terms in each of the Loan Documents shall mean and refer to Wells Fargo Bank, National Association, as Trustee, on behalf of the Registered Holders of CSAIL 2018-CX11 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2018-CX11, together with its successors and assigns.

          (iii)    All references (if any) to "'Guarantor" in each of the Loan Documents shall jointly and severally and individually and/or collectively, as the context may require, mean and refer to David Helfgott, an individual.

          (iv)    All references (if any) to "Guaranty" or "Recourse Guaranty" in each of the Loan Documents shall mean that certain Guaranty of Recourse Obligations dated the Assumption Effective Date made by Guarantor in favor of Lender.

      (b)    Loan Agreement:

          (i)    The following definitions are added to Section 1.1.1 of the Loan Agreement in their proper alphabetical order:

          "*Assumption Agreement*": that certain Assumption Agreement entered into as of the Effective Date (as such term is defined in the Assumption Agreement) between Lender, Original Borrower (as such term is defined therein), New Borrower (as such term is defined therein), Original Guarantor (as such term is defined therein) and New Guarantor (as such term is defined therein).

          "*Assumption Effective Date*": the Effective Date as such term is defined in the Assumption Agreement.

          (ii)    The following definitions in Section 1.1.1 of the Loan Agreement are modified to read as follows:

South Gate Apartments
Loan Number: 30114467
Assumption Agreement

**EXHIBIT 4**

"*Clearing Account Agreement*": that certain Deposit Account Control Agreement (Soft Lockbox) dated as of the Effective Date, between Lender, Borrower and Clearing Bank, as the same may be amended, restated, replaced, supplemented or otherwise modified in accordance with the terms thereof, setting forth Borrower's, Clearing Bank's and Manager's obligations relating to the establishment of the Clearing Account, the direct deposit by Tenants of all Rents to the Clearing Account.

"*Clearing Bank*" shall mean Wells Fargo Bank, N.A., a national banking association, or such other bank as may be selected by Lender to maintain the Clearing Account. Lender may in its discretion change the Clearing Bank from time to time.

"*Deposit Account Agreement*": that certain Deposit Account Agreement dated as of January 31, 2018 between Lender, Borrower and Deposit Bank named therein, as modified by the Amendment to Deposit Account Agreement dated as of the Effective Date, between Lender, Borrower and Deposit Bank named therein, as the same may be further amended, restated, replaced, supplemented or otherwise modified in accordance with the terms thereof, establishing the Deposit Account and setting forth the parties' obligations relating to the funds transferred from the Clearing Account pursuant to the provisions of this Agreement.

"*Deposit Bank*": shall mean PNC Bank, National Association, a national banking association, or such other bank as may be selected by Lender to maintain the Deposit Account. Lender may in its discretion change the Deposit Bank from time to time.

"*Guarantor*": David Helfgott, an individual.

"*Key Principals*" or "*Key Principal*": David Helfgott, an individual.

"*Manager*": Aloft MGT LLC, a New York limited liability company.

(ii)     Section 5.13 is replaced in its entirety with the following:

"**5.13   Special Delaware Law Covenants**.

(a)     Borrower will continuously maintain its existence and shall not dissolve or divide or permit its dissolution or division;

(b)     Except upon the express prior written consent of Lender, which consent may be withheld or conditioned in Lender's sole and absolute judgment and discretion, Borrower shall not dissolve, divide or terminate (and waives its right to consent to the dissolution, division or termination of itself) and shall not

take any action towards that end, or otherwise dispose of all or substantially all of its assets or change its legal structure;

(c)    Borrower shall not have the power to divide pursuant to the Act (including, without limitation, Section 18-217 of the Act) and the organizational documents of any such Borrower shall provide an express acknowledgment that it does not have the power to divide pursuant to the Act (including, without limitation, Section 18-217 of the Act); and

(d)    Borrower shall not change (or permit to be changed, and Borrower shall cause not to be changed) Borrower's (i) name, (ii) identity (including its trade name or names), (iii) principal place of business set forth in this Agreement or (d) limited liability company structure, without notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, without limitation of any other term or provision set forth in this Agreement or the other Loan Documents, in the case of a change in Borrower's structure (including, without limitation, a "Division" pursuant to the Act (including, without limitation, Section 18-217 of the Act)), without first obtaining the prior written consent of Lender, which consent may be withheld or conditioned in Lender's sole and absolute judgment and discretion."

(iii)    The organizational chart attached to this Agreement as Schedule 2 shall replace and be substituted for the organizational chart attached to the Loan Agreement as Schedule 3.

**EXHIBIT 4**

# EXHIBIT A

## LEGAL DESCRIPTION

TRACT ONE: TERRACE APARTMENTS

Being Lot 1, Block 2 of the Replat of a portion of Westwood Sixth Addition, an addition of the City of Sherman, Grayson County, Texas according to the plat thereof recorded in Volume 3, Page 31, Plat Records, Grayson County, Texas and being more particularly described as follows:

Being at a 1/2" iron rod set at the intersection of the north R.O.W. of Archer Drive (60' R.O.W.) with the west R.O.W. of Shields Drive (50' R.O.W.);

Thence North 82° 00' 00" West along the north RO.W. of Archer Drive a distance of 139.92 feet to a 1/2" iron rod found for corner, said point being the southeast corner of Lot 2 of said Replat of Westwood Sixth Addition;

Thence North 07° 55' 55" East along the east line of Lot 2, a distance of 119.80 feet to a 1/2" iron rod found for the beginning of a curve to the left with radius of 1053.06 feet and central angle of 05° 26' 10";

Thence northerly along said curve to the left and the east line of Lot 2 an arc distance of 99.91 feet to a 1/2" iron rod found for corner, said point being the southwest corner of Lot 4 of said Replat of Westwood Sixth Addition;

Thence South 81 ° 59' 38" East along the south line of Lot 4 a distance of 140.56 feet to a 1/2" iron rod found for corner, said point being in the west R.O.W. of Shields Drive;

Thence southerly along the west R.O.W. of Shields Drive in a curve to the right with radius of 1193.06 feet and central angle of 04° 47' 10" an arc distance of 99.66 feet to a 1/2" iron rod found for corner;

Thence South 07° 56' 40" West continuing along the west R.O.W. of Shields Drive a distance of 120.00 feet to the Place of Beginning and containing 30.756 feet or 0.71 acre of land.

TRACT TWO: SOUTHGATE APARTMENTS

Being a tract of land out of the SAMUEL BLAGG SURVEY, Abstract No. 56, City of Sherman, Grayson County, Texas and being the same 1.6370 acre tract of land conveyed to Vernon B. Mullins by Substitute Trustee's Deed dated recorded in Volume 2001, Page 217, Real Property Records, Grayson County, Texas, and being more particularly described as follows:

BEGINNING at a 1" iron pipe found at the intersection of the east R.O.W. of Travis Street (50' R.O.W.) with the North R.O.W. of Spring Street (50' R.O.W.);

THENCE North 16° 00' 00" West along the east R.O.W. of Travis Street a distance of 239.63 feet to a nail in washer found for corner, said point being at the intersection of the east R.O.W. of Travis Street with the south line of a 10 foot alley;

THENCE North 74° 08' 44" East along the south line of said 10 foot alley a distance of 298.55 feet to a nail in washer for corner, said point being the intersection of the south line of said 10 foot alley with the west R.O.W. of Walnut Street (50' R.O.W.);

South Gate Apartments
Loan Number: 30144467
Assumption Agreement

**EXHIBIT 4**

THENCE South 16° 03' 16" East along the west R.O.W. of Walnut Street a distance of 237.65 feet to a 1" iron rod found for corner, said point bieng the intersection of the west R.O.W. of Walnut Street with the north R.O.W. of Spring Street;

THENCE South 73° 46' 00" West along the north R.O.W. of Spring Street, a distance of 298.78 feet to the Place of Beginning and containing 71,272 square feet or 1.64 acres of land.

TRACT THREE: WESTWOOD GARDENS APARTMENTS

Being all of Lots 1 and 2 in Block 1 of the Replat of Lots 1,2, 3,18,19, 20 & 21 of Block 1, Lots 1,2, 3, 4, 27, 28, & 29 in Block 2 and Lots 1,2 & 3 in Block 3 of the Westwood Sixth Addition, an addition to the City of Sherman, Grayson County, Texas according to the plat thereof recorded in Volume 3, Page 31 of the Plat Records of Grayson County, Texas, and containing 61,420 square feet or 1.41 acres of land.

**EXHIBIT 4**

# Holland & Knight

1722 Routh Street, Suite 1500 | Dallas, Texas 75201 | (214) 969-9500
Holland & Knight LLP | www.hklaw.com

MARK WEIBEL
(214) 969-1111
Mark.Weibel@hklaw.com

## NOTICE OF ACCELERATION

January 25, 2023

Apex South Gate LLC                          *VIA FEDEX NO. 771121014661*
c/o Apex Equity Group LLC              *AND VIA FIRST CLASS CERTIFIED MAIL,*
10 Hill Street                            *POSTAGE PREPAID, RETURN RECEIPT*
Newark, New Jersey 07102            *REQUESTED NO. 9414726699042194046012*
Attn: David Helfgott

Re:   *Securitization:*      ***CSAIL 2018-CX11***
      *Argentic Loan No.:*   ***CSI18C11-44***
      *Borrower:*            ***Apex South Gate LLC***
      *Property:*            ***1920 W. Shield Street, Sherman, Texas 75092et. al***

Dear David:

Holland & Knight LLP is legal counsel to Noteholder[1] in connection with the Loan.[2]

The right to receive payments due under the Note, and the outstanding indebtedness evidenced by the Note, are secured by the liens, security interests, terms and provisions contained within the Loan

---

[1]  **"Noteholder"** means Wells Fargo Bank, National Association, as Trustee, on behalf of the Registered Holders of CSAIL 2018-CX11 Commercial Mortgage Trust, Commercial Mortgage Pass-Through Certificates, Series 2018-CX11, acting by and through the Special Servicer (defined below).

**"Special Servicer"** means Argentic Services Company LP, a Delaware limited partnership, not individually but solely in its authorized capacity as special servicer pursuant to that certain Pooling and Servicing Agreement, dated April 1, 2018.

[2]  **"Loan"** means the debt evidenced by the Note (defined below).

**"Note"** means that certain Promissory Note, dated January 31, 2018, executed by Original Borrower (defined below), as maker, payable to the order of Original Noteholder (defined below), as payee, in the original principal amount of $5,762,598.00.

**"Original Borrower"** means South Gate Apartments, LLC, a Texas limited liability company.

**"Original Noteholder"** means Natixis Real Estate Capital LLC, a Delaware limited liability company.

Securitization:  CSAIL 2018-CX11
Argentic Loan No.:  CSI18C11-44
Borrower:  Apex South Gate LLC
Property:  1920 W. Shield Street Sherman, Texas 75092 , et. al (SS1 Portfolio)

**EXHIBIT 5**                  NOTICE OF ACCELERATION

Apex South Gate LLC
January 25, 2023
Page 2

Documents.[3]   Pursuant to certain assignments, endorsements, and/or transfers of the Loan Documents, Noteholder is the current owner of the Loan Documents.  This Letter[4] supersedes any prior correspondence from Noteholder, and/or its respective agents and representatives.

This Letter constitutes written notice to Borrower that an Event of Default (defined in Section 8.1 of the Loan Agreement) has occurred because of Borrower's failure to timely and properly pay the Monthly Debt Service Payment Amounts for November, 2022, December, 2022 and January, 2023 as required in Section 2.2 in the Loan Agreement.

<u>Accordingly, and pursuant to Section 8.2.1 of the Loan Agreement, the maturity date of the Note is hereby accelerated and, as a result, the entire unpaid balance of principal of, and accrued interest on, the Note, as well as all other amounts required to be paid by the Loan Documents, are hereby immediately due and payable in full.</u>  You may contact Bruce Rickert, Director of Asset Management with Special Servicer, at (469) 609-2003 or brickert@argenticservices.com to determine the total amount due.

Further, Borrower is instructed to immediately wire transfer all rents received by Borrower into the restricted cash management account at Wells Fargo Bank, National Association within one (1) business day after receipt, as required by Section 3.1 of the Loan Agreement (and in any event, on the 1st, 4th, and 7th of each month hereafter).

Borrower is further advised that Noteholder intends to exercise its remedies available under the Loan Documents, at law, and/or in equity, which includes additional attorneys' fees and other amounts provided for in the Loan Documents and those remaining amounts which may accrue interest and for which Borrower, any guarantor, and/or any other obligated party may be liable.  In the event the Property[5] is sold at judicial or nonjudicial foreclosure sale for an amount insufficient to satisfy all amounts due and owing under the Loan Documents, Borrower, and/or any guarantor or otherwise liable party, may be liable for the deficiency, subject to applicable limitations on liability (including, but not limited to, constitutional limitations, statutory limitations and/or any limitations on liability contained within the Loan Documents or applicable law).

Noteholder is entitled to collect the rents from the Property pursuant to the assignment of rents set forth in Section 2 of the Deed of Trust and Chapter 64 of the Texas Property Code.  **In accordance with §**

---

[3]   **"Loan Documents"** means, collectively, the Loan Agreement (defined below), the Note, the Deed of Trust (defined below), the Assumption Agreement (defined below) and any and all other documents executed in connection therewith and/or relating in any way thereto.

**"Loan Agreement"** means that certain Loan Agreement, dated January 31, 2018, entered into by and between Original Borrower and Original Noteholder.

**"Deed of Trust"** means collectively, that certain Deed of Trust, Assignment of Leases and Rents and Security Agreement, dated effective January 31, 2018, executed and delivered by Original Borrower, as grantor, to Theresa B. Lyons, as trustee for the benefit of Original Noteholder, as beneficiary, recorded as Instrument Number 2018-2399 in the Real Property Records in Grayson County, Texas, covering, among other things, the Property.

**"Assumption Agreement"** means that certain Assumption Agreement, dated November 23, 2020, entered into by and among Noteholder, Original Borrower and Borrower (defined below) whereby Borrower assumed all of Original Borrower's obligations under the Loan.

**"Borrower"** means Apex South Gate LLC, a Delaware limited liability company.

[4]   **"Letter"** means this Notice of Acceleration letter.

[5]   **"Property"** means that certain real property, personal property and general intangibles described in the Deed of Trust.

Securitization: CSAIL 2018-CX11
Argentic Loan No.: CSI18C11-44
Borrower: Apex South Gate LLC
Property: 1920 W. Shield Street Sherman, Texas 75092 , et. al (SS1 Portfolio)

#183856504_v2 201148.00175                    **EXHIBIT 5**                    Notice of Acceleration

Apex South Gate LLC
January 25, 2023
Page 3

64.054 of the Texas Property Code, Noteholder hereby demands that Borrower pay to Noteholder the proceeds of any rents from the Property that have accrued but remain unpaid and that accrue on or after the date hereof.

All of Noteholder's claims, demands and accruals regarding the above described indebtedness, whenever made, and whether for principal, interest or otherwise, are intended to comply in all respects, both independently and collectively, with applicable usury laws, and are accordingly limited so that applicable usury laws are not violated.

Noteholder reserves the right to exercise, in such order as Noteholder elects, any one or more of the remedies available to Noteholder pursuant to the Loan Documents or otherwise at law and/or in equity (including, without limitation, actions to collect the rents and other income from the Property), and nothing contained in this Letter shall constitute a waiver of any rights of Noteholder to pursue such rights and remedies. Borrower shall not be entitled to expect an opportunity to cure any future default by reason of Noteholder's election to grant the cure periods set forth herein, and other than notices required in the Loan Documents, Borrower shall not be entitled to expect any additional notice of Borrower's failure to perform an obligation required by the Loan Documents by reason of Noteholder's election to provide the notices and specifications set forth in this Letter.

Borrower is hereby advised that negotiations, if any, between Noteholder and Borrower shall not constitute a waiver of Noteholder's right to exercise its rights and remedies under the Loan Documents or otherwise at law and/or in equity, including, but not limited to, those described in this Letter. Any such waiver shall not be effective unless set forth in writing, duly executed by an authorized representative of Noteholder. Borrower shall not be entitled to rely upon any verbal statements made or purported to be made by or on behalf of Noteholder in connection with any alleged agreement by or on behalf of Noteholder to refrain from exercising any of Noteholder's rights under the Loan Documents or otherwise at law or in equity.

Neither this Letter nor any statement by or on behalf of Noteholder as to the amount due and owing under the Loan Documents shall constitute a waiver of any rights of Noteholder to collect any additional amounts to which Noteholder may be lawfully entitled pursuant to the terms of the Loan Documents or otherwise at law and/or in equity. The specific enumeration of Events of Default contained in this Letter shall not constitute a waiver of any other default(s) or event(s) of default which may now or hereafter exist under the Loan Documents.

**NOTEHOLDER IS ATTEMPTING TO COLLECT THE INDEBTEDNESS EVIDENCED BY THE LOAN DOCUMENTS AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

To the extent your obligations have been discharged, dismissed, or are subject to an automatic stay of a bankruptcy order under Title 11 of the United States Code, this notice is for compliance and informational purposes only and does not constitute a demand for payment or any attempt to collect any such obligation. This notice is given pursuant to 11 U.S.C. Section 362(b)11, if applicable.

To assert and protect your rights as a member of the armed forces of the United States, if you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, please send written notice of the active duty military service to the sender of this notice immediately.

Securitization: CSAIL 2018-CX11
Argentic Loan No.: CSI18C11-44
Borrower: Apex South Gate LLC
Property: 1920 W. Shield Street Sherman, Texas 75092 , et. al (SS1 Portfolio)

#183856504_v2 201148.00175          NOTICE OF ACCELERATION

**EXHIBIT 5**

Apex South Gate LLC
January 25, 2023
Page 4

Sincerely,

Mark Weibel

cc:    Mr. Bruce Rickert (via email)
       Sam Murphy, Esq. (firm)

Securitization: CSAIL 2018-CX11
Argentic Loan No.: CSI18C11-44
Borrower: Apex South Gate LLC
Property: 1920 W. Shield Street Sherman, Texas 75092 , et. al (SS1 Portfolio)

#183856504_v2 201148.00175          EXHIBIT 5                    NOTICE OF ACCELERATION

Apex South Gate LLC
January 25, 2023
Page 5

## FOR NOTICE PURPOSES ONLY

David Helfgott                          *VIA FEDEX NO. 771121069716*
c/o Apex Equity Group LLC          *AND VIA FIRST CLASS CERTIFIED MAIL,*
10 Hill Street                        *POSTAGE PREPAID, RETURN RECEIPT*
Newark, New Jersey 07102          *REQUESTED NO. 9414726699042194046005*
(guarantor)

Glankler Brown, PLLC               *VIA EMAIL (jkahane@glankler.com)*
6000 Poplar Avenue, Suite 400        *AND VIA FEDEX NO. 771121107787*
Memphis, Tennessee 38119       *AND VIA FIRST CLASS CERTIFIED MAIL,*
Attn: S. Joshua Kahane, Esq.         *POSTAGE PREPAID, RETURN RECEIPT*
jkahane@glankler.com               *REQUESTED NO. 9414726699042194045992*
(borrower counsel)

Securitization: CSAIL 2018-CX11
Argentic Loan No.: CSI18C11-44
Borrower: Apex South Gate LLC
Property: 1920 W. Shield Street Sherman, Texas 75092 , et. al (SS1 Portfolio)

#183856504_v2 201148.00175          NOTICE OF ACCELERATION

**EXHIBIT 5**

# TRIGILD

EST 1976

A PROPOSAL FOR

## SS1 Multifamily Portfolio



West Wood Gardens Apartments - 221 Archer Drive, Sherman, TX 75090
South Gate Apartments - 915 South Travis Street, Sherman, TX 75090
The Terrace Apartments - 1920 West Shields Drive, Sherman, TX 75090

Presented to:

Abhinav Chaudhury
Argentic Services Company LP
AChaudhury@argenticservices.com
469-609-2018

trigild.com

EXHIBIT 6



# TRIGILD IVL OVERVIEW

Trigild IVL has successfully handled over 2,000 court-appointed fiduciary assignments throughout the country, operated multimillion dollar businesses, and liquidated billions of dollars of business, real estate, FF&E, and related assets. We have served in multiple roles under the auspices of numerous courts – including as Receiver, Bankruptcy Trustee and Chief Restructuring Officer. Equipped with decades of experience, Trigild IVL is an expert at devising long-term solutions and sound strategies that maximize recovery.

## Fiduciary Team Experience

- Since 1988, Trigild IVL has handled over 2,000 receivership appointments for over 3,500 real estate and business assets.
- Receiver professionals include Attorneys at Law who are admitted to the California and Texas bars, Licensed Real Estate Brokers, Paralegals, MBAs, and CPAs who are supported by in-house accounting, operations, marketing, HR, and IT professionals.
- Serving as federal equity receiver on a filing by the Securities and Exchange Commission (SEC) for an alleged Ponzi scheme.
- Served as receiver in 41 different states and Puerto Rico and the Virgin Islands with an aggregate value of nearly $50 billion.
- State and federal receiverships for hotels, restaurants, convenience stores, multifamily, office, industrial, retail, gas stations, truck stops, apartments, office buildings, assisted care facilities, retail centers, mobile home parks, residential subdivisions, marinas, self-storage units, senior care, and a water park.
- Approved as Receiver by the State of New York Unified Court System
- As receiver, has directed the sale of over 300 properties.
- General Counsel has extensive legal, financial, and real estate experience with significant transactional and litigation knowledge, including contract drafting and negotiation, processing of entitlements, alternative dispute resolution and trial work.
- 40-year-old property management firm specializing in distressed properties and operating businesses located throughout the United States.
- Extensive construction management experience on all asset types
- Trigild's staff has done expert witness work in matters concerning hotel liability, security, feasibility studies, "slip and fall", wrongful termination, value of leased premises, safety standards and operating performance.
- Bondable for virtually any dollar amount required.
- Frequent speakers to professional financial and legal groups on foreclosure and uses of receiverships.
- Host of the Trigild Lender Conference and Trigild Spring Conference - annual educational conferences on the latest trends for handling non-performing commercial loans.
- Publisher of the *Trigild Deskbook*, a state-by-state guide to Receivership and Foreclosure laws-by-state guide to Receivership and Foreclosure laws.

**DALLAS**
4131 North Central Expressway
Suite 775
Dallas, TX 75204
214/422/2395

**SAN DIEGO**
9339 Genesee Avenue
Suite 130
San Diego, CA 92121
858/242/1222

**NEW JERSEY**
24 Church Street
Montclair, NJ 07042
973/226/1950

**MIAMI**
17555 Collins Avenue
Suite 3301
Sunny Isles Beach, FL 33179
858/242/1222

**CHICAGO**
2215 Sanders Road
Suite 155 S
Northbrook, IL 60062
858/242/1222



# PROPOSED FEE SCHEDULE

**Receivership:**

Monthly:

$300 per hour
Minimum of $3,000

Reimbursement of all out-of-pocket expenses

**Property Management/Accounting:**        Third Party with Plaintiff Consent

**Construction Management per project (if needed)**

| | |
|---|---|
| The first $250,000 is billed at | 5% |
| The second $250,000 is billed at | 4% |
| All remaining amounts are billed at | 3% |

 

**DALLAS**
4131 North Central Expressway
Suite 775
Dallas, TX 75204
214/422/2385

**SAN DIEGO**
9339 Genesee Avenue
Suite 130
San Diego, CA 92121
858/242/1222

**NEW JERSEY**
24 Court Street
Montclair, NJ 07042
973/226/1950

**MIAMI**
17555 Collins Avenue
Suite 3301
Sunny Isles Beach, FL 33179
858/242/1222

**CHICAGO**
2215 Sanders Road
Suite 155 S.
Northbrook, IL 60062
858/242/1222



# SCOPE OF WORK & TERMS

___

# Receivership Services

**Receiver/Paralegal Documents & Communication**

- Provide a proposed Order Appointing Receiver to lender's legal counsel.
- As requested, appear telephonically in court
- Obtain and file Receiver's Oath and Bond.
- Prepare, serve parties of record and file Receiver's Opening Report.
- If required by the Court prepares, serve parties of record, and file all Receiver's Interim Reports.
- Prepare, serve parties of record and file Receiver's Final Account and Report.
- Prepare and file Receiver's Certificate(s) if applicable.
- As appropriate, file motions to close out Receivership.
- Upon discharge of Receiver, cancel Receiver's bond.

**Receivership Start-Up**

- Secure control of all property operations in coordination with a qualified property management firm.
- Secure control of property related bank account(s).
- Manage funds in property bank account(s), open new bank account(s) in the name of the Receivership Estate and transfer all funds to Receivership account(s).
- Change merchant account numbers, if any.
- Assess and oversee cash handling procedure.
- Manage operating income, if any.
- Review and audit accounts receivable/accounts payables.
- Evaluate and address status of bad debts and rental delinquencies.
- Review known pre-receivership operating expenses to assess validity of outstanding invoice(s) / claim(s) and facilitate payment to claimant(s).
- Examine State / City Tax Systems to determine need for Tax ID number.
- Acquire Employer Identification Number from Internal Revenue Service.
- Transfer or apply for new business and tax licenses as applicable.
- Determine status of property tax payments.
- Evaluate existing insurance coverage and secure additional coverage, as necessary.
- Secure sales and marketing materials.
- Notify utility companies of receivership.
- Transfer existing utility accounts or open new accounts for the Receivership Estate.
- Notify licensors of receivership.
- Transfer existing or apply for new licenses to ensure property compliance.
- Analyze property's security threat level to determine whether or not onsite security is needed.
- Audit property's life safety emergency protocols.
- Review key control and inventory administration keys; change locks where necessary.

**DALLAS**
4131 North Central Expressway
Suite 775
Dallas, TX 75204
214/422/2385

**SAN DIEGO**
9339 Genesee Avenue
Suite 130
San Diego, CA 92121
858/242/1222

**NEW JERSEY**
24 Court Street
Montclair, NJ 07042
973/226/1950

**MIAMI**
17555 Collins Avenue
Suite 3301
Sunny Isles Beach, FL 33179
858/242/1222

**CHICAGO**
2215 Sanders Road
Suite 155 S.
Northbrook, IL 60062
858/242/1222

# TRIGILD

- Evaluate payments of common area maintenance charges, if any, between property and adjacent properties and implement changes as appropriate.
- Identify and secure contracts and leases.
- Review, evaluate and consider renewal or replacement of relevant of property-related agreements.
- Perform other reviews as necessary, leasing documentation, leasing process, and cost segregation.
- Notify vendors of receivership.
- Conduct audit of current vendors to determine necessity of each.
- Hire / terminate vendors
- Complete and submit opening report that details the following to the court:
    o Property inspection and property condition report
    o Property and unit inventory
    o Inspection Photographs

**Receivership Closing**

- Notify vendors that Receivership is closing.
- Request final invoices.
- Send out accounts receivable notification.
- Send notification letter to the necessary license, permit, and tax agencies.
- Cancel insurance policies in name of Receivership.
- Coordinate transition of service and maintenance contracts from receiver to Plaintiff upon foreclosure.
- Contact utility companies to perform final meter reading.
- As appropriate, prepare and submit closing inventories.
- Notify tenants that Receivership is closing.
- Prepare or oversee final accounting.
- Close accounts and disburse funds.
- Prepare Receiver's final report for the court.
- Close out Receivership with court.

**DALLAS**
4131 North Central Expressway
Suite 775
Dallas, TX 75204
214/422/2365

**SAN DIEGO**
9339 Genesee Avenue
Suite 130
San Diego, CA 92121
858/242/1222

**NEW JERSEY**
24 Court Street
Montclair, NJ 07042
973/226/1950

**MIAMI**
17555 Collins Avenue
Suite 3301
Sunny Isles Beach, FL 33179
858/242/1222

**CHICAGO**
2215 Sanders Road
Suite 155 S.
Northbrook, IL 60062
858/242/1222

**TRIGILD**

# PROPOSED PROJECT TEAM



**CHRIS NEILSON,** *Managing Partner*

Chris Neilson, J.D., Managing Partner, oversees Trigild's business operations and serves as one of the firm's principal receivers. Federal and state courts throughout the United States have appointed Neilson as receiver over all types of commercial properties, including offices, malls, shopping centers, apartments, hotels, and golf courses. Neilson is also an approved fiduciary in the State of New York.

In addition to his receivership work, Neilson has handled the resolution of millions of dollars of unsecured judgments against debtors throughout the U.S. and has sourced and secured debtor-in-possession financing for fiduciaries through bankruptcy. Neilson is also a founding partner of P.D. Capital, a commercial real estate investment company focused on acquiring value-add retail projects.

Neilson began his legal career as an attorney practicing in the real estate and capital markets groups of an AmLaw 100 law firm where he focused on complex loan workouts for securitized business trusts (REMICs) through their special servicers.

Neilson received his J.D. from the Southern Methodist University Dedman School of Law where he was a member of the SMU Law Review and received a B.B.A. from Baylor University where he was the Outstanding Graduating Senior of the Hankamer School of Business.



**IAN LAGOWITZ,** *Managing Partner*

Ian Lagowitz founded IVL Group, where he has been involved in nearly one thousand receivership, fiduciary, and trustee appointments over the course of his 25-year real estate career. He is well versed in bankruptcy recovery, having been involved in disposing hundreds of retained assets from bankruptcy sales, reviewing approximately 10,500 proof of claims, and handling cures and assumptions for the transfer of operating leases.

In addition to his specialization in asset management and distressed assets, he is highly experienced in property evaluation, leasing, sales, redevelopment, brownfield redevelopment, mergers and acquisitions, institutional work-outs, asset recovery and property management.

Ian Lagowitz joined Onyx Equities in 2010. As Director of Receivership and REO Management, his responsibilities included serving as a court appointed receiver and managing agent, client relations, and oversight of the receivership and REO portfolio. Ian also led operations for 12 states. He was responsible for facilitating the opening of Onyx's regional offices in Atlanta, GA, Annapolis, MD, Charlotte, NC and Memphis, TN.

Prior to joining Onyx, Ian held key roles at a variety of notable organizations including DiLeo Associates and The Alman Group. Ian is a graduate of the University of Maryland. He is a licensed broker in the state of New Jersey. He is a board member of Prodigal Sons and Daughters, and he is currently the Associate Coach for the Seton Hall University Men's Golf Team.

**DALLAS**
4131 North Central Expressway
Suite 776
Dallas, TX 75204
214/422/2365

**SAN DIEGO**
9339 Genesee Avenue
Suite 130
San Diego, CA 92121
858/242/1222

**NEW JERSEY**
24 Church Street
Montclair, NJ 07042
973/226/1950

**MIAMI**
17555 Collins Avenue
Suite 3301
Sunny Isles Beach, FL 33179
858/242/1222

**CHICAGO**
2215 Sanders Road
Suite 155 S.
Northbrook, IL 60062
858/242/1222

# TRIGILD



**DAVID WALLACE,** *Chief Operating Officer and General Counsel*

David Wallace oversees Trigild's team in court-ordered receiverships for assets across the nation, successfully resolving distressed loans and preserving assets as a court-appointed fiduciary.

Mr. Wallace led a team of real estate asset managers, property managers, property accountants, accounting firms, and law firms in a bankruptcy liquidation of interests in a real estate portfolio that included more than 100 companies with equity and other management entities. The portfolio, valued at over $1.6 billion, included assets in the multifamily, student housing, and retail asset classes, and creditors recouped more than 60% of their claims.

Mr. Wallace also leads the legal team on a number of other fiduciary assignments, in bankruptcy, state, and federal courts. He has extensive experience in workouts related to CMBS and balance sheet loans, as well as transactions involving private equity, REITs, and sovereign wealth funds. Further, Mr. Wallace has overseen and served as lead counsel in a number of fraudulent transfer actions with ultimate recoveries in the tens of millions of dollars. Wallace also serves as a Ch. 11 trustee for a large real estate holding company with assets across multiple property types.

Wallace holds a B.B.A in Finance from Texas Christian University and a J.D. from Southern Methodist University. Prior to joining Trigild, Mr. Wallace worked as a financial analyst and also as an attorney with Fulbright & Jaworski, LLP. At Fulbright, Mr. Wallace represented a broad range of clients in both litigation and transactional matters. Mr. Wallace also represented a number of master and special servicers in connection with CMBS loan transactions and workouts. Clients included pharmaceutical and device manufacturers, banks, oil and gas companies, and other Fortune 500 companies across an array of industries.

Mr. Wallace lives in Keller, TX with his wife and two daughters, and enjoys playing golf in his free time.



**MAEGAN KALBERMATTEN,** *Director of Operations & Receiverships*

Maegan is a detail-oriented manager with over seven years of operational and receivership experience across multiple asset classes. She applies strong communication and leadership skills, process improvement tactics, and workflow optimization methods to elevate operational efficiencies.

Prior to joining Trigild IVL, Maegan served as Director of Asset Management and Receiverships at IVL Group. At IVL, Maegan was responsible for monthly reporting, bonds, bank account setup, operational and transitional takeovers, coordinating monthly calls with bond holders and special servicers, and managing client relations.

Prior to IVL, Maegan also served as Property Transition Manager and Asset Manager for Onyx Management Group. During her tenure with Onyx, Maegan was responsible for and implemented the operation of regional offices in Atlanta, Charlotte, Philadelphia, Memphis, and Annapolis. In addition, she transitioned over 75,000,000 SF in Receivership and REO Management assets.

Maegan is a graduate of Pennsylvania State University, with a bachelor's degree in Hotel, Restaurant, and Institutional Management

| DALLAS | SAN DIEGO | NEW JERSEY | MIAMI | CHICAGO |
|---|---|---|---|---|
| 4131 North Central Expressway | 9339 Genesee Avenue | 24 Church Street | 17555 Collins Avenue | 2215 Sanders Road |
| Suite 775 | Suite 130 | Montclair, NJ 07042 | Suite 3301 | Suite 155 S. |
| Dallas, TX 75204 | San Diego, CA 92121 | 973/226/1950 | Sunny Isles Beach, FL 33175 | Northbrook, IL 60062 |
| 214/422/2365 | 858/242/1222 | | 858/242/1222 | 858/242/1222 |



# THANK YOU

—

**We appreciate your consideration.**

Proposal Submitted by:

| | | |
|---|---|---|
| **Chris Neilson** | **Ian Lagowitz** | **Maegan Kalbermatten** |
| chris.neilson@trigild.com | ian.lagowitz@trigild.com | maegan.kalbermatten@trigild.com |
| 214/766/9272 | 973/226/1950 | 973/226/1950 |

Please visit our website at *www.trigild.com.*

**DALLAS**
4131 North Central Expressway
Suite 775
Dallas, TX 75204
214/422/2365

**SAN DIEGO**
9339 Genesee Avenue
Suite 130
San Diego, CA 92121
858/242/1222

**NEW JERSEY**
24 Court Street
Montclair, NJ 07042
973/226/1950

**MIAMI**
17555 Collins Avenue
Suite 3301
Sunny Isles Beach, FL 33179
858/242/1222

**CHICAGO**
2215 Sanders Road
Suite 155 S.
Northbrook, IL 60062
858/242/1222